## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

CHARLES WILLIAMS,

VALENCIA WILLIAMS,

and their MINOR CHILDREN,

*Plaintiffs,*

     v.

TOWN OF HANSON, MA.;

MICHAEL MIKSCH, in his official and supervisory capacities as the Chief of the Hanson Police Department;

BRENT PETERSON, individually and in his official capacities as a police officer for the Hanson Police Department; and

PAUL O'BRIEN, individually and in his official capacities as a police officer for the Hanson Police Department.

*Defendants.*

Civil Action No._____

**Complaint and Jury Demand**

"How the police mistreated me that night poisoned our life in this town. It was a turning point. Since the first six months, for the most part, had started out positive and encouraging with neighbors, like we hoped."

- Charles Williams, recounting his family's turbulent experience living from 2021–2024 in the rural suburb Hanson, MA.

"The same year they held 'a Bill Russell Day' 500 people attended, people broke into our house, spray-painted racist graffiti on the walls and worse… When the team travelled, vandals would come by and tip over our garbage cans. The police said 'racoons' were responsible. I asked how I could apply for a gun permit. Soon the racoons stopped."

- Bill Russell, recounting contrasting scenes concerning 1963–1964, during his family's 11-year stay in the rural suburb Reading, MA.

"I refuse to accept the view that mankind is so tragically bound to the starless midnight of racism…that the bright daybreak of peace and brotherhood can never become a reality."

- Martin Luther King, Nobel Peace Prize acceptance speech, 1964.

## COMPLAINT FOR RELIEF

Plaintiffs Charles Williams and Valencia Williams hereby sue the Town of Hanson, MA ("Hanson"), and Michael Miksch, Brent Peterson and Paul O'Brien (variously as "Officers of the Hanson Police Department") for their deprivation of their rights, and where appropriate, the rights of their minor children, under specific federal laws and amendments to the United States Constitution, and where appropriate, specific state laws of Massachusetts.

The gravamen of the lawsuit is a 911 call for police assistance that went crooked, resulting in an arrest for the felony assault with a dangerous weapon that the district attorney's office would later dismiss.

### Jurisdiction and Venue

1.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 over the federal claims concerning violations of the Second, Fourth and Fourteenth Amendments and 42 U.S.C. §§ 1983 and 1985(3). This Court also has supplemental jurisdiction under 28 U.S.C. § 1367 over the related claims under state law.

2.      Venue is proper in this judicial district under 28 U.S.C § 1391 because the events giving rise to this civil action occurred in this judicial district.

2

3.  This Court has personal jurisdiction over Defendant Town of Hanson, a municipality within the Commonwealth of Massachusetts, and over all individual Defendants because they reside in the Commonwealth of Massachusetts and they are employed by the Town of Hanson.

Parties

4.  Plaintiff Charles Williams is a parent of two boys and a girl and a Black Hanson homeowner since June, 2021. He is a lifelong resident of Massachusetts.

5.  Plaintiff Valencia Williams is a parent of two boys and a girl and a Black Hanson homeowner since June, 2021. She is a lifelong resident of Massachusetts.

6.  Defendant Town of Hanson is a municipality duly organized and existing under the laws of the Commonwealth of Massachusetts. Originally incorporated in 1820 with a population of 917 residents, Hanson now accommodates approximately 11,000 residents. It retains a flavor of colonial self-sufficiency with an elected Select Board and Town Administrator supervising many Committees and Boards performing integral functions. The Select Board oversees the Hanson Police Department ("HPD"). It denies or approves police officer suspensions and remedial settlement agreements. Hanson sits approximately 26 miles from Boston and borders Halifax, Pembroke, Hanover, Rockland, Whitman and East Bridgewater.

7.  Defendant Michael Miksch is an employee of Hanson and serves as Chief of the HPD. He supervises all HPD employees, including Defendants Peterson

and O'Brien. At all relevant times, Miksch acted in a supervisory capacity and as agent, servant and employee of Hanson. This action asserts claims against Miksch in his supervisory and official capacities. While Miksch has expressed what appears to be a genuine interest in a resolution, it is unclear whether inaction reflects a conflicting assessment of the facts or a disagreement with the Select Board.

8. Defendant Brent Peterson is an employee of Hanson and serves as a HPD police officer. At all relevant times, Peterson acted as an agent, servant and employee of Hanson. This action asserts claims against Peterson in his official and individual capacities.

9. Defendant Paul O'Brien is an employee of Hanson and serves as a HPD police detective. At all relevant times, O'Brien acted as an agent, servant and employee of Hanson. This action asserts claims against O'Brien in his official and individual capacities.

<u>Factual Allegations</u>

<u>Part I</u>

10. Nearly sixty years has passed since Celtics legend Bill Russell helped further integrate Reading, the northwest suburb of Boston, and Martin Luther King, Jr. attended the Noble Prize ceremony in Oslo, Norway, but the bravery and moral clarity they displayed are still required today. For young Black families pursuing a slice of the American dream by moving to the suburbs where schools are better, housing is more affordable, crime is less and nature is near, the purchase regularly comes with strings attached: exposure to racially-motivated overt and

covert mistreatment by fellow residents, law enforcement or elected town officials whether conspiring or acting individually.

11.    Standing on the shoulders of giants like Dr. King, Bill Russell and Rosa Parks, the Plaintiffs, a young Black married couple named Charles and Valencia Williams, parents to two boys with a girl on the way, determined it was in the family's best interest to buy a home in the rural southern suburb of Hanson, Massachusetts.

12.    On June 30, 2021, they purchased a home at 115 Leon Court.

13.    The three-bedroom home is located less than a mile from the picturesque West Monponsett Lake.

14.    As for Leon Court, the unpretentious residential street held five other homes, numbers 118, 81, 73, 55 and 48, along a dirt road without any street lights.

15.    Charles and Valencia felt like they found a hidden gem.

16.    Over July and August they settled in. They mostly spent summer exploring the nearby woods, meeting friendly and unfriendly neighbors and learning directions for how to get places around town. In fall, the boys entered school. The parents continued working in their meaningful jobs. As a conductor for the MBTA's commuter rail service, Charles transported thousands of riders daily. As a nurse home health specialist, Valencia treated many patients situated in and around Hanson needing medical care.

17.    During the Covid-19 pandemic years, both parents were considered essential workers and had kept working straight through the many long lockdowns.

18.     Charles and Valencia's jobs require they interact with the public—heterogenous people spanning all walks of life—every day. Early in life, each demonstrated this facility. In his and her respective high schools, Charles was elected class president and Valencia was elected class secretary. Accordingly, the amiable couple reasoned they could settle in Hanson and contribute their positive presence to enriching the still-mostly-white town of just over 11,000 residents.

19.     According to the census, Hanson had zero Black residents in 2010.[1]

20.     By 2020, Hanson had 90 Black residents.

21.     Like Martin Luther King Jr. prophesied nearly sixty years ago, Charles and Valencia were optimistic that "the bright daybreak of peace and brotherhood…can become a reality" in the Hanson of today.

22.     In this regard, Charles felt that he had less reason to fear the Hanson police than the average Black man—despite his sturdy build and dark skin—because he was close to becoming a police officer. Already employed in public service, Charles had grown sufficiently interested in joining the police force that he took and passed the written police exam. On August 6, 2021, the state notified Charles that he had scored 88, far above the passing score of 70. Exhibit E. Now Charles was eligible to be hired by a police department in Massachusetts.

23.     Indeed, the second week of January 2022, Charles discussed potential job openings with the Hanson police chief Michael Miksch in person. Following this pleasant meeting, Charles felt that his family would be safer from harm in Hanson.

---

[1] Valencia, Milton J, "Priced out of the city, Black Bostonians are finding their dream homes on the South Shore." Boston Globe, May 7, 2022.

24.     Meeting the police chief felt like a wise precaution.

25.     Then shortly after 1 a.m. on January 20, 2022, it all unraveled. As Charles completed his nighttime commute by turning into the now-more-familiar Leon Court street where he owned the home at 115, he spoke to his wife Valencia on the phone. At eight months pregnant, Valencia's routine was to wait up for Charles to return home for a nightly reunion.

26.     But Charles found a car blocking entry to his driveway. It was controlled by a white male Charles had never seen before and held three other white males Charles had never seen before.

27.     Charles let the strangers know he had to enter his driveway.

28.     Defendant Dylan Leighton leapt from the idling car, yelling invective and charging Mr. Williams with threatening motions. "You own this house. I own this motherfucking street…"

29.     The three other men also left the car to corner Mr. Williams.

30.     They instilled fear for his life in Mr. Williams.

31.     In the foreground, Charles could see three more white men streaming from the idling Mazda 6 sedan threatening to engulf him. In the background, Charles could see Valencia stepping onto the porch to consummate their nightly ritual.

32.    A primal fear gripped Charles: "I'm going to become the new Ahmaud Arbery." Arbery, 25, had been jogging two years earlier in Georgia when three white men chasing in a truck murdered Arbery.[2]

33.    Despite being cornered, in order to escape what he reasonably believed to be imminent serious bodily injury or death, Charles exerted no force whatsoever against his assailants. Instead, Charles merely signaled self-defense.

34.    Signaling self-defense bought Charles space and time to call 911 for police help. Specifically, what did Charles do? He removed the folding work knife from his pocket and pointed it toward the ground.

35.    As a would-be victim of violent crime or a mugging at the hands of the four assailants, Charles justifiably feared for his own safety, the safety of his pregnant wife standing alone on the porch, and the safety of his two sons asleep upstairs in the house.

36.    The defensive gesture stopped the posse: the enraged ringleader redirected while the other three men reconsidered.

37.    In the resulting buffer space, Charles immediately called 911: He told the dispatcher that he was under attack without betraying any weakness to the surrounding four white men who were listening closely.

38.    The dispatcher alerted police in the area.

39.    By a lucky or unlucky fluke, an officer hearing the call was patrolling a few streets away in his cruiser. The responding officer arrived on the scene while

---

[2] Fausset, Richard. "Two in Arbery Case Sentenced Again to Life in Prison; Third Man Gets 35 Years." New York Times, August 8, 2022.

Charles and the dispatcher were still talking. The recording of the call shows Charles telling the dispatcher, "the police are here," before ending the call.

40.    In fact, the responding officer, Defendant Brent Peterson, arrived so promptly that he entered a crime scene still hot and underway. The ringleader Dylan Leighton was threatening Charles and departing and the other three men were lurking near the car. After Charles pointed out the ringleader to Defendant Brent Peterson, the officer "yelled to the male [Dylan] and directed him to stop." According to the police report,[3] before Charles could get another word in edgewise or explain what occurred fully, the other three men blurted out that Charles had "pulled a knife on them." Meanwhile Dylan Leighton reversed direction and returned to the scene and approached Officer Peterson.

41.    Now Officer Peterson literally found himself standing in Charles Williams shoes being menaced by Dylan Leighton. By Officer Peterson's own accounting, "he was obviously intoxicated and refused to listen to any directives given to him. Multiple times Leighton approached me aggressively with a raised voice. After the third time this occurred, Leighton was placed in handcuffs and detained for my safety."

42.    Officer Peterson, as a uniformed police officer, felt compelled to exercise self-defense against Dylan Leighton by placing Leighton in handcuffs for Officer Peterson's safety.

---

[3] Narrative for Patrol, Brent M Peterson, Ref 22HAS-1-AR. See Exhibit B.

43.    Standing in Charles Williams shoes, Officer Peterson knew that Dylan Leighton was a dangerous aggressor and that Charles Williams was the innocent victim who had dutifully called 911.

44.    Officer Peterson could likely smell the liquor on Dylan's breath and in the breathing of the other three assailants.

45.    But in his written police report, Officer O'Brien would omit and conceal the most important evidence: As Charles Williams was attempting to park in his driveway, the victim was ambushed by hostile strangers who outnumbered the victim four to one.

46.    Besides Officer Peterson's firsthand knowledge, there was a second eye-witness who had observed the sequence of events transpire from her vantage point on the front porch at 115 Leon Court: Valencia Williams, Mr. Williams' loving wife. Incredibly, the police never interviewed or spoke to the eight-months pregnant Valencia Williams that night[4] or since.

47.    In contrast, Officer Peterson and Defendant Detective Paul O'Brien showered lavish attention on the obvious instigating wrongdoers: the police, wrongdoers and a wrongdoer's father huddled together conferring out of earshot for so long that the obvious victims tired of waiting and went inside their home to stay warm at 115 Leon Court.

48.    This flagrant unequal treatment by the police downgraded Charles and Valencia to second-class citizens.

---

[4] As the police report notes, auxiliary units from Whitman had arrived, creating a scene where many police officers were present, at least initially.

49.     Next, under a dead-of-night, starless sky, we assert Defendant police officers and the four posse members (and potentially their supporter(s)) agreed to frame Charles Williams for the crime assault with a dangerous weapon, a felony, for the express purpose to remake Mr. Williams from innocent victim to the culprit.

50.     By doing so, the Defendant police officers and the posse members conspired to deprive Charles Williams of his liberty in violation of the Fourth and Fourteenth Amendments.

51.     By doing so, the Defendant police officers and the posse members conspired to violate Charles Williams federal civil rights.

52.     Framing Charles Williams would accomplish dual objectives: first, it would injure Mr. Williams and his family; second, it would exonerate or "clear" the actual wrongdoers Dylan Leighton, Ryan, Kennedy, Nico Flamos and Joseph Hoeg, who had ambushed and cornered Mr. Williams in front of his house after midnight—causing Mr. Williams reasonably to fear great bodily harm, for his life and for the physical safety of his heavily pregnant wife and sleeping young sons.

53.     The Defendant police officers did more than take a substantial step in furtherance of the conspiracy: They carried out the entire plan to a tee.

54.     Defendants Officer Peterson and Detective O'Brien actually knew Charles Williams was the innocent victim.

55.     Based on the totality of the circumstances, Officer Peterson and Detective O'Brien lacked the legitimate probable cause needed to execute a warrantless arrest of the innocent victim Charles Williams.

11

56.     Nonetheless, to advance the conspiracy, Defendants Officer Peterson and Detective O'Brien belatedly visited the Williams' home not for the purpose of pursuing justice and seeking the truth, but to the contrary—for the prohibited purpose to frame. Inside the Williamses' home, Defendants Peterson and O'Brien requested and received the folding work knife without asking the maker of the 911 call, Charles Williams, or the eye-witness to the incident, Valencia Williams, any impartial investigatory questions. The perfunctory interaction lasted a few minutes before Charles Williams was taken away wearing pajamas, handcuffed and paraded past the awakened new neighbors into the police car.

57.     Valencia Williams, eight-months pregnant, with two sons in the house, was left distraught believing she would never again see her husband Charles Williams alive.

58.     Despite lacking legitimate probable cause, Officer Peterson and Detective O'Brien arrested and charged Charles Williams with the felony assault with a dangerous weapon while refusing to arrest and charge the posse members Dylan Leighton, Ryan Kennedy, Nico Flamos or Joseph Hoeg with any offenses.

59.     As it happens, the district attorney's office, upon later review, would dismiss the charges against Charles.

60.     On January 19, 2022, Plaintiff Charles Williams was looking forward to the birth of his daughter, relishing being a positive role model for his two impressionable young sons and being a Black Hanson homeowner. Most of all, Charles took pride in providing financially for his growing family.

61. The next early morning, after being seized and charged with the felony assault with a dangerous weapon by the Hanson Police Department, Charles spent every second worrying about being imprisoned and being unable to protect or provide financially for his isolated family.

62. During the harrowing period the felony charges were pending, and until a judge granted the petition to seal the record of the matter, the Criminal Offender Record Information (CORI) meant Charles was excluded from attending school events for his kids and prevented from applying for promotions in his career.

63. During this ordeal, Charles suffered pecuniary injury, deteriorating health, reputational damage, humiliation, acute frustration, depression and stress.

64. Take for example, his weight gain: Charles ballooned up to 318 pounds, needing surgery to return to his previous weight.

65. Though his attorney was eventually able to get record of the dismissed felony charges sealed, the imprint of the experience endures.

66. The blatant unconstitutional conduct by Hanson police officers inflicted grave injury on Charles Williams, Valencia Williams and their children that may never heal. In the months since the incident and ordeal occurred, the fallout and harm from the message the police mistreatment sent to the posse and the entire Hanson community—that this new Black family in town was unprotected fair game to be assaulted, harassed and harmed with impunity—has worsened.

67. The Williamses tried persuading Hanson to recognize and rectify the misconduct and harm flowing from the incident. But these sustained outreach

13

efforts proved futile. Exhibits D and E. Having exhausted the channels for securing a voluntary remedy from local government authority, the Williamses look to federal court as the only viable recourse.

68. The Williamses allege all facts in this complaint on their personal knowledge or information and belief.

### Part II

69. Spanning at least the years 2004 to 2012, the Hanson police department was rife with mismanagement, corruption and secrecy.[5] In October 2012, Hanson Police Chief Edward Savage III resigned in disgrace for falsifying arrest and crime statistics, violating the state's conflict-of-interest laws by distorting an investigation to benefit a friend and soliciting police officers to do his undergraduate coursework so as a graduate he could collect higher pay.

70. Notably, Savage commanded the department for a decade.

71. Overall, he worked in the Hanson police department for 26 years.

72. Leading by example, Savage one year falsely reported 1,027 citations when the correct number was 308.

73. Shocked by the systematic malfeasance, a Hanson resident mourned: "If a statistic is provided, there has to be something to back it, particularly in the police department, because the core of the police department's mission is the truth."

---

[5] Ronan, Patrick, "Ex-Hanson police chief said to have inflated arrest statistics." Patriot Ledger, November 17, 2012.

74.    A second resident expressed deep misgivings about the department's integrity, suggesting the department should be investigated to see what else has been covered up.

75.    In 2013, Hanson hired a new police chief: Michael Miksch.[6] The affable Miksch remains commissioner today.

76.    Presumably, Miksch is tasked with upgrading the department's integrity, credibility and professionalism.

77.    Discovery will provide greater opportunity to evaluate the culture and innerworkings of the Hanson police department since then but especially from 2017 to 2022.

78.    But we do know that six months _after_ the incident, on July 19, 2022, Chief Miksch reported to the Hanson Select Board on the need for the Hanson Police Department to update policies and processes to meet federal and state standards. [7]

79.    Unsurprisingly, changing an ingrained internal police department culture of falsification, corruption and dysfunction can't happen overnight. [8]

80.    In fact, eradicating problems can take a generation.

81.    In the interlude, symptoms of the collapsed culture can surface in how police wield power over residents.

---

[6] Staff Writer, "Carver Police Chief Mike Miksch accepts job in Hanson." Carver Reporter, May 31, 2013.
[7] Source, Hanson Select Board meeting minutes, July 19, 2022. Notably, this is six months _after_ the incident took place on January 20, 2022.
[8] Maria Ponomarenko, _The Small Agency Problem in American Policing_, 98 N.Y.U. L. Rev. __ (forthcoming 2024)

82.    Among the most intractable challenges for smaller town police departments like Hanson that are rebuilding trust can be resisting how certain residents can expect police officers to bend or break the law for his or her benefit.

83.    And there was continuity of employees in the Hanson police department and residents living in the town between the corrupt Chief Savage regime and the successor Chief Miksch regime.

84.    When Charles Williams called 911 for emergency assistance, he interacted with these tangled patterns in Hanson, but rightfully expected the police department to rise to the occasion.

85.    Despite this expectation and reliance, Charles Williams misplaced trust in the police response being unbiased is irrelevant because Charles Williams was desperate.

86.    To an uncanny degree, federal laws and the Thirteenth, Fourteenth and Fifteenth Amendments to the Constitution target the specific fact pattern unfolding over the curtilage of the Williams home at 115 Leon Court: white marauders attacking law-abiding Black people as a strategy to foil the exercise of fundamental rights intrinsic to full citizenship.

87.    The Ku Klux Klan Act of 1871 unleashed new federal authority to cope with the menace of terrorist organizations and groups killing and lynching Blacks to reverse the gains of the Civil War by force at the local level.

88.    Otherwise, local governments would keep undermining the promise of Reconstruction by not defending Blacks from local violence and intimidation.

89.     In its own way, the Massachusetts Civil Rights Act (MCRA) of 1979—inspired by the tragic shooting of Black high school football player Darrel Williams during a game at Charlestown High—targets racially motivated violence.[9]

90.     The ambush Charles Williams encountered in front of his home in the wee hours of January 20, 2022, comprised a paradigm civil rights violation.

91.     This specific paradigm scenario appears in the text of all three of 18 U.S.C. § 241 and 42 U.S.C. § 85 (3) and the Massachusetts Civil Rights Act:

   a. "If two or more persons go in disguise or on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured…"

   b. "If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of person of the equal protections of the laws, or of equal privileges and immunities under the laws…"

   c. "Whenever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of right secured by the constitution or laws of the commonwealth…"

---

[9] Hoffman, David A., "The Massachusetts Civil Rights Act: Recent Developments." Massachusetts Governmental Liability Reporter, December, 1989. p. 78-85.

92.     Fortunately, Charles Williams' quick-thinking 911 call to the police averted what had the potential to culminate in a gruesome attack.[10]

93.     It should be mentioned how the Hanson police in the dispatcher, the patrol blueprint, and the patrolling Officer O'Brien did excel at one part of effective policing: they aced the response time.

94.     But this feat was squandered by how they mishandled the remainder, falling far short of the measuring stick in the process.

95.     At least seven conspicuous factors ranging from (1) the person placing the 911 call (2) time of night (3) the sensitive location (4) the lopsided numbers of four to one involved (4) the racial mix (5) the before activity (6) Valencia's presence and (7) the need for handcuffing to restrain Dylan Leighton, would have alerted the antenna of a reasonably discerning police officer to suspect as untrustworthy and self-serving the allegations blurted by posse members.

96.     This totality of the circumstances test showed Charles Williams to be the innocent victim.

97.     Defendants Officer O'Brien and Detective Peterson had time to consider a prudent course of action because they were unhurried and not required to make a split-second decision under duress or fear.

98.     Imagine the officer's lucid response if a white Hanson homeowner called to report being ambushed by four menacing Black men in his driveway after 1 a.m. in the morning.

---

[10] But paradoxically at the cost of his own liberty.

18

99.    What's more, Defendant police officers knew at least one of the posse members to be "a notorious town troublemaker."

100.    Defendant police officers knew at least one or all of the posse members were intoxicated or "drunk."

101.    Additionally, given the potential danger of the ambush, it is curious that the Defendant police officers didn't search any posse members for rope or weapons nor use the menacing conduct as grounds for searching the Mazda 6 sedan for rope or weapons.

102.    Especially since the idling Mazda 6 sedan itself was a potent weapon.

103.    Under Massachusetts law G.L. c. 265, § 15B, assault with a dangerous weapon is a felony punishable by up to five years in prison.

104.    It takes two forms:

   a. Attempted Battery. To prove an accused guilty, the state must prove that beyond a reasonable a doubt: (1) the accused intended to commit a battery upon person X (2) the accused took some overt step toward accomplishing that intent (3) the accused came reasonably close to doing so and (4) the accused committed the assault with a dangerous weapon.

   b. Immediately Threatened Battery. To prove an accused guilty, the state must prove that beyond a reasonable doubt: (1) the accused intended to put person X in fear of an immediate battery (2) the accused engagement in some conduct toward person X which person X

19

reasonably perceived as immediately threatening a battery and (3) the assault was committed with a dangerous weapon.

105.    Charles Williams lacked the specific intent required to be eligible for committing assault with a dangerous weapon.

106.    The police report omits how Charles Williams pointed the folding work knife toward the ground.[11] This gesture is communicative not "assaultive" under the factors specific to this case. That Mr. Williams immediately called 911 shows his peaceful intent.

107.    Can a person trying to parking in his home's driveway, who is startled and outnumbered four to one by assailants, objectively cause the assailants to fear serious impending bodily harm by pointing a folding work knife toward the ground and instantly calling 911?

108.    Applied to the factors involved in this case, the question seems absurd or contrived. Plainly, the answer must be no.

109.    If anything, Williams was communicating a preference for peaceful resolution as evidenced by him instantly calling 911 for police assistance.

110.    Again, in the same[12] situation, when encountering the enraged Dylan Leighton, Defendant Officer Peterson resorted to handcuffing for protection.

---

[11] An experienced train conductor working for the MBTA's Commuter Rail, Mr. Williams knew how to signal in a non-threatening manner when faced with danger.

[12] The predicament Officer Peterson faced was less intense for a number of reasons: (1) he operated as a police officer dressed in full uniform (2) he had no reason to fear the four posse members and (3) Officer Peterson knew soon backup would arrive.

20

111.    In another significant way, the police report incriminates and insulates, stretching credulity past the snapping point.

112.    Insidiously, it both spoon feeds a confession and implants a defense.

113.    It attests that Dylan Leighton exited the Mazda 6 sedan and belligerently confronted Charles Williams without removing his hands from his pockets. But climbing out of a sedan without using both hands is not possible.

114.    It wasn't possible physically for a belligerent Dylan Leighton, especially in his drunken condition, to climb out of the Mazda 6 sedan, and take the 15-20 steps necessary to confront and threaten Mr. Williams while keeping his hands in his pockets the entire time.

115.    This would have caused Dylan Leighton to lose his balance.

116.    Alternatively, if somehow Dylan Leighton had managed a magician's trick of keeping his hands in his pockets while performing these acts, the unnaturalness of Dylan Leighton keeping his hands in pockets would have alarmed Mr. Williams by causing Mr. Williams to believe the enraged Dylan Leighton possessed a weapon or rope he was readying to unleash.

117.    We assert this surgically inserted detail in the police report reflects a conspiracy to frame and harm Mr. Williams while clearing Dylan Leighton, Ryan Kennedy, Nico Flamos and Joseph Hoeg for any wrongdoing.

118.    By this pernicious handiwork, the transformation of Charles Williams from law-abiding, innocent, home-owner victim to stereotypical violent Black criminal was rendered.

21

119.     A second smoking gun is the invisibility of Valencia Williams in the police report. Though Valencia Williams, an eight-months pregnant wife and mother, was present as an eye-witness to the entire sequence of events, and present when the police belatedly knocked on the door at 115 Leon Court, erasing her presence from the narrative was key to dehumanizing Charles—a requirement for his vilification.

120.     Many of the serious injuries inflicted on Plaintiffs Charles Williams, Valencia Williams and their minor children are worsening rather than ameliorating because they feel vulnerable.

## Causes of Action

### Count 1
### 42 U.S.C. § 1983, Fourth and Fourteenth Amendments
### (Unlawful Seizure Claim Against Defendants Peterson and O'Brien)

122.     Plaintiff Charles Williams realleges and incorporates each and every allegation contained in the preceding paragraphs.

123.     The Fourth and Fourteenth Amendments of the United States Constitution protect individuals against unreasonable search and seizure.

124.     At all relevant times, Defendants Peterson and O'Brien were employed by the Town of Hanson and acted under color of state law.

125.     Defendants Peterson and O'Brien seized Charles Williams despite actually knowing he was the innocent victim of an ambush by four men as he attempted to park in his driveway at approximately 1:30 a.m. in the morning after a long day's work guiding the MBTA's commuter rail.

22

126.    Returning home after a long day's work and reuniting with a pregnant spouse and checking in on your sleeping sons represents the quintessential exercise and enjoyment of liberty in America.

127.    By seizing Charles Williams without just cause, Defendants Peterson and O'Brien deprived Charles Williams of his rights under the Fourth and Fourteenth Amendments to be free from illegal seizure.

128.    In arresting Plaintiff Charles Williams, Defendants Peterson and O'Brien took Mr. Williams from his home in the wee hours of the morning wearing his sleeping clothes, paraded him past awakened neighbors in handcuffs and placed him in the squad car.

129.    At the Hanson Police Station, Officer Peterson wrote the incident report charging Mr. Williams with one count of felony assault with a dangerous weapon, M.G.L. c. 265 § 15B, punishable by up to five years in prison.

130.    As a direct and proximate cause of their actions, Defendants Peterson and O'Brien deprived Charles Williams of his Fourth and Fourteenth Amendment rights, in violation of 42 U.S.C. § 1983.

131.    Based on this charge, the Defendants deprived Mr. Williams of his liberty by placing him in a cell, from which he was not free to leave.

132.    Only after his wife Valencia Williams paid a cash bail of $240 was Charles Williams freed.[13]

---

[13] Subject to restraints.

23

## Count 2
## 42 U.S.C. § 1983, Fourth and Fourteenth Amendments
## (Malicious Prosecution Claim Against Defendant Peterson)

133. Plaintiff Charles Williams realleges and incorporates each and every allegation contained in the preceding paragraphs.

134. The Fourth and Fourteenth Amendments of the United States Constitution protect individuals against the wrongful initiation of charges without probable cause.

135. For seeking redress for the wrongful initiation of charges without probable cause, the proper cause of action is malicious prosecution.

136. Because the district attorney later dismissed the felony assault with a dangerous weapon charge against Plaintiff Charles Williams, Mr. Williams can satisfy a threshold for bringing a claim for malicious prosecution under 42 U.S.C § 1983.

137. Furthermore, Plaintiff Williams can satisfy the other related elements:

   a. Defendants knew Plaintiff was the innocent victim of an ambush by the four posse members, but nonetheless initiated criminal proceedings against Mr. Williams in the form of arrest and initiating the charge[14] of assault with a dangerous weapon;

   b. Defendants were motivated by ulterior motives other than pursuing justice in the form of clearing Dylan Leighton and the three other posse members of wrongdoing and framing and hurting Mr. Williams;

---

[14] At the Hanson Police Station, Officer Peterson wrote the incident report charging Mr. Williams with the one count of felony assault with a dangerous weapon, M.G.L. c. 265 § 15B, punishable by up to five years in prison.

c. As a direct consequence of the initiation of the criminal proceedings, Mr. Williams suffered a tangible deprivation of liberty. Specifically, Charles was:

  i. Arrested, jailed and freed only after Valencia paid cash bail in the wee hours of January 20, 2022.

  ii. Tracked by Criminal Offender Record Information (CORI) and banned from applying for career promotions and banned from participating in school events involving his two sons.

  iii. Freed burdened by a protective order covering Dylan Leighton, the actual culprit, living two doors down at 73 Leon Court.

  iv. Required to hire lawyers to contest the charges.

  v. Required to hire lawyers to seal the record of the charges.

  vi. Required to appear in court several weekdays.

d. As a result of the initiation of the criminal proceedings, Mr. Williams also suffered health problems and significant emotional and reputational damages.

138. On January 19, 2022, Plaintiff Charles Williams was looking forward to the birth of his daughter, relishing being a positive role model for his two impressionable young sons and being a Black Hanson homeowner. Most of all, Charles took pride in providing financially for his growing family.

139. The next early morning, after being seized and charged with the felony assault with a dangerous weapon by the Hanson Police Department, Charles spent

every second worrying about being imprisoned and being unable to protect or provide financially for his stranded family.

**Count 3**
**42 U.S.C. § 1983, Second and Fourteenth Amendments**
**(Self-Defense Claim Against Defendants Peterson and O'Brien)**

140.    Plaintiff Charles Williams realleges and incorporates each and every allegation contained in the preceding paragraphs.

141.    The Second and Fourteenth Amendments of the United States Constitution protect individuals right to exercise lawful self-defense.[15]

142.    At all relevant times, Defendants Peterson and O'Brien were employed by the Town of Hanson and acted under color of state law.

143.    When Charles Williams reacted to being ambushed and fearing great bodily or harm or even death, not by exerting any force whatsoever against his four ambushers, but merely by signaling self-defense paired with instantly calling 911 for police assistance, he exercised the purest form of self-defense—fending off criminals.

144.    In this factual context, reasonably signaling self-defense was the least amount of "force" necessary to stop the would-be attack, and is a clearly established constitutional right, especially when paired with instantly calling 911 for police assistance.

145.    Any objectively reasonable and competent police officer would recognize Charles Williams as the innocent victim in this specific context.

---

[15] District of Columbia v. Heller, 554 U.S. 570 (2008)

146.    In constitutionalizing the common law right to self-defense against violent criminal threat, the Second Amendment guarantees Charles Williams' right to exercise pure self-defense against the four posse members in front of his house.

147.    Since Reconstruction Era, the proponents of safeguarding Black freedom, equality and participation in society have recognized the need for Black adults to retain the right to self-defense and not be stripped of it and left at the mercy of vigilantes or criminal threats.

148.    In his own way, Bill Russel embraced this view when he explored integrating the rural suburb of Reading more than 60 years ago.

149.    As defined here, pure self-defense is a clearly established constitutional right and common law right consistent[16] with the major thread winding through state laws[17] and doctrines covering broader contingencies.

150.    Defendants Peterson and O'Brien knowingly trivialized and sanitized the unlawful threatening conduct of ringleader Dylan Leighton and posse members Ryan Kennedy, Nico Flamos and Joseph Hoeg.

151.    The police acted so for the improper purpose of "clearing" the obvious wrongdoers and framing the innocent victim, Charles Williams.[18]

---

[16] In other words, as a key piece of the pre-constitutional inheritance integrated into the founding document.

[17] The Washington State Laws, RCW 9A.16. 110, **Defending Against Violent Crime,** codifies this exercise succinctly: "No person in the state shall be placed in legal jeopardy of any kind whatsoever for protecting by any reasonable means necessary, himself or herself, his or her family, or his or her real or personal property, or for coming to the aid of another who is in imminent danger of or the victim of assault, robbery, kidnapping, arson, burglary, rape, murder, or any other violent crime as defined in RCW 9.94A.030."

[18] Researchers call this police practice of concealing wrongdoing or shifting culpability as creating "cover charges."

152.    By seizing Charles Williams for lawfully exercising pure self-defense, Defendants Peterson and O'Brien deprived Charles Williams of his fundamental rights under the Second and Fourteenth Amendments.

153.    As a direct and proximate cause of their actions, Defendants Peterson and O'Brien deprived Charles Williams of his Second and Fourteenth Amendment rights, in violation of 42 U.S.C. § 1983.

154.    This injury is excruciating because it left Charles Williams in a quandary—Personally, he faces the risk of recurring danger while stripped of any right or semblance of merely signaling self-defense, while he invites recurring prosecution by calling 911 for police assistance to escape looming violence.

**Count 4**
**42 U.S.C. § 1983, Fourteenth Amendment**
**(Equal Protection Selective Enforcement Claim**
**Against Defendants Peterson and O'Brien)**

155.    Plaintiff Charles Williams realleges and incorporates each and every allegation contained in the preceding paragraphs.

156.    The Fourteenth Amendment of the United States Constitution guarantees individuals equal protection of the laws: "No State shall make or enforce any laws which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

157.    At all relevant times, Defendants Peterson and O'Brien were employed by the Town of Hanson and acted under color of state law.

158.    This selective enforcement claim is distinguishable from precise considerations and requirements involved in pleading a selective prosecution claim.

159.    On the very early morning of January 20, 2022, Defendants Peterson and O'Brien responded to a 911 call by Charles Williams for emergency assistance outside his home. Once the scene was brought under control and judged secure, the police officer and detective had the precious luxury of time, space and safety to determine what to do.[19]

160.    As the person calling 911 for police assistance, Charles Williams generally would be considered the victim by a strong presumption.

161.    By all accounts, Charles and Valencia were the only two sober people.

162.    As emphasized elsewhere, Defendant Officer Peterson had perceived Dylan Leighton so menacing and defiant that he handcuffed him.

163.    On information and belief, the police officers present and the Defendant police officers knew members of the posse from past infractions.

164.    By all accounts, the posse's car, the Mazda 6, was still idling and blocking the driveway to Charles and Valencia's home.

165.    As for the Williamses, Valencia was visibly pregnant, and a short conversation with Charles would have surfaced his job as a conductor for the MBTA's commuter rail. How they bought the 115 Leon Court home nearly seven months ago.[20]

---

[19] Because an auxiliary unit from Whitman had arrived, there was ample manpower.
[20] Also, it is possible the police officers knew about Charles and Valencia before responding to the call.

166. But beneath the heavens, the Defendants took their time in abusing their discretion with racial animus being the motivating factor.

167. Mainly because Charles was a Black Hanson homeowner, the police felt he was expendable.

168. Defendants Peterson and O'Brien selectively applied the law of assault to ensnare Charles.

169. Defendants Peterson and O'Brien selectively applied the law of self-defense to ensnare Charles.

170. Defendants Peterson and O'Brien closed their eyes to other applicable laws—federal criminal laws and state civil rights laws—to avoid having to arrest and charge any of the four posse members and to avoid having to enforce the law on Charles Williams behalf.

171. While the sample size here may be on the smaller side,[21] the disparate pattern is striking and should be sufficient.

172. The police did not enforce the relevant law against the four similarly situated white posse members: Dylan Leighton, Ryan Kennedy, Nico Flamos or Joseph Hoeg.

173. As a direct and proximate cause of their biased actions, Defendants Peterson and O'Brien deprived Charles Williams of his Fourteenth Amendment rights to equal protection of the laws, in violation of 42 U.S.C. § 1983.

---

[21] The sample size being five. We have requested comprehensive data sets from the HPD, but the data has not been forthcoming.

30

<u>Count 5</u>
<u>42 U.S.C. §§ 1983, 1985 (3), Conspiracy to Violate Civil Rights</u>
(Conspiracy Claim Against Defendants Peterson and O'Brien)

174.    Plaintiff Charles Williams realleges and incorporates each and every allegation contained in the preceding paragraphs.

175.    Conspiracy laws guard against the inherent danger to society when individuals join together to commit wrongful acts capable of enlarging the scope, sophistication and severity of the possible harm.

176.    42 U.S.C. § 1985 (3) provides a cause of action for conspiracies by private persons.

177.    42 U.S.C. § 1983 provides a cause of action for conspiracies by government actors.

178.    Under § 1985 (3), a first conspiracy involves Dylan Leighton and the three other posse members joining forces to injure Mr. Williams.

179.    Under §§ 1983 and 1985 (3), an interlocking second conspiracy involves Defendants Peterson and O'Brien joining forces with Dylan Leighton and the three other posse members to injure Mr. Williams.

180.    Under § 1983, a third conspiracy involves Defendants Peterson and O'Brien joining forces to injure Mr. Williams.

181.    Dylan Leighton and the three other posse members agreed to force Mr. Williams to leave Hanson because he was Black.

182.    In order to carry out the conspiracy, they agreed to stop the Mazda 6 in front of Mr. Williams driveway and wait for him to return home.

31

183.   They did park the Mazda 6 in front of Mr. Williams driveway and wait.

184.   When Mr. Williams returned home and saw the car blocking entry to his driveway, Mr. Williams asked the strange men to move the car so he can enter his driveway.

185.   Dylan Leighton leapt from the idling car, yelling invective and charging Mr. Williams with threatening motions. "You own this house. I own this motherfucking street…"

186.   The three other men also left the car to corner Mr. Williams.

187.   They instilled fear for his life in Mr. Williams.

188.   Defendants Peterson and O'Brien agreed to help the posse members enlarge the original conspiracy by agreeing to falsely arrest Mr. Williams and by agreeing to help the posse members escape any arrest or charges for their wrongdoing.

189.   Defendants Peterson and O'Brien did falsely arrest and charge Mr. Williams for the incident while not arresting or charging any of the four posse members.

190.   That night, the four posse members were free to go or sleep wherever each person wished to go or sleep.

191.   Defendants Peterson and O'Brien accomplished the objective of the conspiracy by booking Mr. Williams at the police station and memorializing a matching cover story in the police report.

192.    As a result of the conspiracies being completed, Mr. Williams fundamental rights to travel, earn a living and own property were interfered with and his Fourth Amendment rights to be secure and free from unreasonable seizure were violated, causing him injury.

**Count 6**
**42 U.S.C. § 1983, Fourteenth Amendment**
**(Equal Protection Substantive Due Process Claim**
**Against Defendants Peterson and O'Brien)**

193.    Plaintiff Valencia Williams realleges and incorporates each and every allegation contained in the preceding paragraphs.

194.    At all relevant times, Defendants Peterson and O'Brien were employed by the Town of Hanson and acted under color of state law.

195.    The Fourteenth Amendment of the United States Constitution guarantees individuals equal protection of the laws: "No State shall make or enforce any laws which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

196.    The Fourteenth Amendment broadly safeguards Valencia William's right to testify in court[22] and narrowly safeguards her right to testify during a police investigation when she is recognized as the only eye-witness present during and after the events in question leading to a felony arrest.

---

[22] Afred Avins, *The Right to Be a Witness and the Fourteenth Amendment*, 31 M.L. Rev. (1966)

197.    Accordingly, a person who is the only recognized eye-witness present at the scene during and after events forming the basis for a warrantless felony arrest may have a substantive due process right to share the witnessing to police making the arrest.

198.    In this case, Valencia Williams, eight months pregnant, and standing on her porch, observed four men who were white ambush Charles Williams, her husband, as he tried to park in the driveway after a long night's work guiding the commuter rail train network. The time was 1:30 a.m. The married Black couple's two young sons slept upstairs, in the house they had bought and moved into seven months ago. Hanson is a rural, overwhelmingly white town. Valencia was filled with terror observing the incident. After subduing the scene, and spending an exceedingly long time down the street conferring with the four men and family members, the Hanson police eventually came knocking on the Williamses' door. The police arrested and took away Charles without ever asking Valencia Williams a single question or paying attention to a word she had to say.

199.    Because the police took Charles in his sleeping clothes, adding to the injury, it was Valencia at eight months pregnant, who was forced to awaken the two young sons, and drive to the ATM to retrieve cash, then go to the Hanson police station, where Charles was being kept in a cell, to pay the bail.

200.    Not the following day, nor in the many months since, has the Hanson police spoken with Valencia Williams.

34

201.    Pouring these specific facts into the analysis, establishes the police purposely denied Valencia Williams' substantive due process right to testify, causing her injury.

## Count 7
## 42 U.S.C. § 1983, Fourteenth Amendment
### (Equal Protection Arbitrary Treatment Claim
### Against Defendants Peterson and O'Brien)

202.    Plaintiff Valencia Williams realleges and incorporates each and every allegation contained in the preceding paragraphs.

203.    At all relevant times, Defendants Peterson and O'Brien were employed by the Town of Hanson and acted under color of state law.

204.    The Fourteenth Amendment of the United States Constitution guarantees individuals equal protection of the laws: "No State shall make or enforce any laws which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

205.    The Fourteenth Amendment safeguards Valencia William's right not to be discriminated against by the police when she is the lone recognized eye-witness to the event forming a potential felony but the police treat her differently and worse than other similarly situated white individuals—who are inebriated—by taking their testimony and excluding hers.

206.    In this case, Valencia Williams, eight months pregnant, and standing on her porch, observed four men who were white ambush Charles Williams, her

35

husband, as he tried to park in the driveway after a long night's work guiding the commuter rail train network. The time was 1:30 a.m. The married Black couple's two young sons slept upstairs, in the house they had bought and moved into seven months ago. Hanson is a rural, overwhelmingly white town. Valencia was filled with terror observing the incident. After subduing the scene, and spending an exceedingly long time down the street conferring with the four men and family members, the Hanson police eventually came knocking on the Williamses' door. The police arrested and took away Charles without ever asking Valencia Williams a single question or paying attention to a word she had to say.

207.    Because the police took Charles in his sleeping clothes, adding to the injury, it was Valencia at eight months pregnant, who was forced to awaken the two young sons, and drive to the ATM to retrieve cash, then go to the Hanson police station, where Charles was being kept in a cell, to pay the bail.

208.    Not the following day, nor in the many months since, has the Hanson police spoken with Valencia Williams.

209.    The foregoing facts establish the police purposely denied Valencia's equal protection right to be treated fairly by treating her differently and worse than other similarly situated white individuals, who the police did question about their testimony while excluding hers, causing Valencia injury.

**Count 8**
**Monell Liability**
**(Municipal Policy/Failure to Train Liability Claim Against**
**Defendants Miksch and Hanson)**

36

206.    Plaintiffs Charles and Valencia Williams reincorporate and reallege each and every allegation contained in the preceding paragraphs.

207.    During the events in question, Defendant Hanson, through the elected Select Board, exercised oversight over the Hanson Police Department, an agency employing approximately 30 full and part-time officers allotted an operating budget of approximately $3,206,000 for the most recent fiscal year.[23]

208.    In 2013, the Select Board approved the hiring of Police Chief Miksch.

209.    The Select Board had exercised oversight over the Hanson Police Department during the decade-long regime of Police Chief Savage, who was forced to resign in disgrace for falsifying data, corruption and abusing his authority to bend the law to get friends off the hook.

210.    The Select Board commissioned the report that investigated and documented the gravity and scope of the Police Chief Savage's wrongdoing.

211.    To our knowledge, the Select Board accepted Police Chief Savage's resignation without pursuing any further accountability steps or punishment for this chronic and proven wrongdoing.

212.    Notably, there is continuity of employees in the Hanson police department and residents living in the town between the corrupt Chief Savage regime and the successor Chief Miksch regime.

---

[23] Source, Hanson Select Board Meeting Minutes, Annual Town Meeting, May 1, 2023.

213.    As a local law enforcement agency, the Hanson Police Department and Chief Miksch had a strong interest in shaping any proposed legislation touching policing or the criminal justice system in Massachusetts.

214.    In 2018, a popular groundswell in the state supported a landmark criminal justice reform becoming law: The Criminal Justice Reform Act.[24]

215.    To his credit, Chief Miksch had participated in the discourse, advocating for positions he believed would yield better results.[25]

216.    The final bill championed bias-free policing as reality.

217.    Among the mechanisms it introduced for securing this goal was mandatory comprehensive data collection. M.G.L. c. 6A § 18 ¾.

218.    Transparency would combat the problems by shining a bright light on the system's underbelly.

219.    Compliance with the National Incident-Based Reporting System of the Uniform Crime Reporting Program of the United States Department of Justice Federal Bureau of Investigation meant, among other things, that the police would record the race or ethnicity of the arrestee and subjects involved.

220.    Compliance with the NIBRS would yield an overview from intake through any subsequent involvement with the criminal justice system.

221.    This improved data collection approach starts with a police officer writing an incident report documenting a person's arrest on particular charges.

---

[24] Governor Charlie Baker signed the legislation into law on April 13, 2018.
[25] Miksch submitted written testimony to the legislature in his capacity as Chief of Police for the Town of Hanson.

222.    Against this implementation drive in the state, in February and May of 2020, three eye-opening incidents happened in sister states: the Georgia killing of 25-year-old Ahmaud Arbery while jogging by three white men driving a truck, the Minnesota killing of George Floyd in plain view by police officer Derek Chauvin and the New York filing of a false police report against Christian Cooper, a Black birder in Central Park, by Amy Cooper.

223.    These tragedies punctuated the need for accelerated reform.

224.    Back in Hanson, where the rubber hit the road concerning policing and race would be a mostly white suburb of 11,000 residents growing gradually more diverse.

225.    Hanson, which had voted twice for Trump in 2016 and 2020, received another tremor when the January 6, 2021 raid on the U.S. Capitol took place. It was hard to know what the shocking violence would mean locally going forward.

226.    This arc dovetailed with the timeline for Charles and Valencia Williams moving to Hanson in the summer of 2021 and settling in at 115 Leon Court to pursue life, liberty, property and happiness.

227.    In early January 2022, if not before, Chief Miksch had actual knowledge that Charles Williams and his family recently had moved to Hanson and were living at 115 Leon Court, after an extended in-person conversation between the two men about potential job openings with the Hanson Police Department.

228.    But as far as we know, Chief Miksch did not use this knowledge as an opportunity to instruct his police officers to be aware, vigilant or hypervigilant.

39

229.   As we now know, a few weeks later, when Charles Williams called 911 in desperation, the improper police response recast Mr. Williams into the culprit.

230.   Seasoned law enforcement professionals detected there was more to the story than meets the eye.[26]

231.   Yet nobody in leadership or in the rank and file blew the whistle.[27]

232.   Consequently, as a result of this failure, Mr. Williams suffered continuing damages and so did his family.

233.   A glance at Officer Peterson's report for the January 20, 2022 incident reveals a curious quality: It doesn't disclose the race or ethnicity of any of the subjects. Meaning, you can't tell Charles Williams is Black or that Dylan Leighton and the three other posse members are white. See Exhibit B.

234.   This contradicts the best practice established in Massachusetts.

235.   In sister states, police incident reports do identify subjects by race or ethnicity. See Exhibit F.

236.   While it's true that erecting a comprehensive and seamless database encompassing the whole criminal justice apparatus involves technical challenges, tweaking police incident reports to count race or ethnicity is "a no-brainer."

237.   The Hanson Police Department's history of data falsification made embrace of this reform or best practice even more obvious and urgent.

238.   Officer Peterson's report type pertaining to Charles is inadequate.

---

[26] More than one police officer involved with booking Mr. Williams commented the result didn't add up.

[27] Because HPD makes approximately 30-40 arrests annually, it is likely most employees knew of Mr. Williams arrest. Notably, we claim supervisors ratified police officers' mishandling of Mr. Williams 911 call for help.

239. In contrast, adequate police reports insisting on transparency about the subjects' racial and ethnic data would render police misconduct harder to sweep under the rug and would deter police misconduct by increasing risk of being caught.

240. As noted already, six months after the incident involving Mr. Williams, on July 19, 2022, Chief Miksch told the Hanson Select Board the Hanson Police Department needed to update policies and processes to meet federal and state standards.

241. The ambush Charles Williams encountered in front of his home in the wee hours of January 20, 2022, comprised a paradigm civil rights violation.

242. This specific paradigm scenario appears in the text of all three of 18 U.S.C. § 241 and 42 U.S.C. § 85 (3) and the Massachusetts Civil Rights Act:

    a. "If two or more persons go in disguise or on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured…"

    b. "If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of person of the equal protections of the laws, or of equal privileges and immunities under the laws…"

    c. "Whenever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or

enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of right secured by the constitution or laws of the commonwealth…"

243. Because Hanson followed a policy of inaction, when Defendants Peterson and O'Brien came face-to-face with the paradigm transgression in the wee hours in front of 115 Leon Court, they condoned it.

244. In contrast, adequate training methods instructing police officers in how the individual's constitutional protections resonate with federal civil statutes 1942 U.S.C. §§§ 1983, 1985 and 1986 as well as the criminal counterparts 18 U.S.C. §§ 241 and 242 and overlapping state laws,[28] would instill Hanson police officers with the proficiency and vigilance to enforce[29] paradigm transgressions perpetrated.

245. Hanson Police Department failed to adequately respond to unmistakable demographic trends guiding more young Black families to buy homes in Hanson.

246. In contrast, training modules focused on the challenges of responding to 911 calls by Black victims seeking police help with escaping violence, assault or intimidation would teach police officers techniques for dealing with the following situations:

    a. Hearing out the Black 911 caller's account and story.

    b. Resisting pleas for leniency by wrongdoers you know personally.

    c. If unsure or conflicted, ask the police chief or a proxy, for guidance.

---

[28] The Massachusetts Civil Rights Act, M.G.L. c. 22C § 32 and M.G.L. c. 265 § 39
[29] Or refer to the appropriate federal or state partners.

247.    Combined, these three policies would have prevented the misconduct. Any one of the policies should have prevented the misconduct. But the Hanson Police Department rebuffed the policies.

248.    Despite dire warnings, Hanson pursued three policies of inaction.

249.    Alternatively, we plead a municipal failure to train liability claim against Defendants Hanson and Miksch because officials knew or should have known about the inevitable or highly-certain risk of recent Black Hanson homeowners calling 911 for police assistance with escaping violence, assault or intimidation.

250.    Defendants knew or should have known, that without adequate training, Defendants Officer Peterson and Detective O'Brien would succumb to the pressures of the scenario.

**Count 9**
**Intentional Infliction of Emotional Distress**
**(IIED Claim Against Defendants Peterson and O'Brien)**

251.    Plaintiff Valencia Williams realleges and incorporates each and every allegation contained in the preceding paragraphs.

252.    At all relevant times, Defendants Peterson and O'Brien were employed by the Town of Hanson and acted color of state law.

253.    Shortly after 2 a.m. January 20, 2022, Defendants Peterson and O'Brien engaged in extreme and outrageous conduct when they conspired to falsely arrest Charles Williams in front of Valencia Williams, his eight-months pregnant

wife, conduct they knew, or should have known, would inflict severe emotional distress on Valencia Williams.

254.    In Valencia's home, presence and sight, Defendants Peterson and O'Brien (1) disregarded Valencia, (2) arrested her husband Charles in his pajamas, (3) leaving her defenseless against the posse members should they return, (4) forcing Valencia to explain to her two scared young sons what was happening, (5) forcing Valencia frantically to dress herself and two young sons to go into the frigid night and drive to the ATM to withdraw cash for paying bail, (6) forcing Valencia, on account of the sensitive phase of her pregnancy, to drive against doctor's orders and endure the physical pain of driving (7) to park, soothe her sons, and go inside the police station to pay the bail as soon as possible and (8) free Charles to limit the risk of him enduring violence by the hands of the Hanson police while in custody.

255.    The traumatized family made the harrowing return drive to Leon Court in the wee hours.

256.    Dylan Leighton, the ringleader, lived two doors down at 73 Leon Court.

257.    Numb with shock, fear and shame, Valencia and Charles survived a sleepless night, staying wide awake until the arrival of her mother later that morning.

258.    All the way through this time, Valencia was consumed by a primal fear and thought: I can't have this baby alone.

259.    The fear was ignited because the unlawful arrest and felony charge meant Charles could go to prison for up to five years.

44

260.    Valencia also feared the distress would cause her to miscarry.

261.    In the fog of fear or dread, Valencia did deliver the baby.

262.    But in many ways, it was 25 days marred by new medical complications.

263.    In many ways, the circumstances created "a joyless" birth.[30]

264.    Valencia fully grasped how Valencia Jr. was born into a world of profound uncertainty; a world of peril.

265.    This caused virulent post-partum depression extending far beyond February 15, 2022.

266.    There was life before January 20, 2022 and life after.

267.    The incident was like a grenade tossed into their home that detonated, sending shrapnel into every corner.

268.    Life after was defined by:

    a.  Flashbacks.

    b.  High blood pressure.

    c.  Insomnia.

    d.  Spiking anxiety whenever Charles or the sons were out of her sight.

    e.  Crying or weeping.

    f.  Nightmares.

    g.  Headaches.

    h.  Panic attacks.

---

[30] Valencia Williams gave birth to Valencia Williams, Jr. or "Val," on February 14, 2022. Because of the incident, the Valentine's Day was bitter not sweet.

i.  Waves of shame.

269.  Even after the threat of prison receded, the damage and fear of new sham charges lingered.

270.  Roughly 801 days later, the pain or trauma is still excruciating.

271.  Defendants Peterson and O'Brien's extreme and outrageous conduct proximately caused Valencia's severe emotional distress and injury.

272.  In trying to recover peace of mind, Valencia plans to evacuate the family away from Hanson as soon as possible.

### Count 10
### Loss of Spousal Consortium
### (Loss of Spousal Consortium Claim
### Against Defendants Peterson and O'Brien)

273.  Plaintiff Valencia Williams realleges and incorporates each and every allegation contained in the preceding paragraphs.

274.  On September 18, 2020, Valencia and Charles Williams married.

275.  The romantic relationship began in 2012.

276.  Together, as a married couple they have shared many of life's premier milestones: exchanging wedding vows, parenting, career promotions, homebuying, pregnancy and childbirth.

277.  Navigating the excitement and stresses of relocating to Hanson strengthened the couple's bond immensely.

278.  Before the incident, the couple were best friends and passionate lovers.

279.  On January 20, 2022, when the incident happened, Charles Williams suffered tortious injury by the Hanson police, impairing his spousal capacity.

46

280. After the incident, the couple's conjugal rhythm wasn't just disrupted, it was upended.

281. Partly to help fill the growing void around caregiving responsibilities, the couple invited Valencia's mother to live in the house, but this couldn't replace the marital companionship and physical intimacy Charles, her husband, normally would have supplied Valencia.

282. For Charles, the debilitating injury's ramifications include:

    a. Diminished sexual capacity.

    b. Extreme weight gain.

    c. Extreme tiredness.

    d. Depression necessitating therapy.

    e. Specter of being a convicted felon and going to prison, knowing the economic and emotional toll this would take on his family.

    f. Immobilizing panic.

    g. Sullied the daughter's birth, Valencia Jr., three weeks later, on February 14, 2022.

    h. Harder to be present in the moment.

    i. Intense pangs of shame and emasculation

    j. Worry over criminal record derailing plans and aspirations.

283. In sum, the injury to Charles was inflicted at the most sensitive stage—seven months into the family resettling in Hanson and eight months into

Valencia's pregnancy—when Valencia's dependence on her loving husband was at its apex.

284. Valencia, carrying the weight of the world on her shoulders and holding the fate of the world in her hands, is denied the benefits of the marital relationship from her husband.

285. As a direct and proximate cause of their actions, Defendants Peterson and O'Brien inflicted injury on Charles Williams resulting in loss of consortium to his wife Valencia Williams.

**Count 11**
**Loss of Parental Society**
**(Loss of Parental Society Claim**
**Against Defendants Peterson and O'Brien)**

286. Plaintiffs Charles and Valencia Williams, on behalf of their three minor children, reincorporate and reallege each and every allegation contained in the preceding paragraphs.

287. Before the incident happened in the wee hours of January 20, 2022, Valencia and Charles Williams were loving and attentive parents to their two impressionable young sons and eagerly expecting the birth of a daughter in February.

288. The two young sons depended on both parents, not only economically, but also for guidance, affection, love and nurture so crucial to their healthy development.

289.    When the incident happened on January 20, 2022, the parents Valencia and Charles Williams suffered tortious injury by the Hanson police that impaired their parenting capacity.

290.    This tortious injury traumatized the parents and imposed physical limitations on them.

291.    It became more challenging for mother and father to summon the patience, stamina and calm to indulge each child's unique age, nature and personality.

292.    Valencia faced medical challenges in the remainder of pregnancy.

293.    Charles faced medical challenge requiring missing weeks from work.

294.    Consequently, in the disorienting, debilitating, depressing and distracted days and months that followed, the children experienced a significant loss of parental companionship and society.

295.    Soon after the incident, the parents invited Valencia's mother to live with the family to triage the individualized losses.

296.    More than two years later, the grandmother still resides with and provides care to the three children at the 115 Leon Court home.

297.    The three minor children have been deprived of the vigorous love and affection of their parents Charles Williams and Valencia Williams for more than two years, causing the children individualized harms exacerbated by a troubling lack of closure.

<u>Count 12</u>
<u>Private Nuisance</u>
(Private Nuisance Claim Against
Defendants Peterson, O'Brien, Miksch and Hanson)

298.     Plaintiffs Charles and Valencia Williams, on behalf of their three minor children, reincorporate and reallege each and every allegation contained in the preceding paragraphs.

299.     On June 30, 2021, Plaintiffs Charles and Valencia Williams purchased the 115 Leon Court property for the express purpose of securing a long-term family home for wealth-building and child-rearing reasons.

300.     The intended beneficiaries of the purchase included their two young sons and anticipated future-born children.

301.     Shortly after the purchase, the Williams family moved into the home.

302.     For the next six months, the Williams family experienced the use and quiet enjoyment of this family property.

303.     Except for scares with unleashed dogs owned by neighbors, the Williamses experienced uninterrupted use and quiet enjoyment of their property.

304.     The Hanson police station is located at 775 Main Street in Hanson.

305.     The two properties, the 115 Leon Court property and 775 Main Street property, are located approximately 2.1 miles apart.

306.     Following the incident constituting the impetus for this lawsuit happening early on the morning of January 20, 2022, police activity emanating from the 775 Main Street property was redirected and intensified toward the 115 Leon Court property.

50

307.    Since then, the Hanson police station emits manned patrol cars that travel the 2.1 miles-distance between the properties, resulting in the police invading the Williams property interest, mostly in intangible ways.

308.    The passing police cruisers shine lights into the windows of the 115 Leon Court property while the family members are present.

309.    The police patrol cruisers enter the driveway for reversing direction while the family members are present.

310.    The distressing nature of this and other impact interferes with the family's use and quiet enjoyment of the 115 Leon Court property.

311.    The police activity emanating from the 775 Main Street property has caused a continuing private nuisance impairing the Williams property interests in the 115 Leon Court parcel.

312.    As a result, the 115 Leon Court property can no longer serve its primary function as a long-term family home for Charles and Valencia Williams, their two young sons, and  two-year-old daughter.

313.    Secondly, we assert that for any similarly situated young Black family, the impacted 115 Leon Court property has experienced a decline in resale fair market value.

314.    As a result of the deleterious private nuisance effects to the 115 Leon Court property, the Williams family has suffered damages.

### Prayer for Relief

**WHEREFORE**, Mr. and Mrs. Williams respectfully request that this Court:

a. Award compensatory damages against all Defendants;

b. Award punitive damages against Defendants Miksch, Peterson and O'Brien;

c. Award injunctive and declaratory relief against Defendant Town of Hanson, including but not limited to ordering retraining and compliance with the National Incident-Based Reporting System of the Uniform Crime Reporting Program of the United States in Hanson police incident reports;

d. Award the cost of this action, including reasonable attorney's fees; and

e. Award such other relief as this Court may deem necessary and appropriate.

### Jury Demand

Mr. and Mrs. Williams demand a jury trial on all counts so triable.

Dated: April 30, 2024                           Respectfully submitted,

                                                CHARLES WILLIAMS
                                                VALENCIA WILLIAMS

                                                By their attorney,


                                                ____/s/ *Edward S. Burley*____
                                                Edward S. Burley, BBO #699441
                                                Emancipated Law, P.C.
                                                1 Beacon Street, 15th Floor
                                                Boston MA 02108
                                                Tel. (617) 637-6615
                                                ed@emancipatedlaw.com

52

## CERTIFICATE OF SERVICE

I hereby certify that, on this 1st day of May, 2024, I electronically filed the Complaint with the Clerk of Court using the CM/ECF system.

I further certify that I caused a copy of the foregoing Complaint to be served electronically upon the Attorney of Record for the Defendants:

Attorney Douglas Louison
Louison, Costello, Condon & Pfaff, LLP
Ten Post Office Square/Suite 1330
Boston, MA 02109
dlouison@lccplaw.com

/s/ Edward Burley

53