# EXHIBIT 2

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


*****************************

CHARLES P. WILLIAMS, et al.

      vs.                            1:24-CV-11161-IT

PAUL O'BRIEN, et al.

*****************************


    DEPOSITION BY ZOOM OF CHARLES P. WILLIAMS, a witness called on behalf of the Defendants, pursuant to the Rules of Civil Procedure, before Karen D. Pomeroy, Registered Diplomate Reporter and Notary Public in and for the Commonwealth of Massachusetts, at 115 Leon Court, Hanson, Massachusetts, on Thursday, February 28th, 2025, commencing at 10:21 a.m.

APPEARANCES:

EDWARD S. BURLEY, ESQUIRE

Edward S. Burley, Attorney at Law

One Beacon Street, 15th Floor

Boston, Massachusetts 02108

For the Plaintiffs


DOUGLAS I. LOUISON, ESQUIRE

MANUEL D. SOZA, ESQUIRE

Louison, Costello, Condon & Pfaff, LLP

Ten Post Office Square, Suite 1330

Boston, Massachusetts 02109

For the Defendants


Also Present:   Valencia Williams

3

INDEX

DEPOSITION OF CHARLES P. WILLIAMS                    PAGE

Examination by Mr. Louison                            4

Examination by Mr. Burley                             91

EXHIBITS

Number                                               Page

(None.)

4

STIPULATIONS

It is stipulated by and between counsel for the respective parties that the deposition transcript is to be read and signed by the deponent under the pains and penalties of perjury; and that the sealing and filing thereof are waived; and that all objections, except as to form, and motions to strike are reserved until the time of trial.

* * *

CHARLES P. WILLIAMS, having been duly remotely sworn by the reporter, was deposed and testified as follows:

EXAMINATION

BY MR. LOUISON:

Q.  Sir, would you state your name for the record, please.

A.  Charles Williams.

Q.  All right.  Now, Mr. Williams, my name is Doug Louison.  With me is Manuel Soza, who's an attorney, and we are both representing the four named defendants in the lawsuit presently pending in the United States District Court.  We're

5

representing the Town of Hanson and the three individual police defendants who you've named.

Sir, are you familiar with that lawsuit?

A. Yes, sir.

Q. Okay. And it's captioned Charles Williams, Valencia Williams, and their minor children.

Sir, I'm going to be asking you a number of questions about the lawsuit, some background information, and some questions about your history and your allegations in the case.

If at any time you don't understand my question or want me to rephrase it, please say so. Otherwise, I'll assume that you understand my question.

Is that fair?

A. Yes.

Q. And then, also, because we're creating a written transcription of this deposition, I would ask that you make sure that you provide all verbal answers rather than a nod or a smile or a wink. We have to have the court reporter write down your words.

As well, unlike in a conversation at times, I will do my best and ask you to do your best to

6

wait for me to finish my question before you
answer, and, similarly, I will wait until you
finish your answer before I interpose the next
question so that we can make it easier for the
court reporter to transcribe the question and
answers.

Is that okay?

A. Yes, sir.  Understood.

Q. At any time you want to take a break, just let me
know for whatever reason or if you want to confer
with counsel, please do so.

I would ask that if you want a break, if
there's a question before you, that you attempt
to answer that question before taking the break,
if that's okay.

A. Thank you.  Understood.

Q. Hang on one quick second.

(Pause in the proceedings.)

BY MR. LOUISON:

Q. Mr. Williams, what I was looking for is in the
course of my questions for this deposition in
making reference to the complaint, if I talk to
the -- about or use the phrase the incident or
the occurrence or the arrest, would you agree

7

with me that the date that -- underlying this complaint is in the early morning hours of January 20th, 2022?

A.   That is correct.

Q.   Okay.  All right.  Correct to say, sir, that you live at 115 Leon Court in Hanson?

A.   Yes, correct.

Q.   Okay.  And how long have you lived at that house?

A.   This year makes I think four years.  Since '21. Four years effective this July.

Q.   And fair to say that you live there with your wife and two minor children?

A.   Three children; soon to be four.

Q.   Congratulations.  Your wife is Valencia; correct?

A.   Yes, sir.

Q.   And what are your three children's names?

A.   Jabari, Cayden, and Valencia.

Q.   Now, and when is your wife due to have the fourth baby?

A.   March 25th.

Q.   Now, sir, what is your last four digits of your social security number?

A.   6900.

Q.   What is your current employment?

8

A.   Superintendent of operations training for the MBTA.

Q.   Did you say operational strength?

A.   Operations training.

Q.   Training.  Okay.  And how long have you held that position as superintendent -- I'm sorry, did you say supervisor or superintendent?

A.   Superintendent.

Q.   Okay.  How long have you held that position?

A.   I was promoted to that position in May of '24.

Q.   And what was the position that you held prior to that promotion in 2024?

A.   Supervisor of operations training.

Q.   And how long did you hold that position?

A.   From August '23 to May of '24.  So two -- several months.

Q.   Okay.  And prior to that position that you held for only a few months, what was your prior employment or position?

A.   I was a conductor at Keolis Commuter Services.  I was an instructor for the last year of my time there prior to coming to the MBTA.

Q.   Okay.  So Keolis, is a -- is it fair to say it's a contractor or subcontractor to the MBTA?

9

A.   That is correct.

Q.   Okay.  And what was the position that you held on the night of the incident, January 20th, 2022?

A.   I was a licensed passenger conductor.

Q.   How long had you held that position?

A.   At that time -- I started in 2015 -- so probably around seven years.

     My math might be off, but since 2015 to that night.

Q.   Okay.  And is it fair to say that, if I got the count correctly, you had two changes or elevations in your employment since January of 2022?

A.   I'd say three, but yes.

Q.   Okay.  Three.  Is it fair to say that your salary increased with each of those promotions?

A.   Decreased and then increased.  I know that --

Q.   What was the decrease and then the increase?

A.   So I took a pay cut to become a supervisor, but I saw the potential for growth.  So once I became superintendent, my salary increased again.

Q.   So when you were a conductor with Keolis, you were making a certain amount.  You took a decrease to take the supervisory position?

10

A.   Yes.

Q.   Okay.  And then since then, is it fair to say that your salary is higher than it -- not just salary but annual income is higher than what it was in 2022?

A.   Yes.  It's probably equivalent, but yes.

Q.   Okay.  And when you were the operator -- and I'm using that term generically -- in 2022, were you earning a base salary and overtime?

A.   That is correct.

Q.   Okay.  And was --

A.   Hourly; not salary.  Hourly.

Q.   Say that again.

A.   I was hourly; not salary.

Q.   You had a base pay; fair to say, and then along with that was overtime?

A.   Yes.

Q.   Okay.  When you became a supervisor, did you lose the overtime opportunity?

A.   Yes, because I became salaried.

Q.   Okay.  And was that the cause for the decrease in income at that time?

A.   Yes.

Q.   Okay.  For each of the years since 2022, have you

11

filed income tax returns?

A. Yes, I have.

Q. Okay. And have you filed one already for 2024?

A. I have not yet.

Q. Can you tell us your -- well, strike that.

In order to hold the position you presently hold, are you required to have any licenses or certifications?

A. No.

Q. In the prior positions that you held as an operator for Keolis in 2022, were you required to have any licenses or certifications?

A. Yes.

Q. What was that?

A. A passenger -- passenger -- I'm sorry, a conductor's license under the FRA.

Q. Under what?

A. The Federal Railroad Administration. FRA.

Q. And did you have that at all times that you were in that position as an operator?

A. When I was a conductor, yes.

Q. I keep using the term operator/conductor.

Prior to taking the position as a conductor, what was your employment?

12

A.   I worked in radio and television, and I held a few jobs, like I did sales; I sold cars for a little bit.

I did some security work while I was in college.

Q.   And in what communities were those positions?

A.   So my radio job one was in Dorchester; television, Needham, Massachusetts; the other television was in downtown Boston.

Q.   In 2022, January 20th, how old were you?

A.   At that time, would have been 20 -- I'm sorry, 31.  Yeah, 31.

Q.   Okay.  And can you tell us your educational background.

A.   Yes.  I attended Emerson College on a full four-year scholarship.

Q.   Did you graduate from Emerson?

A.   I did, in May of 2013.  2013, yes.

Q.   And what degree did you graduate with?

A.   Bachelor's degree in broadcast journalism.

Q.   After you graduated from Emerson, did you go into the broadcasting or radio that you indicated?

A.   Yeah, I worked in the industry for a little bit.

Q.   And who did you work for when you left Emerson?

13

A.   I worked for Channel 7.

Q.   Where did you go to high school?

A.   West Roxbury High.

Q.   Where did you grow up?

A.   I'm sorry?

Q.   Where did you grow up?

A.   In Roxbury.

Q.   And did you attend Boston public schools through West Roxbury High School?

A.   Yes, I did.

Q.   Okay.  And you went directly from West Roxbury to Emerson?

A.   That is correct.

Q.   Okay.  When did you get married to Valencia?

A.   September 18th, 2020.

Q.   Okay.  I want to direct your attention -- well, let's -- before we do that, in your present position as the supervisor, what is -- what is the nature of the work that you do?

A.   Superintendent.  My job is to manage a group of almost 120 instructors.  We hire and train new operators for the MBTA.

     Through that management, I conduct disciplines; I conduct developing of programs,

14

trainings, and just managing the staff.  You know, manage vacations; any issues that may come up; conflicts with students or the instructors themselves.

I sit in dispositions.  We have several lawsuits against the MBTA; so I partake in that where, you know, training is questioned.

Also, involved in the accident investigations; so if there was an incident on the system or, you know, a major accident, we coordinate and collaborate with the NTSA, FRA, FTA; internal stakeholders.

Q. And who is your immediate supervisor?  Who do you report to?

A. Marie Walker.

Q. Say it again?

A. Marie Walker.

Q. Okay.  And what position is that?

A. She's the senior director of training.

Q. And where is your place of employment?

A. Dorchester, Massachusetts.

Q. MBTA headquarters?

A. We have several offices, but my office is located in Dorchester.

15

Q. Okay.  Now, turning your attention to January 19, 2022, do you have a recollection of that date?

A. I want to say -- is that the -- I think it was a day I went to work.  It's the only thing that sticks out.

Q. And what -- what was the work that you did that day?

A. I was a passenger conductor at the time; so I did trips.

Q. And where were you working?  What line were you working?

A. I honestly don't remember, but I was working out of South Station.

Q. Okay.  And was that your usual location was working at South Station at that time?

A. Primarily, yes.

Q. Okay.  Now, how did you get to work?

A. I drove my personal vehicle.

Q. Okay.  And at that time, you were already living at Leon Road in Hanson; correct?

A. Leon Court, correct.

Q. Leon Court.  And where had you lived prior to Leon Court?

A. 178 Springvale Ave., Everett, Mass.

16

Q. And I know you may have already said this. How many -- how long had you been living at Leon Court prior to January 19th?

A. I'd say just about a year, because we moved in July of '21, and so -- yeah.

Q. Okay.

A. Actually, less than a year. Would have been less than a year.

Q. Less than a year. Okay. And --

MR. BURLEY: It would be July to January; right?

THE WITNESS: Yes.

BY MR. LOUISON:

Q. So six months, approximately?

A. Yes, six months.

Q. All right. Now, had you had any interactions with the Hanson Police Department or police personnel from July to January?

A. I did.

Q. And what was the nature of those interactions?

A. I had reached out to the chief because at that time, I had aspirations of becoming a police officer.

Q. And what was the purpose of reaching out to the

17

police chief?

A.   To inquire about any job vacancies.

Q.   And which police chief did you reach out to?

A.   Hanson police chief.

Q.   Okay.  But the present police chief,
Michael Miksch?

A.   Yes.

Q.   Okay.  And when you say "reached out," what was
the nature of your communication?

A.   So I had taken the police exam.  I was just doing
research to see which department had vacancies.
Being that I had just moved to Hanson, I was just
inquiring of any vacancies.

Q.   Had you already taken or had you taken the State
civil service examination?

A.   Yes, I did.

Q.   When did you take that?

A.   I believe 2019.  I can't remember off the top.

Q.   Were you certified on an active list in 2022?

A.   Yes, I had signed with Everett.  I was No. 10, I
believe.

Q.   Called by Everett?

A.   Yes, I signed.

Q.   Okay.  And -- but you did not start any training

18

or probationary period with Everett?

A.  No.

Q.  Why not?

A.  I -- when I signed, I never heard back from them and I moved; so I didn't really follow up.

Q.  Okay.  Did you list any other communities when you took -- were certified of the civil service list other than Everett?

A.  I did several communities.

Q.  When you moved to Hanson, did you contact the civil service to indicate an interest in Hanson Police Department?

A.  I think I updated my profile on the website.  I can't remember.

I never called anyone, but I know I updated the profile with the preferences.

Q.  And when you say you had the contact with the chief of police, did you meet with him or speak with him?

What was the nature of that contact?

A.  We had a phone conversation.

Q.  Okay.  And what did he indicate to you relative to vacancies or hiring with Hanson?

A.  He said at the time they were fully staffed, but

19

he did recommend I think looking at like Quincy or Brockton.  Kind of gave me some other departments to look at.

Q.  Okay.  And when you -- if you were certified in that list in 2019, did you ever take another civil service examination after that list expired?

A.  I did not.

Q.  Okay.  And do you know when that list expired?

A.  I think it's a two-year -- I believe it's two years.

Q.  But do you know if it was extended?

A.  I do not.

Q.  Okay.  So that was the only time.  Was -- strike that.

    Was that the only time that you took the civil service examination?

A.  That is correct.

Q.  Did you apply to any other departments other than indicating your interest in the City of Everett for a police position?

A.  I believe I was on Boston's list, and I don't remember if I was on the State police.  I think I was on the State police list as well.

20

Q.   Were you ever called by either of those two agencies for any pre-employment background?

A.   I was not.  I think my number was too high on the list.

Q.   Okay.  And since those agencies -- Everett, Boston, and the State police -- did you ever have any other contact with any other law enforcement agencies relative to employment?  Either on the local, State, or federal levels.

A.   I'm sorry.  Could you repeat the question.

Q.   Yeah.  Other than the three agencies that you just indicated that you indicated interest, Boston, State police, and Everett, did you ever apply for any other law enforcement positions either on the federal, State, or local level?

A.   Not that I can recall.

Q.   Okay.  You never contacted or asked about the transit police through the MBTA?

A.   I may have.  I don't really remember because it's civil -- actually, that might be separate.  I don't remember exactly when I applied.

I think you can just pay a fee and you're covered under all three; State, local, and transit, but I don't remember.

21

Q.   Okay.  Now -- and is that fair to say going forward from that date until today, have you applied for any other law enforcement positions?

A.   I have not.

Q.   Not?

A.   No.

Q.   Okay.  Now, going back to my question to you January 19th, 2022, and your recollection of that day, your earlier answer was that you believed you worked that day; correct?

A.   Yes.

Q.   You believe that it was from your usual place at South Station; correct?

A.   Yes, sir.

Q.   Do you recall the hours of work that day?

A.   I don't, but I know at that time, I was working late afternoons until late night.

Q.   Until midnight?

A.   Late night.  So, yeah, it would have been the early morning.  Probably 11:30-ish.  That sounds about right.

Q.   And how long were your shifts?

A.   Depends.  Anywhere from ten to 12 hours.

Q.   Now, did you drive to work that day?

22

A.  Yes, I did.

Q.  Did you park down at South Station somewhere?

A.  I would have parked at our employee parking, correct.

Q.  And then did you drive directly from South Station to Hanson?

A.  When I left work?

Q.  Yes.

A.  Yes.

Q.  Did you stop anywhere?

A.  I don't recall, but I don't believe so on that night.

Q.  Did you -- were you alone, or did you have anyone with you?

A.  I was alone on the phone with my wife.

Q.  Okay.  And how long did that drive take from South Station employee parking to the Town of Hanson; to your home?

A.  At that time of night, it averages about 40 minutes, 45 minutes.

Q.  What kind of car were you driving?

A.  A 2020 Toyota Highlander.

Q.  Now, excuse me, what do you recall occurring or that you observed when you arrived onto

23

Leon Court?

A.   So my street, there are two access points.  I came from the longest access point at the top of Leon Court.

As I approached the front of my residence, there was a headlight coming from the opposite end.  It pulled into my driveway.  I stopped in front of my house, and four white males jumped out of the car and ambushed me.

Q.   You're driving, fair to say, on the right-hand side of the road coming down to your driveway?

A.   That is correct.  So I was coming from this end; they were coming -- another vehicle was coming from this end.

Q.   Right.  And is your driveway on the right-hand side of the side of the road that you were on?

A.   I have two driveways, and this was the driveway on the left-hand side.

Q.   So, I guess I'm a little confused.  You have a driveway that's on the left and the right-hand side of the road?

A.   I have -- left-hand side of the house and the right-hand side of the house.

Q.   Okay.  So they're both on your side of the road,

24

though; is that correct?

A.   Yes.

Q.   And when you saw the headlights, were the headlights on the left-hand side of the road in the conventional way where cars pass side to side, or was the headlights on your side of the road?

A.   It would have been my left-hand side.

Q.   On your side?  So that it was coming head-on towards you?

A.   That is correct.

Q.   Okay.  And what did you observe that car do?

A.   Pull into my driveway.

Q.   How far away was your car from the car when you first observed the headlights?

A.   I can't give you an approximate, but I'd say maybe 50 feet.
     I don't remember exactly.

Q.   Were you able to identify the car when you first saw the headlights?

A.   No, I had never seen that vehicle before.

Q.   Now, you then testified that the car turned into your driveway?

A.   Yes.  It pulled into my driveway.  My street is

25

very narrow.

Q.   Say that again.

A.   It's a very narrow, small street; so ....

Q.   So it pulled into your driveway; right?

A.   Yes.

Q.   Did it -- how long is your driveway from the street or the road up to your house?

A.   I don't have an exact measurement, but if I had to guess, I don't know, 50 to 100 -- I'm not great with that type of stuff.

Q.   Let me ask you this, in a better way to estimate, how many car lengths would you estimate the length is from the road to your house?

A.   About three car lengths.

Q.   Okay.  And when the car that you observed turned into your driveway, how far up did it pull?

     Did it stop at the road and the driveway?  Or did it drive up a car length or two or three.

A.   It was a car length into my driveway.

Q.   And then what did you do when you observed that?

A.   I was in my vehicle, and four white males jumped out.

Q.   And then what did you do when you saw those four white males come out of the car?

26

A.    I opened my car door and got out of the car.

Q.    Did you pull your car into your driveway?  Or did you leave it in the road?

A.    I couldn't pull it in because they were blocking my driveway.

Q.    Okay.  So you left it at the bottom of the road?

A.    In front of my house.

Q.    Did you block their car in at the driveway?

A.    No.  We weren't near each other.

Q.    Did you -- you then got out of your car.
      What did you do next?

A.    I asked them why are they blocking my driveway; I'm trying to get into my driveway.

Q.    And when you say you saw four white males jump out of the car, when they got out of the car -- was it a four-door car?

A.    It was a four-door car, yes.

Q.    And they got out of all four sides or all four doors; both sides?

A.    Simultaneously, correct.

Q.    Where did they go from the moment they exited their car?

A.    They all approached me and -- towards my vehicle.

27

Q.  How many feet were there between your vehicle and their vehicle?

A.  I'd say about two car lengths, maybe.

Q.  When you said that you got out of your car, did you stay by your car?  Or did you walk towards them?

A.  Yes, I was in the doorway -- my car door was open, and I was in the doorway.

Q.  And did you stay in that position?  Or did you approach them in your driveway?

A.  I stayed in that position.

Q.  So you stayed in the road?

A.  Yes.

Q.  How were you dressed, by the way?

A.  How am I dressed now?

Q.  No, no, no.  How were you dressed then?

A.  Oh, I was in uniform.

Q.  What is that made up of?

A.  At that time, I believe I was in a polo-like shirt issued by the company, and I would have had work pants that had several pockets.

Q.  And did you -- as part of your duties, did you have any utility belt or tools or equipment that you were required to carry as a conductor?

28

A.    Yes.  A radio; a punch, which is, you know, to click tickets; and I had a multi-functioning like tool, knife.

Q.    Okay.  And -- and did you have the radio on you at that time when you were at home?

A.    No, it would have been in my -- somewhere in my vehicle.

Q.    Okay.  But you take it with you; you don't leave it at the station?

A.    Yes, I take it to charge.  To charge it at night.

Q.    You have a charger at home?

A.    Yes.

Q.    And the punch for the tickets is something you carried back and forth?  You didn't leave it at work?

A.    That is correct.

Q.    And the multi-purpose knife that you just indicated, was that your knife, meaning you purchased it personally, or was that provided to you through work?

A.    That was personal.

Q.    Describe that knife for me?

A.    I'm sorry?

29

Q.  Would you describe that for me.

A.  Yes.  It was a small pocket knife.  I think I got it -- a Husky maybe.  I got it from Home Depot. Like five bucks.

Q.  Do you still have that today?

A.  That -- I do.

Q.  And when you say multi-purpose, what were the functions on that tool?

A.  I believe it's utilized to -- it's sold as a box cutter, but --

Q.  Does it have a blade?

A.  Yes.

Q.  And are there any other devices or instruments on that tool?

A.  Not that I recall.

Q.  Okay.  So it's -- it's a knife.

You said it's a multi-purpose tool, but it doesn't have a screwdriver or a pair of pliers attached to it; correct?

A.  Not that I recall.  I haven't looked at it in a long time.

Q.  When's the last time you looked at it?

A.  It's tucked away in my drawer since I retrieved it from the Hanson police; so I haven't touched

30

it since.

Q. So it's a knife; fair to say?  It's got a blade on it; right?

A. I would say so.

Q. Okay.  And is it folded?

A. Yes.

Q. And how do you open that knife?  Is there a button or a lever to open the blade?  Or do you have to manually pull the blade out?

A. I believe you push a lever; a button.

Q. Okay.  Now, when you got out of the car, that knife was on your person; correct?

A. I believe so.

Q. You said that you had a pair of pants and trousers on that were from work.

Did you have multiple pockets on the pants?

A. I believe so.

Q. Do you recall as you sit here today where on your person was the knife?

A. I do not.

Q. And is that all of the tools or equipment that you had on your person when you got out of the car?

A. I may have had a pair of gloves.  I don't

31

remember the fine details.

Q. Did you have a jacket on?

A. I believe I did.  It was pretty cold that night.

Q. When you got out of the car, you indicated a moment ago that you stood by your open door; right?

A. Yes.

Q. Where and what did the four individuals that you observed in your driveway, what did they do?

A. They all approached me in an aggressive manner, and one of them --

Q. Just -- okay.  I interrupted you.  Continue on, please.

A. Yeah.  One of them approached me shouting you're the asshole -- excuse my language, but, quote, you're the asshole that called the cops on my dad.

Q. Now let me stop you there for a second.

A moment ago you just said they approached you in an aggressive manner.

What would you describe and how would you describe the aggressive manner?

A. Well, four white men jumping out of a car at almost midnight, four against one was aggressive.

32

They appeared intoxicated, and they were yelling.

Q. Okay. So when you used the term "aggressive manner," you mean you perceived it as aggressive because there were four white people that got out of a car?

A. That is correct.

Q. Okay. And you said that they appeared to be intoxicated.

What made you think that they were intoxicated?

A. Again, the volume, the tone, the approach. I interact with people daily; so --

Q. You said "approach." Did they run towards you or --

A. They walked in a brisk manner.

Q. And the tone you say, you just indicated that you heard one individual make a comment to you; is that correct?

A. That is correct.

Q. And what was the specific statement that that person made?

A. You're the asshole that keeps calling the cops on my dad.

33

Q. Do you know what he meant at that point?

A. I do not because I didn't know who he was at that time.

Q. Did you recognize him?  Whether you knew his name or not, did you recognize who the person was?

A. I did not.

Q. Is it fair to say you'd never seen that individual before that moment?

A. That is correct.

Q. Okay.  Did the other three individuals say anything at that first contact?

A. Not that I can recall.

Q. And what happened next?

A. That same individual approached me.  I was very uncomfortable, and I was in fear of my life at that point.

I went back into my car.  My cell phone was in the center console because I was on Bluetooth speaking to my wife.  I went to retrieve my phone to call 911.

Q. And when you say that you were in fear for your life, what specific actions by those three individual -- four individuals made you fear for your life?

34

A.   Again, the time of day; the manner in which they all simultaneously exited the vehicle.  I didn't know what their intentions were.

Q.   Okay.

A.   Being on the heels of the Ahmaud Arbery case, I thought they wanted to harm me.

     I didn't know the neighborhood like that because I just moved here; so I didn't know who they were.

Q.   So you -- after hearing that comment from that unknown individual, did you make any response to him?

A.   No, I went to call 911.

Q.   Did you get into your car and shut the door?

A.   No, as I went to my vehicle to get the phone, he continued to follow me and became aggressive.

Q.   How close to the driver's side door did that individual get?

A.   I'd say he was literally adjacent to it.

Q.   Okay.  So is it fair to say that he crossed the front of your motor vehicle?

A.   Yes, he was in front of the vehicle.

Q.   In front?  Did he go all the way around the front of the vehicle and come to the door side?  Or did

35

he stay --

A.   That is correct.

Q.   Which is correct?

A.   That he came around to the door; the driver's side door.

Q.   Okay.  And when you got out of the car initially, did you leave it running?  Or did you shut it off?

A.   It was running.

Q.   When you got back into the car, did you turn it off?

A.   Not until I moved the car.

Q.   Okay.  But at that -- at the sequence we are right now, where that unknown individual's walked around the front of the car and is at the door, did you leave it running?

     Was the motor vehicle still on?

A.   According to my memory, yes.

Q.   Okay.  And did you call 911?

A.   I did.

Q.   Okay.  And did you shut the door to your car?  Or did you leave it open?

A.   I believe I shut the door.  I can't remember, though, but I believe I did.

36

Q. And what did you say to the 911 operator?

A. I believe I said something to the effect of there's some dumb kids in my driveway.

I couldn't really explain because as I was trying to explain, a patrol car showed up.

Q. So you were still on the telephone call when a car arrived?

A. That is correct.

Q. And did you stay in the car that whole time?

A. At this point, I believe I was in the front of my house because my wife was at the door at this time; so ....

Q. Okay.  So I want to break it down.

You called 911.  You were sitting inside your car or when you called 911, did you get out of the car?

A. At no time was I sitting in my vehicle.  I was in the middle of the street on the phone.

Q. Okay.  So my misunderstanding.

When you indicated you went back to the car to retrieve your phone, did you not get into your car to make that 911 call?

A. I leaned to retrieve the phone, it was in the console, but I never sat down.

37

Q.   You made the phone call from outside your car?

A.   That is correct.

Q.   And when you were on the phone with the 911
     operator, where was that unknown first
     individual?

A.   Honestly, I don't remember, but he was so irate,
     he was going up and down the street.
          If I remember correctly, I think he was -- he
     made a comment or threatened to go to his house
     to get a weapon.
          I don't know exactly where he was.

Q.   Did you report that threat to the operator while
     you were on the phone with the operator?

A.   Again, the time -- the call was so short because
     the officer arrived, and I thought they would
     question me and get my side of the story.  I
     never had a chance to.

Q.   And when the individual -- that first individual
     you say was irate and was up and down the street,
     where were the other three individuals?

A.   I think some of them were near the car; then they
     started walking -- a few of them started walking
     toward his house.

Q.   Now, did you ever observe anything in that first

38

individual's hands or in the hands of the other three?

MR. BURLEY:  You broke up a little bit. Could you repeat that for us.

BY MR. LOUISON:

Q.  Okay.  Let me rephrase the question.

When you saw the first individual, did you observe anything in his hands?

A.  No, but the gesture of his hand.

Q.  Okay.  So he was using his hands to gesture?

A.  Yes.

Q.  Okay.  What about the three other individuals? Did you observe anything in their hands?

A.  I don't recall.

Q.  Okay.  Did you report to the operator on the phone that you observed any weapons or other instruments in any of the four individuals' hands?

A.  Again, the duration of the call didn't allow for that.

Q.  So you didn't report that?

A.  No.

Q.  Okay.  Now, at some point, you took that knife out of your pocket; correct?

39

A.   That is correct.

Q.   Okay.  And tell me when you did that.

A.   When the driver of the vehicle got in -- you
     know, pretty in my face.

          MR. BURLEY:  Was it the driver or the
     passenger?

          MR. LOUISON:  Well, let me ask the questions
     if you don't mind, Mr. Burley, and we can clarify
     that.

BY MR. LOUISON:

Q.   The one individual that you're talking who has
     approached your motor vehicle and made the
     comments that you have recounted for us, was he
     the operator of the vehicle, or do you recall
     what door he got out of?

A.   I think he was.  It's so long ago.

          He was in the front.  I believe he may have
     been the passenger.  I know he was in the front
     definitely.

Q.   So did the operator of the motor vehicle take any
     actions towards you?

A.   I don't recall.  Again, they all approached me,
     but I don't -- it was just one individual who was
     the aggressor.

40

Q.  Okay.  And that's the individual who you said made the comment to you initially?

A.  That's right.

Q.  Okay.  You had indicated in response to an earlier question that he came over to the side of your car and then was walking up and down the street?

A.  Yes.  When he approached me, I was in fear of my life.  That's when I took out the weapon or the knife.

Q.  Okay.  So you were at the side -- at the side -- driver's side door of your car when you took out the weapon?

A.  That is correct.

Q.  Okay.  Did he have a weapon in his hand?

A.  No, but his gesture as if he -- he gestured as if he was going to hit me.

Q.  And describe for me specifically what that gesture was.

A.  It was like a hand fist.

Q.  Like in a boxing stance or some other --

A.  No, in a fist, you know.

Q.  Okay.  And where were the other three?

A.  Again, a few I think were near him; some went to

41

his house.  I -- it was a chaotic scene.

Q.  So when you say "his house," did you learn that he was your neighbor?

A.  I did, after that, because his father came out.

Q.  Okay.  But at the moment that we're now in, which you're describing, did you observe one or more of the other three leave the area and go to your neighbor's house?

A.  That is correct.

Q.  Okay.  And when you observed the -- strike that.

How many people went to the neighbor's house?

A.  I don't recall.  I know there was --

Q.  There were three; right?

A.  Yeah, but I don't -- I wasn't really counting. You know, I know a few.  Maybe two.  I don't recall exactly.

Q.  More than one of the you think maybe three went and left and went over to the neighbor's house?

A.  That's fair to say, yes.

Q.  Okay.  And when you say left to go to the neighbor's house, did they cross your lawn or property or did they go out to the road and go into the next driveway?

A.  Based on the layout, they would have walked

42

through my front yard to their house, yes.

Q. So there was no fence or other device blocking
your property line from the neighbor's?

A. No.

Q. So when you took the knife out of your pocket --
by the way, are you left- or right-handed?

A. Right-handed.

Q. Was the knife in your right-side pocket?

A. Most likely it would have been.

Q. And did you deploy the blade when you took it out
of your pocket?

A. I don't know what deploy implies, but --

Q. Well, I had asked you to describe the knife
earlier, and you said that it was a folding
knife, that there was a button or lever to open
the blade; correct?

A. That is correct.

Q. So when I say "deploy," I mean did you open the
blade or did you activate the blade so it came
out of the folded shape?

A. I opened the knife and pointed it down.

Q. Okay.  You pointed it down, holding it by your
side, or where were you --

A. That is correct.

43

Q.   Okay.

A.   To my side.

Q.   And you deployed -- you took the knife out and pointed it down as you just described prior to the police car arriving?

A.   That is correct.

Q.   And what happened next that you recall?

A.   I'm on the phone with 911.  The individual in question, again he's irate, said he's going to his house to get something, and at that time, Officer Peterson pulls up.

     So this happened within less than probably two minutes; the whole encounter.

     MR. LOUISON:  Let's go off the record for a second.

          (Discussion off the record.)

BY MR. LOUISON:

Q.   Mr. Williams, you took the knife out of your pocket; you had it in your right hand.

     Did you stay in the roadway, or did you walk up to your driveway?

A.   I was in my -- I was in my car; so between my car door and my vehicle.  I was still there.

Q.   Okay.  At some point, did you walk up into your

44

driveway?

A.  When the police arrived, yes.

Q.  And at that time, was the other car still in your driveway?

A.  That is correct, sir.

Q.  And your car was still in the roadway?

A.  Yes, sir.

Q.  And at that point, had you seen or became aware of where your wife was located?

A.  She was in the doorway on our porch.

Q.  Now -- and I may have asked you this, we may have skipped over it, did you call her at any time while you were outside in front of the house?

A.  So we were on the phone when I pulled up; so from when I left my job, we were on the phone the entire time.

Q.  Okay.  But you also -- when you got out of the car, because you saw the motor vehicle in your driveway, had you not hung up with your wife?

A.  I did hang up with her.

Q.  Okay.  And then you made a call to 911; right?

A.  A few minutes after; once the situation escalated, yes.

Q.  And then did you recommunicate or reconnect or

45

recall your wife after the 911 call?

A. No, because at this point, she'd heard the commotion.

Q. Did you become aware while you were outside where your wife was located?

A. Yes.

Q. Where was she?

A. Again, she was at the front door on the porch.

Q. Is there a -- would you describe for me the front of the house.

What kind -- when you say "the porch," how big was that? Was it enclosed or open?

A. Screen door. It's an open porch; maybe a 5-by-5 with several steps.

Q. Was she outside of that screened area or inside of the screened area?

A. She came onto the porch outside, yes.

Q. Inside the porch the screened area or on the outside?

A. Outside.

Q. Okay. And when you say that you saw the police cruiser come up and you identified the officer as Officer Peterson, where did that cruiser stop?

A. The top of my driveway; so I think just behind

46

the other vehicle.

Q. Behind the other vehicle?  Is that what you said?

A. Correct, yes, it was.

Q. Okay.  What then happened immediately upon that police cruiser arriving?

A. So at this point, I hang up with the dispatcher.

I tried to speak with the officer.  He tells me not to approach him and to stand over there, which was stand in my driveway.

And Dylan is irate.  He's giving him commands to stop; he's not listening to him; so he ends up putting him in 'cuffs.

Q. You just used the term -- the name Dylan for the first time.

A. Yes.

Q. Okay.  When did you learn the identity of Dylan?

A. After my arrest.

Q. Okay.  So you still didn't know who this individual was at that point which we're now discussing?

A. That is correct.

Q. Okay.  And so you observed the police officer handcuff that individual; yes?

A. That is correct.

47

Q. And what did you do and where were you when you were observing that?

A. Probably in the -- I was in the front of my house waiting to -- waiting for him to come talk to me, but it took so long and it was cold; I ended up coming back inside the house.

Q. So is it fair to say that you walked from the end of your driveway up your driveway to your house while Peterson was doing his thing with Dylan?

A. So, again, my vehicle's in the middle of the road at this time.

The officer comes. I'm standing at the corner of my house where, you know, my driveway and my front lawn is.

Once he tells me -- once the officer tells me not to approach him, I just stand there for a little bit. Again, I'm observing the whole incident as they're -- the whole arrest, and because it was cold, I came back inside the house.

Q. You say "came back." You went in for the first time?

A. Yes.

Q. You went inside, and did you talk to your wife

48

when you went inside?

A.   Yeah.  I told her they said to wait.

Q.   Okay.  Did you go further into your house, or did you wait at the porch area?

A.   I was in my living room area.

Q.   How long were you there before you went back outside?

A.   I'd say less than two to three minutes, because I went to move my vehicle into the driveway.

Q.   How were you moving your vehicle into the driveway if the police cruiser and the other car was there?

A.   I think at this point they had -- the individuals had moved their vehicle; so there's -- there's enough space to move around after that.

Q.   But was -- did Peterson move his police cruiser?

A.   No, his car was -- his car was like at the top of my driveway, but it was like in the middle of the road; so it wasn't really obstructing.  I could still maneuver into my driveway.  I have a pretty large --

Q.   So the cruiser was not in your driveway; it was at the outside of the driveway in the road area

49

somewhere?

A. Yeah, it was pretty adjacent.  It was close, but, again, it wasn't like obstructing the driveway.

Q. Understood.  So then you observed someone come over from the other house and move that unidentified car that was in your driveway?

A. I don't remember observing them move it, but the vehicle wasn't there when I went to move mine.

Q. So you don't have a recollection of observing anyone move the car?

A. No.  I can't identify who did, no.

Q. But in any event, before Peterson did anything further, communicated further with you, is it your testimony you went outside to then move your car into your driveway?

A. That is correct.

Q. Okay.  And did you drive your car into the driveway?

A. That is correct.

Q. Did you park it in the usual location that you park your car?

A. Yes.

Q. Did you shut the car off?

A. Yes.

50

Q.   When you drove the car into the driveway, did you observe where Peterson and Dylan were at that time?

A.   I believe they were in front of his residence at this time.

Q.   In front of David's residence?

A.   That is correct.

Q.   Okay.  And were you able to observe them from your location?

A.   Observe and slightly hear some of the conversation.

Q.   And what would you say the distance is between their location in front of that house and your location?  How many feet?

A.   About two houses; so maybe like 50, 60 feet.  It's not -- it's really close proximity.

Q.   Is there a house between your house and their house?

A.   That is correct.

Q.   Yes.  So they're not the adjacent neighbors; they were two houses over?

A.   Yes, but our houses are so close, we're compacted.

Q.   Okay.  But you could still hear some portion of

51

the exchange between Dylan and the police officer?

A.  That's correct, sir.

Q.  Now, at some point, did another police officer arrive?

A.  Yes, two, I believe.  A detective --

Q.  When did that occur?

A.  After the arrest was made, I think he called for backup; so several minutes.

I think it was an officer from Halifax and then a detective.

Q.  When you say "the arrest was made," what are you referring to?

A.  To Dylan being placed in 'cuffs.

Q.  Okay.  So when you're using the term the arrest was made, it was when you observed Peterson placing handcuffs on Dylan?

A.  That is correct.

Q.  Okay.  And was he handcuffed on your property or at his property?

A.  It was in the middle of the road, I believe.

Q.  Okay.  And then did you observe Peterson walk Dylan over to his property?

A.  That is correct.

52

Q.   Did you see Dylan again other than observing him across the yards to his house?

A.   That night?

Q.   Yeah.

A.   I did not.  I don't believe.  I did not.

Q.   He did not return to your property?

A.   No.

Q.   Okay.  So at some point, you went inside to the house; you were in your living room.

     At some point, did you go back outside again?

A.   No.  The only time I went out was when they came to my door, the officers.

Q.   So -- and I may have gotten this a little confused.

     At one point, you testified you went outside to move your car into the driveway.

A.   That is correct.

Q.   You accomplished that.  Did you then leave your car and go back into the house?

A.   So I parked my vehicle.  When I -- yeah, I come in the house; I go to move my vehicle, come back, and then I come in the house; so I only went out if you want to say one time.

Q.   Okay.  Went out once, but came in the house twice

53

basically?

A.    Yes.

Q.    Okay.  And then what happened next after you went back into your house after moving your car?

A.    So again, I'm waiting for somebody to come speak to me; like a good 20 minutes goes by.  I can hear them.  My front door's open.

My wife and I hear the detective and officer conversing about a knife and whether or not to arrest me or not.

Q.    Where were they located when you're hearing this conversation?

A.    In front of Dylan's residence.

Q.    And how many feet away would you estimate Dylan's residence was to the front door of your house?

A.    Again, several -- maybe -- our houses are like two houses down; they're really compact; so if we're going to use car length references, I'd say like maybe four or five.

Q.    And you're testifying that you could hear the two police officers conversing about the knife from that distance?

A.    That is correct.

Q.    Okay.  And what exactly do you say you heard?

54

A.    It was whether or not to arrest me, and Officer Peterson asked Detective O'Brien, you know, should they take me, and he said he didn't care; it was his decision.

Q.    What happened next?

A.    They come over to my house, knocked on the door. I open the door. First -- the first and only question was they said you had a knife? And I said yes. And they asked to see the knife.

      At this point, I had taken off my pants; so I -- they said can I see the knife, and I said sure, and I went to my --

Q.    When you say you took off your pants, did you put anything else on?

A.    I had like thermals under.

Q.    Okay. So when the police came to the door and they asked -- or spoke to you and asked about the knife, you were just in your thermals and a top, I guess?

A.    Yes.

Q.    Okay. They asked to see the knife after you affirmed that you had a knife?

A.    That is correct.

Q.    Okay. What happened next?

55

A.   I showed -- I give them the knife.  They open the knife; they look at it; and they ask me to step outside.

Q.   Were your pants back on at that point?

A.   They were not.

Q.   Okay.  So you stepped outside.  Did you have shoes on?

A.   No.

Q.   What happened next?

A.   They said that they had to place me under arrest because of the weapon, and I was in shock.  I was -- I was in total shock.

I said, you know, I gave the weapon because I had nothing to hide, and it was -- I called the police, and it was in self-defense; and then they placed me in 'cuffs.  My wife just told me to just go.

I asked to put on my pants.  They wouldn't let me.  I asked for a jacket; they wouldn't let me.

Q.   Did you put shoes on?

A.   My wife ended up bringing me shoes when I was in the police car.

Q.   So you were led out of your house and put in the

56

police car?

A.   With thermals only.

Q.   Okay.  And then did your wife come out to the car?

A.   She did.

Q.   Okay.  And did you have any conversation or communication with her then?

A.   I did.  I said I can't believe this, and I said there's going to be a lawsuit.

Q.   What else did you say to your wife?

A.   I think that was it.  She just told me to comply.

Q.   Did you observe the police say anything or communicate with your wife at all?

A.   They told her I believe that -- where they were taking me and they'd call her, I believe; something to that effect.

Q.   If you recall, between Peterson, O'Brien, or the other Halifax officer, who was speaking with your wife?

A.   O'Brien.

Q.   And who transported you to the station?

A.   Peterson.

Q.   Did you speak to Peterson at all during the drive

57

over?

A.   I did.

Q.   What was said in that drive?

A.   I was telling him, you know, I don't think this was fair.  I called -- I tried to explain the story, the situation; then I tried to tell him about myself.  Like I'm not a trouble person.  I just came from work.  I told him what school I went to; kind of gave him my resume about where I worked.

Q.   And what, if anything, did he say to you?

A.   He said he didn't want to be doing this, you know, and pretty much was like -- you know, he kept saying I'll have my day in court.

Q.   Now, what happened when you got to the police station?

A.   I get to the police station; I'm in the booking area.  They handcuffed me to like a chain -- I'm sorry, to like a metal iron, and I asked them to not do that because it was straining my hand.

     You know, I felt like I was being treated like an animal; so they did release the handcuffs.

     I pretty much was quiet.  I didn't really say

58

much.  I got to call my wife.

Can't hear you, sir.

Q.  How long were you at the police station?

A.  I'd say an hour or two.  Maybe less -- an hour or two; somewhere around there.

Q.  And were you always outside where you first indicated you were placed?  Or did you get moved at any time?

A.  No, they placed me in a cell.

Q.  Okay.  And did you have any -- what's referred to as a booking process?  Did you have your photos and fingerprints taken?

A.  I did.

Q.  And did you get interviewed by a police officer?

A.  Yes.  I believe they called the county sheriff.

Q.  Did you talk to O'Brien or Peterson further in the station at any time?

A.  I may have had a conversation, again, trying to plead my case.  You know, and then the one conversation I did have with Peterson upon my release was in some type of conference room.

As I'm walking out --

Q.  Was that that evening?

A.  Yes.  So after my wife came with the -- you know,

59

and released me, we're walking out; we're walking through like a conference room, I guess, like the front of the police department, and Peterson says to me that, between him and I, he would deny ever making this statement, but that kid -- I'm quoting here -- is an asshole, and he should have been the one arrested.

Q. And what did you say?  If anything.

A. I'm sorry.  I can't hear you.

Q. What did you say, if anything, to this cop's comment in response?

A. I don't think I really said anything.  I just took their information.

Q. Okay.  Did you drive home with your wife?

A. I did.  My wife and my kids.

Q. Say it again?

A. My wife and my children at the time.

Q. Okay.  They came down to the station with your wife?

A. Yes.

Q. All right.  And you went back into the house when you got home obviously?

A. Yes.

Q. Okay.  Now, would you describe for me what

60

followed with any of the criminal charges that were brought against you.

Did you have to go to court?

A. Yes, I did.

Q. When did you go to court next?

A. That next -- that same morning.

Q. Okay. Fair to say that the criminal charges were dismissed against you?

A. After fighting and retaining an attorney, yes.

Q. And who did you retain as an attorney?

A. I forget his name. I'm not sure if it's Robert Burnes.

I forget his name, but I did retain an attorney. I don't remember his name. This was prior to my counsel now.

Q. Now, I want to ask you relative to some of the allegations made in your complaint as to the impact this incident you claim had on you.

Did you -- did you indicate in your complaint that the pendency of the criminal charges prevented you from attending any social or school events?

A. That is correct.

Q. And what specifically did you not attend?

61

A.  My son had a field trip -- several field trips which you're required to do some CORI application before being allowed; so I was unable to attend several of those field trips.

Q.  And did you actually have a -- did you seek a CORI printout?  Or did you just not bother?

A.  I had a charge over me; so I knew I wouldn't pass.

Q.  Okay.  Have you subsequently attended school events or field trips with your children?

A.  Certainly.

Q.  Now, you had made an indication in your complaint that you didn't apply for a promotion; is that fair to say?

A.  That is correct.  Several promotions.

Q.  What promotion did you not apply for?

A.  It would have been manager -- line manager at the time.

Q.  And why did you not apply for it?

A.  Because anytime you go for those positions, if you do get accepted, they have to run a background check.

Q.  How long did the criminal charges remain pending before they were dismissed?

62

A. Oh, I don't have an accurate exact time, but I tried to get that sealed relatively quick; so -- I don't know what's the standard -- the standard Massachusetts time.

So I think I went to court twice. I think there was like a pretrial probation. I was on pretrial probation. I'm not sure how long that duration is.

Q. The matter was resolved by pretrial probation; is that correct?

A. I believe, yes.

Q. So you were arraigned the next day or shortly after the arrest; correct?

A. Yes.

Q. And then the next time that you went was the pretrial probation disposition; is that correct to say?

A. I believe so. I may have tried to go in once or twice earlier I think to try to expedite the process, but that -- according to my memory, yes.

Q. And did you use the term that you had the record sealed?

A. I did.

63

Q.  Okay.  And you had that sealed after the disposition was imposed; correct?

A.  That is correct.

Q.  Okay.  Had you ever been arrested prior to that date?

A.  Yes.

Q.  And when was -- when did that occur?

A.  2016.  November of 2016.

Q.  What was the circumstances of that arrest?

A.  My wife and I got into an argument.  My -- yeah, my wife and I got into an argument.

Q.  Okay.  Was she -- were you married at that time?

A.  No.

Q.  Okay.  And where did that argument take place?

A.  Everett.

Q.  Did the Everett police arrest you?

A.  Yes.

Q.  And what were you charged with?

A.  Battery.  Assault and battery?  I don't know.  I think so.

Q.  And what was the disposition of that charge?

A.  The charges were dropped.  I don't -- it was a while.  I don't remember.

Q.  Was that record sealed?

64

A.   I believe it was, yes.

Q.   Okay.  Was there any other time that you had been arrested other than Everett in 2016 and this incident?

A.   No.

Q.   Have you ever been criminally charged in any other matter other than that Everett one and this one?

A.   No.

Q.   Have you ever had a criminal application sought against you?

A.   No.

Q.   Have you ever been a plaintiff suing somebody in a civil case?  Other than this one.

A.   Yes.

Q.   What was the nature of that?

A.   The venue we had booked for our wedding didn't want to refund our money.

Q.   So you had a -- some sort of contract lawsuit?

A.   Yes.

Q.   Okay.  And when did that occur?

A.   That was -- I mean, our wedding was 2020.  I think we resolved that in 2021.  '22 or '21.  I don't have a timeline on it.

65

Q.  Okay.  What -- do you recall what court that was in?

A.  So it was a magistrate.  I think it was out of -- what's the court by Forest Hills?

It was -- it was via Zoom; so it might have been West Roxbury, but it was via Zoom.

Q.  Okay.  Have you ever been -- other than that, have you ever been a plaintiff in any other civil lawsuit?

A.  No.

Q.  What about as a defendant in any civil lawsuit?

A.  No.

Q.  Now, you'd also claimed other damages as a result of this incident including weight gain.

Would you describe what you mean by that, that you suffered weight gain as a result of this incident.

A.  Yeah.  I became extremely depressed; so I just began overeating, and it just became really unhealthy.

Q.  And you said "extremely depressed."  Did you seek any counseling; go through any sort of mental health therapist or psychiatrist or psychologist?

A.  I did see a therapist.

66

Q.   You did?

A.   Yes, a therapist.

Q.   Who'd you see?

A.   Nick Auerbach.

Q.   And when did you start seeing that therapist?

A.   Sometime I believe in '22.  Shortly after this incident.

Q.   As a result of this incident?

A.   I'm sorry.

Q.   As a result of this incident?

A.   Yes.

Q.   All right.  And how long did you see that therapist?

A.   Several -- several weeks.

Q.   How often?

A.   I think it was maybe twice.  Twice a week.  I can't remember.

Q.   For how long?

A.   I'm sorry.

Q.   For how many weeks?

A.   I don't remember the duration; the exact duration.

Q.   At some point, that therapy treatment ended?

A.   It didn't end; it just -- my work schedule just

67

became really complicated with the appointments; so ....

Q. So at some point, you stopped seeing this therapist?

A. Yes.

Q. Have you seen any other therapist as a result of any anxiety or depression that you claim arises out of this incident?

A. Not to date.

Q. And you indicated some sort of deteriorating health.

What was the nature of the deteriorating health that you claim is related to this?

A. I'm not -- could you please elaborate.  I'm not sure.

Q. Well, so, at paragraph -- paragraph 63 of your complaint -- reading from paragraph 63 of your complaint, you write During this ordeal, Charles suffered pecuniary injury, deteriorating health, reputational damage, humiliation, acute frustration, depression, and stress.

And in an earlier answer to one of my questions, you made reference to bad health; so I'm asking you what specifically was the nature

68

of your deteriorating or bad health.

A. Sorry.  The weight gain became obesity.  I became obese; severely obese, which started --

Q. How much weight did you gain?

A. Close to 60-plus pounds.  60 to 70 pounds.

Q. Have you lost that weight now?

A. I have.

Q. Okay.  What was the -- what was the steps that you took to lose the 60 pounds that you say you gained?

A. I ended up having the sleeve surgery; weight-loss surgery, and then I lost some weight --

Q. When did you have that?

A. -- on my own.

    I'm sorry?

Q. When did you have that surgery?

A. '22.  June of -- no, I'm sorry.  June of '23.  June of '23.

Q. Where did you have that surgery?

A. Faulkner Hospital.

Q. Okay.  Now, you have made allegations in your complaint that, subsequent to this incident that occurred in January of 2022, that there's been some sort of continued harassment against you by

69

the Hanson police.

Is that a fair summary of your allegations?

A. That is correct.

Q. Would you tell me specifically what you're alleging has been subsequent instances of harassment by the Hanson police.

A. So they would frequently drive by my house, shine a light into my house.

A few weeks ago, they came to my house. I was at work, but my wife was home. They came to inquire about cars being vandalized, but we're the only house that they came to.

I had asked the chief to have their -- to communicate with his officers that they need not patrol or ride on this street; it's a private road. There's no reason for them to be on this street unless they're responding to an emergency.

Q. You indicated that police cruisers or other vehicles going down Leon Court was a form of harassment directed toward you?

A. Yes.

Q. Okay. And you made -- you made reference to it being a private street?

70

A. That is correct. According to the Town.

Q. To your understanding, it's a private street with public access that the Town also maintains?

A. According to them, yes.

Q. Okay. When you say "according to them," who's "them"?

A. The Town of Hanson.

Q. Okay. Well, have you observed the Town plow that roadway?

A. I have.

Q. And have you seen the Town fill potholes on that roadway?

A. Correct, yes.

Q. Have you ever observed police -- strike that.

Have you ever observed public safety vehicles, whether they be ambulances, fire, or police cars, go down that roadway prior to January 22nd?

A. Prior to that? I would say no.

Q. So you've never seen an ambulance or a fire engine or a police car prior to January of 2022, for the six months that you lived there?

A. That is correct.

Q. Okay.

71

A.  It's a very private, quiet road.

Q.  Subsequent -- I'm sorry.  I interrupted you.

A.  No.  Again, it's a very quiet, private road.
    They may have.  I just never observed it prior to
    that date.

Q.  But what about after January of 2022?  After this
    arrest.
        Did you ever see an ambulance or a fire
    apparatus on that road?

A.  Several times, yes.

Q.  Okay.  And are you asserting that those events
    were harassing towards you?

A.  Some of them.  I can't prove all of them, but I
    believe most of them, yes.

Q.  So do you -- are you asserting that an ambulance
    driving down your roadway was directed at you?

A.  Not ambulance.  Police vehicles.

Q.  Okay.  But my question was ambulance and fire,
    and you said some of them or several of them were
    directed at you; so I'm asking you specifically
    what you mean by that.

A.  So ambulance and fire, no.  I -- strike that.
    Ambulance and fire, no, but the police vehicles,
    yes.

72

Q.  But you have observed ambulances and fire driving
    down Leon Court?
A.  Yes.
Q.  Okay.  And you've also observed police cars go
    down Leon Court; correct?
A.  Yes.
Q.  But you're distinguishing that the police
    vehicles going down Leon Court were harassing
    activities directed at you but the fire and
    ambulance were not?
A.  That is correct.
Q.  Okay.  And you said that you claim that police
    shown lights in your house?
A.  That is correct.
Q.  When did those occurrences happen?
A.  I don't have an exact date at this time, but
    somewhere after the January '22 incident.
Q.  And how many times do you claim that occurred?
A.  Say more than six times.
Q.  And did you ever write down any of those dates
    that you say that occurred?
A.  I don't know if I've written them, but I'm
    sure -- I communicated with my attorney; so it's
    probably documented via email.

73

Q. Other than communicating with your attorney, did
you memorialize those occurrences in any other
fashion?

A. I don't recall.  I'd have to look through my
notes.  Probably.  I'm not sure.

Q. Well, when you say "notes," what notes are you
referring to?

A. I have notes in my phone.

Q. And do you -- do you maintain notes just about
all personal activities or notes relative to this
occurrence?

A. Personal, various things.

Q. Okay.  So do you keep a diary of life events?

A. I wouldn't say a diary, no.

Q. But some sort of memorialization of occurrences
in your life?

A. No.  I just write notes.  I wouldn't call it
that.

Q. Okay.  So where do you keep these notes?

A. In my Notes section of my phone.

Q. Okay.  And so if you had memorialized these
events where you claim police shown lights at
your house, you would have memorialized that in
your Notes section of your telephone?

74

A.  Not necessarily.

Q.  Well, I'm asking you necessarily.  Where would you have kept them?

A.  Via email to my attorney.

Q.  Okay.  Other than an email to your attorney, any other place you would have memorialized these events?

A.  No.

Q.  Okay.  Did you ever call the police to complain about these alleged instances?

A.  Yes.  I emailed and called them.

Q.  And when did you call or email them regarding police allegedly shining lights at you?

A.  I don't have those dates.

Q.  Okay.  Did you ever go down to file any sort of complaint about that?

A.  No.

Q.  What other occurrences, if any, do you claim constituted subsequent harassment by police towards you?

A.  I'm not sure I understand the question.

Q.  Well, your -- I asked you to define or explain to me your allegation about subsequent harassment by the police directed at you.

75

Do you remember that question?

A. Yeah.

Q. And in answer, you said police cruisers were observed driving down your street; yes?

A. Yes.

Q. And you indicated that that constituted harassment toward you?

A. Yes.

Q. Is that correct?

A. Yes.

Q. And then you also said that there were occurrences at least six times where police shown lights at your house?

A. That is correct.

Q. Okay. And you told me those in response to my question about describing for me police harassing conduct; so my question now for you is what, if anything, else would you describe as constituting police harassment toward you?

A. Besides the incidents that I just stated, I think those are harassing incidents. Stopping near or at my residence.

Q. Say that last part again.

A. Stopping near or at my residence or driving near

76

or at my residence.

Q.  Stopping you near your residence?

A.  No.  Driving or stopping near my residence.

Q.  Oh, okay.

A.  Yeah.

Q.  So you've observed police stopped near your residence?

A.  Oh, they'll drive by -- my house is on a corner. They'll drive by slowly.

Q.  When you're saying it's on the corner, is the -- what's the corner street?

    If it's Leon Court, what's the intersecting street?

A.  It's not.  So it's a dead end.  So Leon Court; you know, Pol -- Poltech (phonetic).

    So my house is -- it's like an L -- I don't know if you can see that -- but it's still -- still kind of like one road.  It's one long dirt road.

Q.  So when you say it's a dead end, does the --

A.  It ends, but it's -- it's a dirt road.  So you have Leon Court on one side; Poltech on the other side.

Q.  But you can drive through -- not you.  One can

77

drive through Leon Court to get to the next street; right?

A.  That is correct.  So let's say this was the corner.  My house is right here, and this is the corner.

Q.  Okay.  And the next road that you would continue on on Leon Court to is what road?

A.  Depends.  You have Woodbine.

Q.  Is that a public way?

A.  That is, yes.

Q.  Okay.  What's the other street?

A.  I'm blanking right now.  What is that street?  I'm blanking right now.

Q.  Okay.  But -- you can't think of the name, but is that other street a public way as well?

A.  As far as I know.  It's a very weird little community here.

Q.  Now, you've had some problems or instances with your neighbors; correct?

A.  Yes.

Q.  Okay.  And fair to say you've called the police on several occasions as a result of issues with them?

A.  Yes.

78

Q.   What would you describe the nature of these issues with your neighbor?

A.   They had two nuisance dogs that would constantly run onto our property and chase my wife -- excuse me, my wife and my kids and I.

Q.   And subsequent to January 20th, 2022, have you had occasion to call the police regarding those unleashed dogs?

A.   I can't recall off the top.  I don't think so, but I can't recall.

Q.   But you do indicate that you've had other issues with your neighbors for which you have called the police department; correct?

A.   It would be in regard to the nuisance dog, correct.

Q.   Okay.  So I just asked you, did you call the police regarding the nuisance dogs, and you said you don't recall whether you called the police or not.

A.   No, I don't recall the dates.  I recall I called the police.  I don't remember the dates.

Q.   Okay.  Without recalling the specific dates, is it fair to say that those occurrences with the dogs happened after January of 2022?

79

A.   Yes.

Q.   Okay.  Were there any other instances other than the unleashed dogs that involved your neighbors that caused you to call the police?

A.   Not that I remember.  Not that I can recall, no.

Q.   Okay.  And what's the name of -- what's the name of the neighbor with whom you were having this dispute?

A.   David Leighton.

Q.   What's the name?

A.   David Leighton.

Q.   And Dylan, who you described earlier, is the son of David; correct?

A.   As far as I know, yes.

Q.   So on January 20th, 2022, when you first encountered Dylan and the other car, you recall testifying that he said something like you're the asshole who called the police on my father?

You recall making that statement or hearing that?

A.   Yes, sir.

Q.   Okay.  So prior to January 20th of 2022, did you call the police relative to some issue with your neighbor?

80

A.   Yes, sir.  I believe so.

Q.   Okay.  What was the nature of that call?

A.   It would have been a nuisance call.  There were several of them where the dogs would chase after our cars, literally in the middle of the road, run onto our yard, come barking at us.

Q.   Okay.

A.   Sorry.  I think we lost you.  Can't hear you.

Q.   Can you not hear me?

A.   I can hear you now.

Q.   We're going to fix this.  This is a new system; so I apologize.

     You described at least, you said, six occurrences where you observed police cruisers go by your street; right?  Or your house.

A.   Yes.

Q.   Okay.  Now, in any of those times, were you able to observe who was driving the police cruisers?

A.   Unfortunately, not.  The windows are tinted.

Q.   So did you ever observe the police chief driving one of those cruisers by your house?

A.   I cannot --

Q.   Michael Miksch.

A.   No, I cannot confirm that I did.

81

Q. Did you ever observe the defendant Brent Peterson operating one of those cruisers by your house?

A. I cannot confirm that, no.

Q. Did you ever observe Peter O'Brien operating one of those cruisers by your house?

A. I cannot confirm that I did.

Q. Say it again.

A. No, I cannot confirm that it was him at any time.

Q. You're aware that you, in one of your counts of your complaint, have alleged that Miksch, O'Brien, and Peterson were operating cruisers by your house and constituting a nuisance towards you?

A. I'd have to turn to my attorney for that.

Q. Well, if you know or not.  As you sit here today, are you not aware that you have actually alleged that those three individuals drove their police cruisers by your home in order to constitute a nuisance?

A. I don't know how to answer that.

        MR. LOUISON:  Let's take a five-minute break for five minutes.  How's that?  Make sense?

        I just want to see what else we may have for you.  Okay?

82

THE WITNESS:  Sure.

MR. LOUISON:  So it's 11:55.  Let's regroup at 12:00 o'clock.

Okay?

THE WITNESS:  Okay.

(Recess was taken from 11:55 a.m. until 12:03 p.m.)

BY MR. LOUISON:

Q.  All right.  Mr. Williams, back on the record. Just talking about some of the allegations and claims that you made in your complaint.

Did you take any time off from work or your employment as a result of this incident?

A.  My former employer, I probably did.  I'm pretty sure I did.

Q.  Can you speak up a little bit.  I can't really hear you.

A.  I said from my former employer, I probably did, yes.

Q.  Well, probably or did?

A.  I did take some time off.  I was stressed.

Q.  Why did you take time off?

A.  Due to stress.  I was unable to focus and do my job.

Q.  How much time did you take off?

83

A.   I can't remember off the top.  I'd have to look
     at my notes.

Q.   And were you compensated for that time off
     through sick leave or any other source or
     vacation?

A.   I may have had some compensation.  I'd have to
     look in my notes.

Q.   And, again, those notes that you're referring to
     are contained where?

        MR. BURLEY:  Through records.

A.   Our records.

BY MR. LOUISON:

Q.   Okay.  And what would be the nature of the
     records so that we could ask for them that would
     memorialize your claim that you took time off or
     lost time from your employment?

        I'm asking that because you've made these
     allegations.  I want to be able to establish how
     much time you actually took off.

        So where would those records be and in what
     form?

A.   I think I may have -- I communicated with my
     attorney through email; so I'm sure we can
     look -- look through emails.

84

Q.   Okay.  And you've also made a claim of a loss of consortium with your children.

Can you describe for me what impact, if any, you allege occurred in your relationship with your children as a result of this incident.

A.   Can I ask you to rephrase that question, please.

Q.   So are you aware that in your complaint you are claiming that your relationship with your children was adversely impacted?

Are you aware of that?

A.   Yes.

Q.   Okay.  So what's the nature of the impact?

What occurred with your children as a result of this incident?

A.   They are afraid for me; they're afraid for themself.

There's a lack of trust of the police; so they're afraid every time I leave the house something's going to happen to me.

Q.   At the time of your -- of the incident in January 2022, you had three children?

A.   That is correct.

Q.   And what were their ages?

Well, put another way, it was approximately

85

three years ago.

How old are they now?

A.   So 15, 11, and 3.

Q.   So 15 was 12; 11 was 9; and 3 wasn't born; right, at the time?

(Court reporter interrupted.)

BY MR. LOUISON:

Q.   Is that what you said?  Is that right what I said?  The 15-year-old was 12?

A.   Yes, that is correct.

Q.   And the 11 year old was 9, approximately?

A.   Approximately.  And my daughter was born a month after; so yes.

Q.   And the three-year-old was not yet born at the time of the incident; correct?

A.   That is correct.

Q.   All right.  And you say that the -- they are afraid for you.

What have they said to you that makes you think that they're afraid for your safety?

A.   Oh, they question why was I was arrested after calling the police.  Just from the whole incident, they don't trust the police; so when we see the police in the town when we drive by, they

86

think that they'll just pull me over and arrest
me again.

Q. Have they said that to you?

A. Yes.

Q. When was the last time they said something to the effect that they are afraid that the police are going to pull you over?

A. I don't have an exact date or time.

Q. Say that again?

A. I don't have an exact date or time.

Q. Okay. And the three year old has not said that; is that fair to say?

A. That is correct.

Q. Okay. Have you ever discussed with the older ones, the 15- and 11-year-old, about the incident?

Have you ever talked to them about it?

A. Yes, I have.

Q. Okay. When did you talk to them about it?

A. Sometime shortly after the incident. Maybe a day or two.

Q. And have they ever received any sort of counseling or therapy as a result of this incident?

87

A.   No.   We just talk to them.

Q.   Now, you indicated in your complaint in your discovery responses that your mother-in-law has come to live with you at your home; is that correct?

A.   Yes.

Q.   Okay.   And when did she come to live with you?

A.   Would have been end of January '22, right before the baby was born; so maybe a week or two after this incident.

I don't remember the --

Q.   So fair to say that she came to live with you because your -- your wife was about to give birth?

A.   Well, it was because of the incident.   We were afraid we needed another adult with our kids. Everything that was going on; so it wasn't the birth.   It just -- it was a coincidence of the time.

Q.   So was your -- was the plan in your family -- strike that.

Was there any plan in your family prior to January 20th, 2022, that your mother-in-law was going to come to live with you?

88

A.   No.

Q.   So that only occurred and was put into place
     after you were arrested?

A.   That is correct.

Q.   And how long did she stay with you?

A.   She's still currently with us.

Q.   So are you asserting that she's living with you
     to this day because of the incident that occurred
     on January 20th, 2022?

A.   That is correct.

Q.   And why is she presently living with you in
     February of 2025 because of the incident that
     occurred in January of 2022?

A.   Because we still feel unsafe.

Q.   Okay.  And do you feel that your mother-in-law
     can provide some level of safety; security?

A.   She can't, but to my children, yes, she's
     actually a protection to and from school and just
     an extra eye during the day when we are -- my
     wife and I are at work.

Q.   Your children are not of an age that they can be
     left alone while you and your wife are at work;
     correct?

A.   That is correct.

89

Q.  Okay.  So had you ever -- did you have someone living with you prior to January 20th of 2022 to keep an eye on your children while you and your wife were at work?

A.  No.

Q.  So what did you do with your children during that period of time?

A.  Which period of time?  I'm sorry.

Q.  Prior to January -- prior to the incident date in January '22.

A.  Well, I was working primarily nights, and my wife worked days; so she would come home from work, and then I would go to work.

Q.  Okay.  And did your work schedule change after January 20th or sometime after January 20th?

A.  Most likely did.  It changed a while -- a lot at that time.

Q.  Fair to say that you went from nights to days as you became the superintendent and a supervisor?

A.  Yes.

Q.  Okay.  And was your wife working from 2022 to the present?

A.  She would have taken time off due to the birth of my daughter, but yes.

90

Q.  After the birth of your daughter in February or thereabouts of 2022, she took some maternity leave; fair to say?

A.  Yes.

Q.  But then returned to work?

A.  Yes.

Q.  Okay.  And what was the -- and at that time, your mother-in-law had moved in with you; correct?

A.  Well, this was prior -- yeah.  So prior to February of '22, yes.

Q.  And prior to the birth of the -- of your third child she moved in with you; correct?

A.  Yes.

Q.  And where did she live prior to moving in with you?

A.  She lived in Everett, Mass.

Q.  Okay.  What's your mother-in-law's name?

A.  Brenda Keel.

Q.  What is it?

A.  Brenda Keel.

Q.  If we wanted to reach her via mail or other means, her address is the Leon Court home that you're at?

A.  Yes, sir.

MR. LOUISON:  Okay.  Give me one moment, will you please.

THE WITNESS:  Sure.

(Pause in the proceedings.)

MR. LOUISON:  That's it for me for Mr. Williams.

I don't know if Attorney Burley has anything.

MR. BURLEY:  There was -- you caught me off guard.  There was something that I wanted to get through, but -- I don't think it was so much that.

MR. LOUISON:  We're on the record right now. I don't know if you want that --

MR. BURLEY:  Okay.

FURTHER EXAMINATION

BY MR. BURLEY:

Q.  I think just to be clear, since we reviewed it, when you moved from Everett to Hanson and then how much time there was before the incident, if you can just tell us that now that we've sort of refreshed the memory.

A.  So came July of '21; so it was about six months.

Q.  Six months?

A.  Yes, sir.

92

Q.  I think there was a little confusion when you
    first asked the question; so six months.  Okay.
        MR. BURLEY:  That's really it at this
    moment.
        MR. LOUISON:  Then we will end this
    deposition of Mr. Williams.
        THE COURT REPORTER:  Attorney Burley, would
    you like the transcript and, if so, in what
    format?
        MR. BURLEY:  Let me get back to you about
    that.
(Conclusion of proceedings at 12:19 p.m. this date.)

93

CERTIFICATE

I, Karen D. Pomeroy, a Registered Diplomate Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that Charles P. Williams, the witness whose deposition is hereinbefore set forth, was duly remotely sworn by me and that such deposition is a true and accurate record, to the best of my knowledge, skills and ability, of the testimony given by such witness.

I further certify that I am not related to any of the parties in this matter by blood or marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this 10th day of March, 2025.

_____
                    Notary Public

My Commission expires:
June 13, 2025

Dunn Reporting Services, Inc.
617-422-0005

94

ERRATA SHEET

CHANGES TO THE DEPOSITION OF CHARLES P. WILLIAMS
INSTRUCTIONS TO WITNESS:  1) Please note any desired corrections to your testimony by page and line number.  2) Enter text as it appears in the transcript.  3) Enter text as it should appear.


PAGE    LINE                    CORRECTION

_____   _____  _____

_____   _____  _____

_____   _____  _____

_____   _____  _____

_____   _____  _____

_____   _____  _____

_____   _____  _____

_____   _____  _____

_____   _____  _____

_____   _____  _____

    I, Charles P. Williams, do hereby certify that I have read the foregoing transcript of my testimony, and I further certify that said transcript is a true and accurate record of said testimony.

    Dated at _____, this _____ day of _____, 20_____.


                    _____
                         Charles P. Williams

Dunn Reporting Services, Inc.
617-422-0005