# EXHIBIT 4

# In The Matter Of:

*Charles Williams, et als. v.*
*Town of Hanson, MA, et als.*

*Brent Peterson*
*March 4, 2025*

*Beacon Court Reporting Services*
*100 Independence Drive, Suite 7*
*Hyannis, Massachusetts 02601*
*(774) 678-4255*
*www.beaconcourtreporting.com*



Original File 2025-0304_Peterson.txt
**Min-U-Script®**

Brent Peterson - March 4, 2025

```
              IN THE UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS

                              Case No.  1:24-CV-11161-IT

*****************************
CHARLES WILLIAMS, VALENCIA    *
WILLIAMS, and their MINOR     *
CHILDREN,                     *
            Plaintiffs,       *
                              *
v.                            *
                              *
                              *
TOWN OF HANSON, MA.;          *
MICHAEL MIKSCH, in his        *
official and supervisory      *
capacities as the Chief of    *
the Hanson Police             *
Department; BRENT PETERSON,   *
individually and in his       *
official capacities as a      *
police officer for the        *
Hanson Police Department;     *
and PAUL O'BRIEN,             *
individually and in his       *
official capacities as a      *
police officer for the        *
Hanson Police Department,     *
            Defendants.       *
*****************************
```

        REMOTE DEPOSITION of BRENT PETERSON, taken
   pursuant to the applicable provisions of the
   Rules of Civil Procedure, appearing via Zoom
  Conferencing from Rockland, Massachusetts,
   before Kristin M. Stedman, Registered
  Professional Reporter, Certified Shorthand
   Reporter No. 1412, and a Notary Public in and
   for the Commonwealth of Massachusetts,
   reporting from Plymouth County, Massachusetts,
   on Tuesday, March 4, 2025, at 9:42 a.m.

           BEACON COURT REPORTING SERVICES
           100 Independence Drive, Suite 7
            Hyannis, Massachusetts  02601
           www.beaconcourtreporting.com

REMOTE APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:

EDWARD S. BURLEY, ESQ.
Emancipated Law, P.C.
1 Beacon Street, 15th Floor
Boston, MA  02108
(617) 637-6615
ed@emancipatedlaw.com

ON BEHALF OF THE DEFENDANTS:

DOUGLAS I. LOUISON, ESQ.
MANUEL D. SOZA, ESQ.
Louison, Costello, Condon & Pfaff, LLP
10 Post Office Square, Suite 1330
Boston, MA  02109
(617) 439-0305
dlouison@lccplaw.com
msoza@lccplaw.com

ON BEHALF OF BRENT PETERSON AND PAUL O'BRIEN:

LAUREN KOPEC, ESQ.
Sandulli Grace, P.C.
44 School Street, Suite 1100
Boston, MA  02108
(617) 523-2500
lkopec@sandulligrace.com

ALSO PRESENT:

Allyson Christian

I N D E X

EXAMINATION BY MR. BURLEY..................Page 4

E X H I B I T S

No.                                            Page No.

None marked.

P R O C E E D I N G S

- - - - -

BRENT PETERSON,

having first been satisfactorily identified and

duly sworn by the Notary Public,

was examined and testified as follows:

- - - - -

EXAMINATION BY MR. BURLEY:

Q.   I am Attorney Ed Burley representing Charles

and Valencia Williams and their minor children

in this matter against the Town of Hanson,

Chief Miksch, Officer Brent Peterson, and

Detective Paul O'Brien.

MR. BURLEY:  I am going to pause for a

minute just so we can try to get the feedback

under control.

Q.   Okay.  Officer Peterson, pleasure to meet you

at last.

Can you tell me where you were born?

A.   I was born in Stoughton, Massachusetts.

Q.   And where did you go to high school?

A.   West Bridgewater High School.

Q.   At what point did you move to the Town of

Hanson, or close to the Town of Hanson?

A.   I moved to Pembroke, next door, about five years ago -- five and a half years ago.

Q.   And how long have you been a Hanson police officer?

A.   I have been with Hanson, I am in my ninth year right now.

Q.   Where were you living when you first --

A.   I was living in Brockton.

THE REPORTER:  Excuse me, sorry, I can't see the witness.  If you can just flip up the laptop screen.

MR. BURLEY:  Oh, yeah?

MR. LOUISON:  Oh, you need to -- I am sorry --

THE REPORTER:  And I just missed the last two questions.  I am sorry.

MR. BURLEY:  So why don't we -- I will start -- I will repeat those questions.

THE REPORTER:  Thank you.

MR. LOUISON:  I apologize.

Q.   So when did you start -- when did you join the police force in Hanson?

A.   In Hanson, I transferred to Hanson in 2016.

Q.   2016.  So you have been a member of the Hanson

police force for how many years?

A.   I am in my ninth year.

Q.   And for the last five years, you lived where?

A.   In -- oh, living-wise?

Q.   Yeah.

A.   Pembroke, Mass.

Q.   Okay.

A.   Next town.

Q.   Prior to the morning of January 20th, 2022, how well did you know Charles Williams?

A.   I don't believe we ever --

THE REPORTER:  I am sorry, I am hearing some feedback.

MR. BURLEY:  I am going to restart my questioning just for the flow here.

THE REPORTER:  Thank you.

Q.   Officer Peterson, can you tell me when you were born?

A.   1977, February 25.

Q.   And your current age is?

A.   I just turned forty-eight.

Q.   So how long have you been a police officer?

A.   Full-time municipal, I have been an officer since mid 2013.  I originally graduated the

part-time academy in 2002, and worked various law enforcement, police, investigative jobs since then.

Q. It says 2013 that you were a --

A. In the full-time academy.

Q. So that is your -- you are about to celebrate your twelve-year anniversary of being a police officer?

A. Yes, coming up on twelve years.

Q. As I mentioned, before the night of January 20, 2022 -- it's actually the morning, early morning -- how well did you know Mr. Williams?

A. I don't believe we had ever interacted prior to that.

Q. And Valencia Williams, his wife?

A. Same. I don't think I have ever interacted with her.

Q. The kids?

A. No.

Q. Had you been to the house before that morning?

A. Prior to that, not that I can ever remember having a call there for any reason.

Q. Had you patrolled the street before; were you familiar with the street?

A.    Yeah.  It was a rarity for me to --

Q.    And by the street, I mean, Leon Court, 115
      Leon Court is where the Williams live and then
      --

A.    It would be a rarity for me to be driving down
      that road.  Mostly because the road was so
      terrible, I hated driving down it.  It was
      just potholes.

Q.    I can empathize; I was there Friday.

A.    But yeah, I wasn't really there all that
      often.

Q.    Okay.  Infrequently?

A.    Yeah.

Q.    Now, the night in question, when Mr. Williams
      called 911 out of distress, you were able to
      respond?

            MR. LOUISON:  Objection to the form of
      the question, but you can answer.

Q.    When Mr. Williams called 911, the morning in
      question, where were you?

A.    I was actually not far away.  Part of our
      required patrol area is what we refer to as
      Monponsett.  It's the southern-most part of
      the town, and once per shift, we are required

to be in that area and log, and I just happened to be in that area when that call came in, maybe a street or two over.

Q.   And when you got the call, what did you do?

A.   I went right over.

Q.   And what did you see?

A.   Upon pulling up, there was Mr. Williams in his driveway.  I briefly asked what was going on. He pointed to a gentleman walking down the roadway, saying he was involved -- something along the lines of in my face -- exactly, which I don't remember, obviously.

So at that point, as the other gentleman was walking away, I said, hang here for a moment.  I tried to get the attention of the gentleman walking away, and then went from there.

Q.   Had you ever seen the gentleman walking away before?

A.   I don't recall.  I was familiar with the name. After I realized who was it, I was familiar with the name.  I don't know if I directly had dealings with him in the past, but I was familiar with the name.

Q.   What is the name?

A.   Dylan Leighton.

Q.   Did he have any other family members who you were familiar with?

A.   His father was another one that we were familiar with, had past dealings with.  I believe David was his dad.  I am not sure.

Q.   When you say familiar with, are you talking about in a policing capacity?

A.   Yes.

Q.   So what does that mean?

A.   Calls to their house.  I believe there had been some in-depth investigations done by the detective unit and/or other officers there possibly -- again, before my time.  I believe it was for drugs.  I know the house, a search warrant, I believe, was issued there at one time, but again, he was familiar to us as kind of -- I guess the term -- rest in peace; he passed a while ago, but he was kind of a pain.

Q.   And you said this was David Leighton, this is the father?

A.   Yes.

Q.   And had you also had police dealings with the

son, Dylan Leighton?

A.   Again, I believe so.  I don't recall ever having dealings with him at that point.

Q.   So while you had been down the street, and the street wasn't, say, a priority for the department, just because of where it was and a little bit remote, would you say the house was on the radar for the Hanson Police Department?

A.   Mr. Williams' house.

Q.   No, the Leighton residence.

My understanding is David Leighton, the father, and Dylan Leighton lived in the house together.

A.   Correct.  I do remember they also would have long-term house guests.

Q.   Okay.

A.   They would also be part of the problem half the time.  Not necessarily --

THE REPORTER:  I am sorry, I can't hear.  Hello.  There is just too much feedback.  I am having a real difficult time hearing the witness.

MR. BURLEY:  Feedback again, huh?

(Discussion off the record.)

Q.    So we were establishing that -- how many
people reside in Hanson, approximately?

A.    About -- based on the last census, probably
about twelve thousand.  Roughly twelve
thousand.

Q.    We're establishing that the Leighton household
was on the map for law enforcement within that
twelve thousand?

A.    We knew of it.  It certainly wasn't our
biggest issue, but we knew about it.

Q.    And that night, you sort of -- I am going to
go back in a little more detail about when you
first came upon the scene, but since we're
talking about the Leightons now, let's stay
with that topic.

      Did you speak to David Leighton and
Dylan Leighton that night?

A.    Initially, it was Dylan.  I believe later on,
after things had calmed and whatever, at some
point, his dad did come out to find out what
was going on, and I do know that due to his --
due to Dylan's intoxication, we made sure -- I
do remember talking with his father and
saying, are you sure you've got this, you

know, so we don't have to do anything else with it, you can take responsibility for him, and he did, and he got him back to the house, but he was not there immediately, that I recall. It was sometime later.

Q. Okay. So let me stick with that. We are going to go out of order, but I think it's more efficient this way.

When you talked to David Leighton, you were closer to his residence than the Williams' at that point?

A. I couldn't say. We were in the street. I couldn't say where we were in the street.

Q. Okay. The Williams' recollection is that at a certain point, it was closer to the Leightons', and you had questioned them sort of closer to the Leighton residence.

Does that sound about accurate or close?

A. Initially -- if you are speaking about David, I couldn't say.

If you are speaking about Dylan, initially, he was walking towards the house. I had him come back towards me. So we were

probably -- my best recollection would be
equal distance between the two houses.

Q.  Just because we're there, do you remember when
    you talked to -- at this point, when you were
    talking to David and Dylan, were you also --
    were there other people that you were talking
    to at the same time?

A.  The three other friends, I guess, or cohorts
    of Dylan were there also.

Q.  Okay.

A.  Along with two members of Halifax Police, and
    Detective O'Brien, obviously.

Q.  Right.  By this time, backup had arrived?

A.  Yes.

Q.  Okay.  So what was the nature of your
    conversation with Dylan, the three friends,
    and David Leighton?

A.  Again, David came in after the fact.

Q.  Okay.

A.  But the initial conversation was -- when I
    first had Dylan come back -- and to
    fast-forward a little bit, he was advancive
    and not following directives, so he was placed
    in handcuffs.

While that was going on, his friends noted to me that, quote-unquote, he, being Mr. Williams, had pulled a knife.  So at that point, we started -- I started getting information in regards to what happened with that.  Again, David didn't come into the picture until much later.

Q.  Okay.  So how long would you say that you questioned Dylan and friends?

A.  Five, ten minutes, at most.

Q.  And what kind of questions were you asking?

A.  Did you see the knife, can you describe the knife, was there -- well, first would be was anybody actually hurt.  You know, what was said, how did this come about, what started this whole thing, this disruption at the end of the street.  The basics of -- investigatory questions that I would ask.

Q.  And their answers, what started it?

A.  I believe Mr. Williams was trying to back his vehicle into his driveway.  At which point -- not -- thankfully, not Mr. Williams was driving, another vehicle came around the corner and had blocked, blocked that off,

which started some kind of an argument between Mr. Leighton and Mr. Williams, in front of the house.

Q.   Is it possible that you talked to Leighton and friends, that -- David Leighton, is it possible that it might have been closer to fifteen or twenty minutes?

A.   For that length of time, all of them?

Q.   Yeah.

A.   I wouldn't -- I mean, I am trying to think.  I would have to speak to all them, I would have to speak to all of them as separately as I possibly could in that situation.  It could have been twenty minutes.

Q.   Do you remember if David Leighton asked you for any -- a favor that night?

A.   No.  No.

Q.   He didn't ask you to not arrest his son?

A.   Not that I recall, and I think David would know better than to ask us for a favor.

Q.   Okay.  At that point, after you questioned Dylan and friends and spoke to David, what did you do next?

A.   Once the other officers arrived, I went back

and spoke to Mr. Williams, to get his side of the story and find out what happened.

Q. How did you do that?  Was Mr. Williams waiting for you outside or --

A. If I remember correctly, I had to go up and knock on the door or ring the doorbell.  He had gone back inside.

Q. So you knocked on the door, and what happened?

A. He opened it, and I got more information from him in regards to their claiming, you know, he pulled a knife on them, what happened, and he went and explained his reasoning for doing so, that he felt that Mr. Leighton had lunged at him.

So he explained his reason for pulling a knife, admitted he pulled a knife.  I then asked him where the knife was.  He said in the house.  I believe Mrs. Williams went and got it for him, and it was handed to me at that point.

We then -- I then went back to the other group, with the knife, to confirm that that was the knife that they saw, heard, and identify it positively, and it went from

there.

Q.  In the police report, it describes the knife as a Smith & Wesson folding knife with a 3.5-inch blade?

A.  Correct.  I think it was an 8-inch knife with a 3.5-inch blade, yes.

Q.  So Mr. Williams has a different recollection of that, that it's a different knife.  We can get into that later.  I don't have that with me.  I have the knife that he claims that he had.  Is this possibly the type knife --

MR. LOUISON:  Objection to the form of the question, but since it's before you, you can respond.

A.  That is not the knife.  This was more of something that we would carry, like a tactical knife.

Q.  Okay.

A.  So not anywhere close to that.

Q.  I think that is just an evidentiary question, comparing what they were -- seen.

So when you were -- when you had left questioning David Leighton and the friends, and you were walking towards the Williams'

Brent Peterson - March 4, 2025                    19

house, what were you deciding what to do; what were your options at that point?

A.   Is this prior to talking to --

Q.   Yes, on your way to talk to Mr. Williams.

A.   At that point, it was wide open.  I was not -- I had not made a decision on what was going on yet until -- obviously, it was only fair to talk to -- there's always two, if not three or four sides to a story.  I went back to get Mr. Williams' side of the story before I made any decisions.

Q.   Was the main line of your questioning starting with the knife?

A.   I believe I started with -- at that -- I didn't have enough time during my first encounter with him to get -- again, because Mr. Leighton was walking down the street, and I focused on getting him back, so I didn't have a lot of time to talk, so it began pretty much, what happened, and I got Mr. Williams' side of the story about, hey, he got out, he was yelling at me, they all got out, they confronted me, Mr. Leighton lunged at me, so on and so on and so on.  Did you pull a knife?

Brent Peterson - March 4, 2025                          20

Yes, I pulled my knife out.  He admitted to doing so.  He admitted to opening it and brandishing it.  Do you still have the knife?  So just that low line of questioning in regards to what happened.

Q.  And time-wise, how long would you say that you questioned Mr. Williams?

A.  Five or ten minutes.

Q.  And how long did you question Valencia Williams?

A.  I don't believe that I actually had a conversation -- not that I remember -- that I had a conversation with her.  I can't remember if I did or not.

If I did, it wasn't anything -- I wasn't aware that she had been privy to anything that had happened outside, at that point.

Q.  Okay.  So we get there.  And then Mr. Williams comes back with the knife?

A.  I asked him if he still had it, and he stated yes.  I think I remember Mrs. Williams going to get it for him in the house.  Brings it out, gives it to me.

Brent Peterson - March 4, 2025                21

Q.    At this point, there has been some time that
      had passed.  My understanding is that
      Mr. Williams was getting ready to go to bed,
      that he had changed out of his work clothes,
      so he was --
            MR. LOUISON:  Objection to the form of
      the question.
Q.    When you came back to the house, how was
      Mr. Williams dressed?
A.    I couldn't -- at the time, no idea.  I wasn't
      paying attention to that.  I was paying
      attention to the investigation, and talking to
      him and getting his side of the story.
            He wasn't -- it wasn't anything so
      unusual that it caught my eye, whatever it
      was.
Q.    And so once you saw the knife, what did you --
      you were given the knife to examine, what did
      you do next?
A.    At that point, I asked Mr. Williams to hang
      around.  I brought the knife back to Dylan
      Leighton and the three other witnesses.
      Again, separated them out as best I could.
      Two of them identified the knife as the one

that Mr. Williams had pulled out and brandished.

Mr. Leighton identified it by the sound it made, which is what he initially stated to me, he hadn't actually seen it, but he had heard it.  When I opened it for him, he confirmed that was the exact same sound.

The fourth witness admitted that he did not see the knife, because he was -- I believe he was still in the car at the time.

Q.   Dylan Leighton was intoxicated at the time?

A.   Yes.

Q.   And were the other three individuals also intoxicated?

A.   Not to -- if they were, not anywhere close to the same level.

Q.   So he recounted to you a very precise sensation about hearing it, but at the same time, he was quite intoxicated, right?

You sort of stated that, that he was --

A.   It is fair to say he was intoxicated.  I can't say to which level, but yes.

Q.   Given that, did you question the accuracy of his recollection?

A.    No, I had no reason to.

Q.    In your experience, an inebriated person has a full capacity for recollection just as a person who is sober?

A.    At this point, things had calmed, and this was not an extensive amount of time in between. This was -- I asked him to recall a memory from no more than -- at most half an hour ago so I took it at face value when he said, yes, that is the sound, that is what I heard.

It wasn't like it was days or months later.  It was a sound he heard no more than half an hour ago.

Q.    Now, the incident began with you receiving a 911 call?

A.    Yes.

Q.    Who made the call?

A.    Mr. Williams.

Q.    And what was he asking for?

A.    It came over to us as there being a disturbance.  It came over -- that is how it was dispatched to us, a disturbance with multiple people in front of 115 Leon Court.

Q.    Okay.  And when someone makes a 911 call, is

Brent Peterson - March 4, 2025                    24

the protocol to speak with that person first?

A.   You can -- yeah, if it works out that way, yes, that would be the best to do.  It doesn't always work out that way, but if you can, yes.

Q.   When you respond to a 911 call, are you concerned that the people who the call is being made against, so to speak, like, are telling you a version that is self-serving; is that something to watch out for?

A.   People lie all the time.

Q.   People lie all the time, right?

A.   Yeah.

Q.   Did you suspect that Dylan and the three friends might have had a motivation to lie?

A.   Not under those circumstances with the manner in which they exclaimed to me that, he pulled a knife on us.  It was not -- did not come across to me as something made up.

     The two that actually exclaimed they saw the knife seemed very genuine, were not -- if intoxicated at all, were not even close to Mr. Dylan's, so I had no reason to disbelieve anything.

Q.   Let's drill down that a little bit.

How did they describe Mr. Williams' handling of the knife?

A. It had come out of his pocket, and he had flicked it open. Like I said, it was more of a tactical knife than anything else.

Q. And they feared that he was going to cut them?

MR. LOUISON: Objection to the form of the question, but you can answer if you know.

A. I don't know if they were -- their level of fear; I couldn't comment on it.

Q. Now, in an assault, any kind of assault, when you are considering an assault charge, those impressions or feelings can be relevant to deciding whether someone has been assaulted or not, correct?

A. In some cases yes.

Q. But you didn't ask if they feared for their safety?

A. My understanding was that they were not as close, and that the blade being opened and brandished was directly towards Mr. Leighton, so I wasn't at that point, at that point, considering them victims. They were just witnesses, so I wouldn't have been concerned

with their level of fear in that circumstance.

Q. Would you say that you were considering Dylan Leighton as a victim at that point?

A. Once I was -- had information to show that the weapon was brandished directly at Mr. Dylan, yes, yeah, at that point I was --

Q. Okay.

A. -- leaning towards more of a victim than a witness.

Q. And again, brandished is more like a term of art, right?  So did they say, he brandished a weapon towards us?

Is that the word they used, or how did they describe how the knife was --

A. Taken out of his pocket and opened up.  Never said anything about, you know, like, waving it in the air or anything like that, but taken out of his pocket, opened towards the individual.

Q. Now, it was opened towards Dylan Leighton?

A. Correct.

Q. And did they say how long he kept it open?

A. No.

Q. Did they say he showed the knife before or

after he pulled it out of his pocket?

A.   I believe the knife -- yeah, the knife was shown before he called 9 -- I believe.  I believe that was the timeline.

Q.   So we get to the Williams'.  You ask about the knife.  They present the knife.  And just retrace again what did you do.

A.   I am sorry?

Q.   Just retrace for me again what you did once the Williams presents you with the knife.

A.   At that point, I take the knife back to the witnesses, Dylan and the other three.  The one, like I said, again, he didn't see it.  The other two positively identify it as the one that was in Mr. Williams' hand, and Mr. Leighton, Dylan, says, I didn't see it but I heard it.  I said, is this the sound you heard.  I opened it the way it would be opened, whipped open, and he said, yeah, that is the sound I heard.

Q.   And you believed Mr. Leighton?

A.   Yes.

Q.   And then what happened next?

A.   At that point, I believe I spoke to Detective

O'Brien, who was the officer in charge that night, kind of updated him on everything I had after speaking with all the parties and -- I am trying to think if there was anything else before the decision was made that -- I believe I also had asked somewhere in there, you know, Dylan, do you have any weapons on you or anything like that.

He might have -- he probably was patted down, too. I can't say specifically, but I likely would have once I cuffed him. He was not in possession of any weapons, and I would have reiterated that during the questioning.

And then, I believe the decision was made to place Mr. Williams under arrest for the assault with a dangerous weapon.

Q. Would it be common, if you had patted Dylan down, that that is something you would -- if you had patted Dylan down, is that something that you would have noted in your police report?

A. Sometimes. I am not perfect. It wouldn't have been omitted on purpose, but writing your report at 4 o'clock in the morning, I tend

sometimes -- I don't always put every little detail in.

Q. But in a situation like this, where the use of a knife plays such a large role, it seems like that patting down of the other person or searching for weapons takes on maybe a larger significance?

A. Again, yes and no.  Mr. Williams never claimed that he had a weapon, so I wasn't as concerned.  It was more if he is intoxicated, I would want to make sure he doesn't have something on him, if he is intoxicated, but there was no claim by Mr. Williams that he had seen or heard or had been threatened with a weapon.

Q. I know I am jumping around here a little bit, but bear with me.

On your way back to the Williams' house, you have a talk with Detective O'Brien?

A. Correct.

Q. Probably deciding what to do, right?

A. Advising him of what everybody has said, and what we have as far as facts in the case, and what should be done about it.

Q.   Okay.  What were your options at that point?

A.   My opinion, at that point, really the only option was to place Mr. Williams under arrest.  He had committed a felony.  We don't normally let felonies just happen and then nothing -- and just let people walk away or don't do anything else.

     If it had been -- if this had been a trespass -- you know, minor misdemeanor type of situation, yeah, don't do it again, or a summons or something else, but pull a knife on somebody, you are probably going to be arrested for the felony.

Q.   Were you concerned at all that Mr. Williams had called 911 to summon help?

A.   Was I concerned --

Q.   In terms of your analysis, in terms of your determination about how to handle it; did that give you pause?

A.   No, I don't think it did, no.  No.

Q.   Okay.  In your time, is it frequent that if you get a 911 call, and then you end up arresting the person who made the 911 call?

A.   It does happen.  Domestic -- it happens --

Q.  actually, it happens all the time in domestics.

Q.  In a domestic.  Now, in a situation like this where the parties -- in a nondomestic situation --

A.  Correct.

Q.  -- I would imagine it's rare, less frequent?

MR. LOUISON:  Objection to the form of question, but you can answer.

A.  It's not common, but it happens.

Q.  So you just stated, so it didn't give you pause that Mr. Williams had called 911 to summon help; that didn't give you pause of what to do?

A.  No.  At that point, because -- having at that point, having all the other facts in play, no, that didn't give me pause.

Q.  So what were the other facts?  There is Mr. Williams -- was Mr. Williams outnumbered?

A.  Again, the way it was explained to me is that Mr. Leighton was the primary aggressor, and was technically the sole aggressor.  Yes, two of the other three were standing outside the car, but were not lunging at Mr. Williams and

whatever else.

So were there more people there than just Mr. Williams, yeah, but I can't -- outnumbered, I don't know if that is the correct way to -- again, there were more people there with Mr. Leighton than there was for Mr. Williams, who had no one there.

Q.   In total, how many people were with Mr. Leighton?

A.   One in the car, two outside standing back, and then Mr. Leighton.

Q.   So four total?

A.   Yes.

Q.   And what was Mr. Williams doing at that time, to your understanding?  Like, where was Mr. Williams coming from at that time?

A.   I believe he was coming from work.

Q.   And where was he going to?

A.   Home.

Q.   Was Mr. Williams intoxicated?

A.   Not that I recall.

Q.   Didn't seem to be intoxicated?

A.   No.

Q.   So he had called -- he was the 911 caller,

nonintoxicated, and he was coming home from work, on his way home, that is the Williams sort of story in a -- narrative that night, right?

A.   Yes.  Yup.

Q.   And there was at least one inebriated person, with three other friends or associates with him; that is the basic setup, right?

A.   Correct.

Q.   And this is taking place in front of Mr. Williams' home?

A.   Correct.

Q.   And Mr. Williams expressed to you that he called 911 because he needed help?

A.   Yes.

Q.   Did you ask him that, why did he call 911?

A.   That is fair.  Because he stated that Mr. Leighton had jumped out of the car and started an argument with him.

Q.   And what did Mr. Williams tell you, specifically, he was trying to do that he could not do because of the vehicle -- the other vehicle and then Leighton's action? What was he basically trying to do as he came

   home from work?  What do people do at the end
of the day?

    MR. LOUISON:  Objection.

A. I believe he was just trying to back his
vehicle into the driveway, if that is -- I
don't --

Q. So he was just trying to finish his commute,
right?

A. Yes.

Q. And what time -- again, what time was it when
this was happening?

A. I believe the call came in at 1:29 a.m.

Q. So a gentleman is coming home from work,
trying to park his car in the driveway, right?

A. Uh-huh.

Q. Not inebriated.  He feels threatened; he calls
911.  He is one; those other folks are four.
So that is the setup, so those facts are --

    MR. LOUISON:  Objection.

A. Yes.

Q. We don't dispute the facts about those
elements, right?

A. There were five total people present.

Q. And I think there was also one more person

Q.    present; wasn't there?

A.    Me.

Q.    I think someone else; someone else pretty
      close to Mr. Williams?

            MR. LOUISON:  Objection to the form of
      the question.

Q.    Did you see Valencia Williams present on the
      porch, on the street, when you were
      questioning the suspects?

A.    I do not recall.  I do not recall.

Q.    So you are saying that the first time you saw
      Valencia Williams was when you came back and
      knocked on the door of the Williams' house?

A.    To the best of my recollection, yes, that is
      -- I don't remember having any interaction
      with her at all.

Q.    When did you notice she was heavily pregnant?

            MR. LOUISON:  Objection.

A.    I --

Q.    Did you notice Valencia Williams was heavily
      pregnant?

A.    I believe at some point I did.  When she came
      out to speak Mr. Williams after he was placed
      under arrest, I believe I saw that, but you

know, didn't really take too much notice of it at the time, or note it.  It wasn't bearing on the situation at hand.

Q.  I just want to make you aware that Valencia Williams has testified that her and Charles were on the phone, in the car on his way home, they were on the phone when he was impeded from getting in the driveway, and that she then came outside, and she is quite sure that you saw her, that she was present before that. Just sort of letting you know that that is her testimony.

MR. LOUISON:  Objection to the form of the question.  Is that a question or is that just -- is there a question?

MR. BURLEY:  I guess it's background, because I want Officer Peterson to be aware of that if he feels like he would like to clarify his testimony at all.

MR. LOUISON:  Objection.  He has answered the questions with you about his recollection of seeing the plaintiff.  That background is not necessary.

Q.  Okay.  So we're sticking with the first time

Brent Peterson - March 4, 2025                    37

you remember seeing Valencia was when you returned to the Williams' house and knocked on the door?

A.   Yes.  To the best of my recollection, that is it.

Q.   So let's go from there.  So you get the knife, and then you said that you had gone back, and you asked the other parties to agree that this is the knife that they pointed out, and then you and Detective O'Brien come back to the house, and what is your decision at that point?

A.   At that point, it was -- the decision was made that due to having probable cause that Mr. Williams committed a felony, he was placed under arrest.

Q.   What is the probable cause analysis?

A.   The analysis?

Q.   Yeah.  You just said probable cause; how do you analyze probable cause?

        MR. LOUISON:  Let me just clarify -- objection -- are you asking in regards to this specific arrest or --

Q.   No, I am asking, specifically, how did you

analyze probable cause -- how did you arrive at probable cause in this particular moment, regarding Mr. Williams?

A. It was a combination of witness statements, the presence of the knife, Mr. Williams' admittance to pulling the knife.  That puts me in way over the reasonable belief that he committed a crime.

Q. And so at that time when you came back -- and were you both in agreement that that was the correct course of action?

A. Yes.

Q. And so my -- and so your -- to use the term, your totality of the circumstances analysis yielded the results that you just explained, was to arrest for felony assault with a dangerous weapon?

A. Correct.

Q. When you spoke to Mr. Williams, did you ask him if he was fearful for his safety?

A. I believe he made comments to me without being asked about that, especially post arrest, but I don't know if --

Q. Sorry.  What I meant is -- sorry about that; I

am jumping around -- is that -- I am talking about what happened -- the basis for the arrest.

Did you ask Mr. Williams if he was fearful of his safety, from Dylan Leighton, that night?

A.    I don't believe I had to ask him.  I believe he commented that he was -- he called 911 because he was in fear.

Q.    So Mr. Williams maintains that he -- that what he did -- the work knife towards the ground to show them that is what he had, because he was trying to buy time, because from his point of view, he was outnumbered.

Do you remember him saying that to you?

MR. LOUISON:  Objection to the form of the question.

A.    No, I don't remember him stating that to me.

Q.    When you asked Mr. Williams if he showed the knife, what did he say?

A.    He admitted to pulling the knife out of his pocket and opening it.

Q.    Did you ask -- did you go into more detail?

A.    No, I didn't, at that point, need to.  I knew

there were no injuries, so I didn't need to ask if he made contact.

Q.    There can be a difference in showing a knife in the offensive or a defensive manner.

Did you ask Mr. Williams if he used the knife defensively?

MR. LOUISON:  Objection to the compound question format, but you can answer it.

A.    I wouldn't even know how to ask that question of Mr. Williams at that time.

Q.    Did you ask Mr. Williams if he tried to cut or stab Dylan Leighton?

A.    No, and Mr. Leighton didn't even -- I would have if Mr. Leighton had claimed so, but he hadn't claimed so, so there was no need to ask that question.

Q.    Did you ask Mr. Williams what his intent was in showing the knife?

A.    Did I ask him specifically, no, because he had commented that he pulled it because he was in fear.

Q.    So he basically said he did it out of self-defense?

A.    Yes, that was his argument.

Q.   And how did you evaluate that?

A.   Basically, and I said something along this lines to Mr. Williams, that you can't bring a -- it's like somebody saying bring a gun to a knife fight.  You can't bring a knife to a fist fight; it doesn't work that way.

     So I understood that he was in fear, but you can't pull a knife on an unarmed person, or a supposedly unarmed person.  It just doesn't -- you are elevating the situation to a much higher level.

Q.   Now, you would say that even if someone -- would you say there is a difference between when you are faced with what you perceive to be a factor, showing them that you have something to protect yourself with, and using that thing to try to harm the other person; is there a difference there?

A.   It's -- no, it's still -- it still fills the same -- what do you call it -- the principles of the statute.  It doesn't change anything.  It still violates the statute the same way.

Q.   But intent -- isn't intent part of that analysis?

Brent Peterson - March 4, 2025                42

A.   No, I don't believe it -- I don't believe so,
     no.
          It's the showing of a weapon to breed
     fear in somebody or -- yeah, I mean -- I don't
     believe there's -- you can't -- it would be
     impossible for -- no, intent is not one of the
     -- I can't think of the word right now.
     Elements.  I don't believe intent is one of
     the elements.

Q.   So you and Detective O'Brien decided to --

          THE REPORTER:  Excuse me, Mr. Burley,
     can you raise your voice, please?

          MR. BURLEY:  Sorry about that.

          THE REPORTER:  That's okay.

Q.   You and Detective O'Brien decide to make an
     arrest, and so how do you make the arrest of
     Mr. Williams?

A.   Returned to the house, asked him to come down
     the steps, I explained to him that due to him
     pulling the knife, he was going to be placed
     under arrest, asked him to turn around and
     place his hands behind his back.  I don't
     think he was happy, but it wasn't -- he
     complied, and he was placed under arrest for

Brent Peterson - March 4, 2025                           43

the assault with a dangerous weapon.

Q.   Okay.  I know he was shocked.

Did he ask -- make a request when you arrested him about --

A.   He did request for me, multiple times, to call the chief, which I explained to him I was not doing at 1:30, 1:45, 2 o'clock in the morning. It wouldn't have -- I didn't quite understand the request at that time, either, but I wasn't going to do it.  That was the main request that I remember.

Q.   Did he also request to put on pants?

A.   I believe Detective O'Brien dealt with that situation.  I did not know anything about him being in some sort of -- again, if he was wearing shorts or under -- like, short underwear, yes, I would have noticed and would have proceeded accordingly to get him clothes.

He was not.  He was wearing long -- either long johns or something else, which is what I found out later on, so it wasn't something that stuck in my head as it being a problem.

He did request, through Detective

O'Brien, can I have some pants, I guess, is what -- and he was -- his wife got them for him, and he was allowed to put them on.

Q.   Did he also ask if he could put on shoes?

A.   I wasn't -- I don't recall.

Q.   Do you remember the temperature that night? It was a January night.

A.   It was pretty cold.

Q.   It was quite cold that night.  Okay.

     And it was at that point that you noticed that Valencia was heavily pregnant, at that point?

A.   Yeah, at some point when she came out to speak to Mr. Williams in the cruiser, I did see her at that point.

Q.   You just mentioned your reluctance to call the chief because of the late hour, 1:45, right?

A.   Yeah.

Q.   So you must have been aware of how disruptive it would be to get arrested at 1:45 in the morning, right?

A.   You know, one is probably in bed asleep, and the other one just came home from work, so two totally different situations.

Never mind, I wouldn't ruin the chain of command and called the chief for an arrest.

Q.   You said it, so I figured I would get into it.

So then what happens next?

A.   He is transported back to Hanson Police station, where he is booked for the one single charge in the normal manner.  Bail was contacted.  He is bailed and released within a reasonable amount of time.

Q.   Okay.  And you filled out your police report that night, correct?

A.   Yes.

Q.   And the next day, did you have any conversations about the case?

A.   With anyone?

Q.   Do you remember talking about the case to Chief Miksch, telling him what had -- sort of last night you had a call, and you did this and --

A.   At some point, when I -- I don't see him every day.  At some point, I would have mentioned to him that he was asking to speak to him, whether it was that day or the next or sometime in the near future, I don't know, but

Brent Peterson - March 4, 2025                46

I am sure I mentioned it to him.

Q.   And was it unusual enough to get a 911 call from a homeowner, a Hanson homeowner, that lead to his arrest, that there would be any kind of review or discussion about what happened there that night?

A.   No.

Q.   And at this point, you had a sense -- was it known by yourself or the extension of the chief, that the Williams were newly settled in Hanson?

A.   I believe I had learned that after the fact at some point, that they had moved in the recent past.  They hadn't been there an extremely long time.

Q.   Okay.  And so let me get the facts.  You have got a 911 call.  You have testimony from someone who is inebriated, that is part of a bigger group.  It's someone that the police have had dealings with in the past.  Those are sort of the elements there.

         MR. LOUISON:  Objection to the form of the question.

Q.   Okay.  So in the light of -- I just want to --

two things.

One, during the night when this was all happening, it seemed like you were not in a rush in any way?

MR. LOUISON:  Did you say not rushed?

Q.  Not rushed, not under any kind of duress or pressure, time pressure?

A.  Besides the fact that we were all outside and it was cold, I mean, yeah, we were under a little bit of -- not a ton, but you know, it was more than enough time to conduct the necessary investigation that we did.

Q.  You wouldn't say that you were forced to make a split-second decision?

A.  No.

Q.  You had time to deliberate --

A.  Speak with everybody, get --

Q.  Speak with everybody?

A.  Get all sides, correct.

Q.  And make a reasoned decision that you felt was born out by the facts?

A.  Yes, sir.

Q.  So the next day, there wasn't any second-guessing on your part --

Brent Peterson - March 4, 2025                48

A.    Absolutely not.

Q.    -- of what had happened?

A.    No.

Q.    And was there any second-guessing about -- at that point, I think it was assault with a dangerous weapon, where if that person is convicted, there's risk of a sentence and a fine?  Those are basically the potential impacts, right?

A.    Worse-case scenario, it's a five-year felony.

Q.    Yeah, it's a five-year felony?

A.    Yes, worse-case scenario.

Q.    But at that point, you sort of had washed your hands of it, it was done, it was in the books; you didn't have any misgivings about what had happened?

A.    I considered it very cut and dry.

        MR. BURLEY:  Can we just take a quick break, and I think I have got a little bit of time left.  Let's take five minutes, and we will come back.

        MR. LOUISON:  Sure.

        (Short break taken.)

Q.    So I have jumped around a bit.  I want to go

back to your initial response to the call.

What do you see when you drive up Leon Court?

A.    I am actually coming from the backside of Mr. Williams' house.  I park the cruiser, get out.  Mr. Williams is in his driveway.  I have Mr. Leighton walking down the middle of the road.  I believe the other three were in the car down the road a little bit.  I can't remember exactly where but -- and then I started immediately started speaking with Mr. Williams, who pointed out Mr. Leighton.  I convinced him to come back.

Q.    And you were clear at that point that Mr. Williams is the person who called 911?

A.    Yes.

Q.    And you were clear that -- or did he indicate that he was in front of his home, at that point?  Did you -- or did you ask sort of if --

A.    I believe it might have come over as the homeowner, over dispatch.

Q.    Okay.

A.    I was aware that that was his house, yes.

Q.   You knew that he was in front of his house?

A.   Yes.

Q.   Okay.  And so how did you proceed?

A.   I merely said to him, are you all right, what happened.  He stated that they got out, confronted him.

     I didn't want whoever was walking away to get -- I am not chasing anybody at my age, at this point, so I didn't want Leighton to get too far away, so I asked Mr. Williams, stay here, I will be back with you.  I went to get Leighton, and that is when that conversation with him started, and his lack of cooperation began, and I guess --

Q.   What was your first impression of Dylan Leighton?

A.   He was drunk, he was aggressive, being louder than he needed to be.

Q.   How was he aggressive?

A.   Raising his voice to me, not listening, not cooperating.  Your normal teenage drunk kid that just has the beer-muscle type of mentality going at that point, and that is why -- like I said, I was alone, and after he

failed to listen to me two or three times, that is why he was placed in handcuffs.

Q.    So you placed him in handcuffs?

A.    Yes.

Q.    Why did you feel that was necessary?

A.    I was the only one on scene.  He was, again, not being cooperative, not complying.  Not -- still having a mostly unknown situation, for my safety, he was just temporarily detained.

Q.    So he was acting uncontrollably, would that be --

        MR. LOUISON:  Objection.

Q.    How would you describe how he was acting?

A.    Um, obnoxious, belligerent.

Q.    So the purpose of putting him in handcuffs was what?

A.    To -- again, purely for safety.  At this point, I do know he is intoxicated.  People do stupid things when they're intoxicated, and I didn't -- the fact that he was not complying with my request or questions or anything else, he was placed -- so it didn't go any further.

Q.    So you felt unsafe to a degree?

A.    I was taking the chance of anything bad

Brent Peterson - March 4, 2025                52

happening out of the equation by doing that.

Q.  So there was a risk?  You felt there was a
    risk that something bad could happen from
    Leighton, or he could threaten you in a way?

         MR. LOUISON:  Objection to the form of
    the question.  He has answered in his own
    words, but if you can answer that.

A.  I have learned over the years that there's
    always a risk, so if you are legally able to
    do something to help remove some of that risk,
    you do it.  In this case, he was legally,
    temporarily detained until I had help.

Q.  But just to be clear, so Mr. Williams didn't
    need to be similarly detained?

A.  No.

Q.  Neither of the three associates of
    Mr. Leighton?

A.  None of them were to the level of belligerence
    that Mr. Leighton was.

Q.  Okay.  Now, after having done that, did it
    occur to you that -- what the interaction
    between Williams and Leighton might have been,
    if you found Williams -- Leighton so
    uncontrollable or aggressive -- uncooperative,

let's say?  Let's say uncooperative.

            MR. LOUISON:  Objection to the form of
      the question.

            Do you understand the question?

            THE WITNESS:  Not entirely.

Q.    Obviously, you are here to assess the
      situation -- that night, right, you are
      responding to a 911 call?

A.    Yes.

Q.    And one of the parties, Dylan Leighton, you
      found the need to arrest to subdue, to
      cooperate with you, right?

A.    To detain, yup.

Q.    And you have got the other party that called
      911, who had been interacting with Dylan
      Leighton just before you arrived on the scene?

A.    Okay.  Yes.

Q.    Was there any kind of inference to be drawn
      there?

            MR. LOUISON:  Objection.

A.    I can only surmise that Mr. Leighton was
      acting belligerent towards Mr. Williams, but
    again, I wasn't there at that point, and I
      don't want to put words in -- or thoughts in

somebody else's mouth.

Q.    So your sense is if -- you made a judgement that it was smart to cuff Leighton so you could gain control of the scene?

A.    Correct.

Q.    Correct?

A.    Yes.

Q.    And did it -- subsequently, did it occur to you that Williams might have felt the need to defend himself from this Dylan Leighton?

A.    I had no doubt that he -- obviously, he pulled a knife; he had some concerns or fear, yes.

Q.    And based on your own interaction with Leighton, that those fears could have been justified?

            MR. LOUISON:   Objection.

A.    Not by -- not by pulling a knife, no.

Q.    I guess it's this, in a situation like this, if Williams was fearful for his life, would it be lawful for him to do anything with the knife on his possession?

            MR. LOUISON:   Objection to the form of the question.   You can answer, if you can.

A.    That would depend on a myriad of other factors

and this and that.

You know, if Mr. Leighton had shown that he had a weapon, or something more aggressive, like a kick, which would also be an assault with a dangerous weapon, anything along those lines, yes, but as I mentioned earlier, we have an unarmed person, and then Mr. Williams who pulls a knife on an unarmed person. I don't know how much simpler that can be that there was a complete difference between the two levels of aggressiveness there.

Q. Do you feel that Mr. Williams' only choice was to take Mr. Leighton's aggression, to not try to ward it off in any way?

MR. LOUISON: Objection.

THE REPORTER: Excuse me, can you please -- you have to shut off your microphone. I am getting a lot of feedback.

MR. BURLEY: Oh, me. Sorry.

THE REPORTER: That's okay.

MR. BURLEY: I forgot about that. I was --

THE REPORTER: That's okay.

MR. BURLEY:  Too many Zoom meetings.

THE REPORTER:  Thank you.

Q.  Okay.  But the details matter.  So this person is also intoxicated, right?  The Leighton person is intoxicated, right?  One person is sober and one is intoxicated, right?

A.  Yes.

Q.  One person is finishing his shift at work, and trying to pull in his driveway; one person seems like they have been out drinking most of the night, correct?

A.  Yes, true.

Q.  So why were you so ready to believe that Williams had brandished the knife in the way Leighton alleges?

MR. LOUISON:  Objection to the form of the question.

Q.  Why did you find Leighton credible?

A.  I had the quickness with which I was informed of the incident, the fact that if you are going to claim -- make a claim like that, that he brandished a knife on me, and then say, well, I heard it but I didn't see it, why would you half lie?

If you are going to lie, lie the whole way; yeah, I saw it, he pulled a knife out and he pointed it right at me.

So between the fact that his claim was just hearing it, the other two saw it, I have no reason to -- no reason to disbelieve it, and especially after asking Mr. Williams if he had done it.  He said, yes, he did.

Q.  And you said before you didn't realize that Valencia -- you didn't see her standing on the porch --

MR. LOUISON:  Objection.

Q.  You didn't notice her --

A.  At that time.  No, I was --

Q.  And when you did knock on the door, did you ask Valencia if she had seen what happened?

A.  I don't -- I don't believe, if I remember correctly, that I asked.  I believe maybe one of the other officers had asked if she had or not, one of the Halifax officers.  I don't remember really speaking with Mrs. Williams at all.

Q.  We know that Charles Williams was present because he called 911.  We know Dylan Leighton

was present.  We know the three friends were present.

Valencia Williams had stated that she was also present.  We know that she was on the phone with Charles, continuously, as it happened.

So seven people who were present is incomplete without Valencia Williams, and you never asked her what she saw?

MR. LOUISON:  Objection to the form of the question.

Q.  Did you ask Valencia Williams what she saw?

A.  I don't recall ever asking her what she saw, no.

Q.  Why is that?

A.  I don't believe there was a point in time that I knew she was privy to being there.

Q.  Okay.  But you knew that these incidents had played out right in front of her house, and she was awake?

A.  No, I did not know she was awake.

Q.  Did you ask if she was awake?

A.  Nope.  I was concentrating on the involved parties.

Brent Peterson - March 4, 2025                     59

Q.    But it sounds like it would have been helpful to have a witness who also could tell you what they saw.  I think that seems like a -- did it occur to you that Valencia Williams might have seen something?

       MR. LOUISON:  Objection to the question -- form of the question.  If you can answer --

Q.    But you didn't ask Valencia Williams if she had seen anything?

A.    I wasn't aware she was a potential witness, no.

Q.    And why is that?

A.    Because I didn't see her there, so I am not going to -- you know, that's the same as me going door to door knocking on -- did you see anything.  I didn't do that, either.

Q.    Your testimony is that you neither saw nor heard Valencia Williams until you went back with Detective Peterson and knocked on the door?

A.    Detective O'Brien.

Q.    Detective O'Brien.  Sorry.

A.    And yeah, that is my recollection.  I do not remember dealing with her at the beginning

stages of this incident, no.

Q.   Okay.

A.   Or interacting with her.

Q.   And does Ms. Valencia Williams appear in the police report that you wrote, her name?

A.   I don't recall.  I don't believe so.

Q.   So we have got someone here -- Valencia -- and so it didn't -- to you, the police report does not seem incomplete without her being mentioned?

A.   She was not an integral part of the investigation.  She never made herself known that she had any information.  If she did -- and certainly -- like I said, I didn't see her at the beginning of the incident so --

Q.   But you thought it was worthwhile to talk to David Leighton who -- you thought he was a good witness to talk to to find out what happened?

A.   He was not used as a witness at all.  He --

Q.   You spoke to him --

MR. LOUISON:  Can I just interpose that you need to let the witness defendant finish his question before asking the next one,

please.

A.   The only reason David Leighton was spoken to that night was to make sure that Dylan had someone to keep an eye on him due to his intoxication.  David Leighton played no part in this whatsoever.

Q.   Okay.  And even after you knocked on the door, and you obviously saw Valencia Williams, and she asked the questions about the pants and shoes, it still didn't occur to you that it would be a good idea to talk to her?

A.   Those questions were asked --

Q.   But you are sort of working as a team.  Neither one of you thought, hey, let's find out what she has to say since we -- since this happened in front of her house?

A.   She certainly didn't speak up.  She was willing to speak up about his pants, but she certainly didn't want to speak up and say anything to us about seeing anything different.

Q.   What do you mean speak up?

A.   If she had information, especially after Mr. Williams was placed under arrest, I would

expect her to say something like, that is not what happened, you know, this and that.

She did not come to us and say anything along those lines that would challenge the other information that had been gathered already; confirm, challenge, or otherwise.

She did not make herself known until the very end, bottom line, and that is when she was worried about him going in whatever clothing he was going in.  There was very limited interaction with Mrs. Williams.

Q.   Very limited interaction.  It's not your responsibility as a police officer to ask questions of people who may have relevant information?

A.   If I believe them to have been present during it, yes, but again, neither Mr. Williams, nor Mrs. Williams, offered any information, talk to my wife, she saw it.  Never made such a comment, anything along those lines.

Mrs. Williams never came out and said, I saw everything that went on.  That is now how it happened.

Q.   Okay.

A.    And at that point, I had clear-cut probable
      cause, based on the information, to do what I
   did, regardless of what else was going on.

Q.    So you stated that you had spoke to Dylan, the
      three friends, and his father from anywhere
      between ten and twenty minutes?

A.    His father was maybe a thirty-second
      conversation; again, only in regards to taking
      Dylan home.

Q.    But you spoke to Dylan and the three friends
      for ten to twenty minutes?

A.    Sure.  Four people, yeah.

Q.    And you spoke to -- just to be clear about
      this, you asked a question about the knife,
      and was that the extent of your questioning of
      the -- you asked him whether he had the knife
   in question -- whether Mr. Williams had --

A.    No, I went back and found out exactly how
      everything started, got his side of the story
      from the very beginning, which I wasn't able
   to do when I first got there because I was
      trying to get Mr. Leighton back to the area.
      So it was a matter of, what happened, fill me
      in.  They jumped out of the car, started an

argument.

He gave me the full story at that point, when I was talking to him initially -- when I went back to talk to him, when I had time to go back to talk to him, as far as, yeah, he lunged at me, I believe was the quote, and all the other information.  So yes, it was -- it was an extended conversation.

I provided him the same amount of time I provided everybody else to explain what the situation was.

Q.   So they may disagree with that, but --

MR. LOUISON:  Objection.

Q.   Now, when you were getting this full story, was Valencia Williams standing next to Mr. Williams; was she present?

A.   No.

Q.   You came back to the house, and she wasn't in the house?

MR. LOUISON:  Objection.

Q.   No, I am just trying to understand.

You said you got the full story from Mr. Williams?

A.   Uh-huh.

Brent Peterson - March 4, 2025                65

Q.  Where were you when you were getting this full
story from Mr. Williams; where was this
interview taking place?

A.  Either the front steps or the driveway.  We
weren't in his house when I was asking these
questions.

Q.  And it's your testimony that Valencia Williams
was not present at that time?

A.  I do not remember her being a part of this at
all, no, until after the fact that he was
arrested, no.  I believe she got the knife for
me inside the house.  Besides that, no.

Q.  Okay.  And that is your testimony?

A.  Yes.

Q.  That is your testimony?

A.  Yes.

Q.  And subsequently -- you know, one of the
things about a police report, it is also
helpful if someone is looking to see what has
happened, right?  You want to sort of piece
things together.

        Now, even in your telling, Valencia
Williams did a couple of actions that were
connected to sort of the arrest and being

there in some ways.  But if I read this -- if someone were to read this police report, they would have no sense that Charles Williams was other than alone that night; there's no other connection to any other human being that night.  It's just Charles Williams in isolation.  And that seems like a curious omission.

MR. LOUISON:  Objection.

Is that a question or a statement?

MR. BURLEY:  Well, I am trying to sort of boil it down.  It's just a question of conflicting testimony.

MR. LOUISON:  Objection.

MR. BURLEY:  No, I am thinking.

MR. LOUISON:  Not for today's purposes. You're making inflammatory comments about your judgment of testimony.  I am asking you just to direct appropriate questions, rather than commentary about the testimony.

Q.  Okay.  In your view, Valencia Williams did not belong, you mentioned, in the police report?

A.  She was not part of the incident, no.

Q.  I also noticed in the police report you say

that Dylan and the friends had been up drinking, and they were on their way home, correct?

A.   Yes.

Q.   Do you say that Mr. Williams was coming from work?

A.   Yes.

Q.   I don't --

A.   Oh, in the report?

Q.   Yeah.

A.   No, I don't believe I put it in.

Q.   Okay.

A.   Where he was coming from.  I believe it was in there that he was backing into his driveway, or entering his driveway, but where he was coming from, no.

        Again, it has no bearing on the situation whatsoever, as far as I was concerned.

Q.   But it had some bearing that Dylan and the friends were coming back from a night out?

A.   Yes, because if somebody is intoxicated, and they're in a different state than other people, yeah, I want that noted.

Brent Peterson - March 4, 2025                    68

I also want it noted because he was handcuffed, so I have to justify why he was handcuffed.

Q. Also, it seems like -- you didn't think it was important to mention that Mr. Williams was on his way home from work, in the report?

A. No.

Q. You didn't feel like that had any bearing on the state of mind?

A. No, I -- no.  It had no -- where he was coming from had no influence whatsoever.  That's why it is not in my report.

Q. Okay.

A. I am guessing if he was coming from a CVS picking up a late-night medication, the same thing would have happened, but it wouldn't have had any bearing on the report so --

Q. Now, did you ask Dylan what he said to Charles Williams?

A. They -- I think -- from what I gathered from the comments flying back and forth, it was that when he came around the corner, whoever the one driving was couldn't continue around the corner because of Mr. Williams backing in,

Brent Peterson - March 4, 2025                    69

which is when Mr. Leighton jumped out and
started the back and forth with the words.

Part of the investigation led me to
believe that they had had issues in the past
that I wasn't aware of, Dylan Leighton and
Mr. Williams, which is why Dylan got out of
the car and started jawing back and forth with
Mr. Williams.

Q. Did you ask Dylan Leighton if he had
threatened Charles Williams?

A. Directly, no, I did not.

Q. Why not?

A. Because I don't remember Mr. Williams stating
that he had openly threatened him, so again, I
would not need to -- I would only do that to
corroborate a comment made by somebody.

Q. So Mr. Williams had called 911 for help?

A. Uh-huh.

Q. Is that correct?

A. Yup.

Q. But you never saw to ask Leighton if he had
threatened Williams?

A. No.

Q. Why is that?

A.   I didn't feel the need to ask such a specific question.

Q.   Had you asked any of the other members, Nico Flamos, Joseph Hoeg, Brian Kennedy, if they had threatened Mr. Williams?

A.   No.

Q.   Didn't ask them?

A.   No.  And Mr. Williams didn't claim that they did.

Q.   Did you ask Mr. Williams why he called 911?

A.   Yes, because they had gotten -- Dylan had gotten out of the car and started an argument with him.

Q.   Okay.  But did you ask him why he called 911 specifically?

A.   Why did you -- no, it was kind of obvious.  I didn't need to ask the obvious.

Q.   Would it be fair to say that you understood Mr. Williams called 911 for help?

A.   Yes.

Q.   For a situation he felt like he couldn't handle on his own?

A.   Yeah, that is fair to say.

Q.   And is it a reasonable inference that he felt

fearful?

A.   I am guessing that if he called 911, yes, he probably felt fearful.

Q.   And all of these factors didn't motivate you to ask the four men who were there if they had threatened Williams in any way?

A.   No, because it wasn't -- no.  That would be a very -- in the field, as a police officer, it would be a very strange question for me to ask, did you threaten him, because first off, they are not going to tell me if they did, and second off, if they did, they're just going to lie.  No, that is not a question I would ask in the field, as an experienced officer, no.

Q.   You talked about the fact as to why you cuffed Dylan Leighton?

A.   Uh-huh.

Q.   Was that enough for you then to wonder what else he had done towards Williams and asked him?

A.   And asked Mr. Williams?

Q.   No, asked Leighton.

A.   No.

Q.   So it didn't occur to you, like, I just had to

Brent Peterson - March 4, 2025                72

put this guy in cuffs to subdue him, what might he have been up to before I got there?

MR. LOUISON:  Objection.

Q.   That connection?

MR. LOUISON:  Objection.

Q.   I guess it didn't -- did the fact that you had to arrest Leighton --

A.   Detain.

Q.   -- detain, create suspicion in you about Leighton's action before you got there?

A.   No, that was purely -- purely for safety reasons.

Q.   Okay.

A.   Just because someone is being loud, obnoxious, and intoxicated doesn't mean they are threatening somebody.

I will yield that Mr. Williams may have felt threatened by Dylan.  He is a big kid being loud, obnoxious, and belligerent, but it doesn't draw to the conclusion that he threatened him.

Q.   You said he is a big kid.  What is his size?

A.   I am 5'10; he is probably 6, 6'1.

Q.   6'1, huh?  6'1 drunk guy, and strong?

A.   Yup.

Q.   And did you think about arresting Dylan that night?

A.   That was a possibility.  It was.  Depending on how the rest of the investigation went.

It's always -- you are always going into a situation knowing what you possibly could arrest for, if you need to do so.  So yeah, that was a thought.

But again, once the investigation was complete, and Mr. Williams had raised it to another level, he was the one who was placed under arrest.

Q.   And when you say it was a thought, what were the factors that raised the possibility of you could have arrested Leighton?

A.   No, he was definitely being disorderly, and if his father hadn't shown up, there was a chance of placing him into protective custody.

Q.   Okay.

A.   So -- but unfortunately, he didn't commit the felony; Mr. Williams did, so he was arrested.

Q.   Okay.  That is fair.  But it sounds like, with the help of the father and the cuffs, was he

able to be subdued enough where you felt like you didn't have to arrest him for disorderly; you felt like you had some discretion?

A.   Yeah.  Again, during the course of the investigation, that went from one direction to the other, yes.

MR. BURLEY:  Can we pause for one minute?  Sorry about that.  You can stay here.  I will walk out.  I will be right back.

(Short break taken.)

Q.   Would you say you had -- you felt like you had some discretion about whether to arrest Leighton or not?

A.   Correct.  Initially, yes.

Q.   And you said part of it was that at a certain point, he was no longer acting disorderly, and that was part of the analysis?

A.   That was part of it.

Q.   What was the other part of it?

A.   That Mr. Williams had committed the felony, and I am not going to arrest both of them, bring them both back to the station, have even bigger problems.

You remove one element, that is all you

Brent Peterson - March 4, 2025                                75

have to do to keep the peace.  That's my job, is to restore peace to a situation.

You certainly don't do that by bringing both parts of the equation back to the station.  The one that committed the felony is removed -- arrested and removed from the situation.  That is what happened.

Q.  Because if you bring them both back --

A.  That's just a nightmare.  Then you have them yelling at each other causing bigger problems.  Possibly hurting each other, possibly hurting themselves.  A million different things could go wrong in that situation.  So in that case -- again, Mr. Williams committed a felony; he was arrested.

Q.  So you felt with Mr. Williams, you had no discretion?

A.  No, not with a felony, no.  I don't find -- it's very rare, unless there's an injury or something else or something -- some extenuating circumstances not to place somebody under arrest for a felony.  Especially with a weapon, there would be very few circumstances that wouldn't happen.

Brent Peterson - March 4, 2025                76

Q.   I am trying to understand this.  A person is
     mugged, the person is mugged, and they try to
     defend themselves by showing a knife, is that
     a no-discretion situation where they -- that's
     a felony?

          MR. LOUISON:  Objection to the
     hypothetical question.  You can answer.

          If I could just put on the record --
     you can answer it if you understand that, that
     it's a hypothetical.

A.   Hypothetically, again, it would depend on the
     situation.  Was the person kicked, was the
     person beaten.  Are they, at that point, hurt
     so badly that they fear for their life.
     Again, there are too many different
     circumstances to fairly answer that.

Q.   That is what I am trying to get at here.

          Would you say that -- your answer to
     why you arrested Williams is that you had no
     -- you didn't have discretion not to -- you
     had no discretion under these facts not to
     arrest Williams?

          MR. LOUISON:  Objection.  That is a
     mischaracterization of his testimony.

Q.   Okay.

A.   I always -- almost, almost always have
discretion, unless it's for, obviously, the
few certain shall laws in Massachusetts, but
my discretion, where there is a way in such a
situation, it would have been a poor decision
not to arrest Mr. Williams, and therefore, the
discretion was not utilized.  It was -- he was
arrested.

Q.   So you're the officer on scene.  In your
totality-of-the-circumstances analysis --

THE REPORTER:  I am sorry, can you
please raise your voice?

MR. BURLEY:  Sorry.

Q.   In your totality-of-the-circumstances
analysis, it led you to conclude that
arresting Dylan Leighton was not warranted?

A.   Correct.

Q.   And in your totality-of-the-circumstances
analysis, it led you to that arresting
Mr. Williams was warranted?

A.   Yes.

Q.   And in making that analysis, you considered
the factor that he was coming home from work?

A.   It wasn't a factor.

Q.   Do you consider the factor that he was --
     hadn't been drinking, and at least one of the
     other men had been drinking?

A.   No.  The fact -- the only factor I focused in
     on is the fact that he pulled a knife in a
     fist fight.  That's the factor.

          It can't be any simpler.  He pulled a
     tactical knife from his pocket, on a gentleman
     who was unarmed -- found to be unarmed and
     hadn't made any contact with him.  It can't be
     any simpler.  He committed a felony; he gets
     arrested.

Q.   But that's a little different.  So there's --
     I mean, there's always the
     totality-of-the-circumstances analysis, right;
     there's always that?

A.   (Nods head.)

Q.   And also the fact that Mr. Williams was one,
     and Dylan and the friends were four; that was
     part of the analysis?

A.   No.

Q.   It wasn't.  And the time of night wasn't part
     of your analysis?

A.    Nope.

Q.    Were the racial dynamics part of the analysis?

A.    On my behalf or Dylan's behalf?

Q.    In terms of what you were looking for, in terms of what you were seeing.  The fact that Mr. Williams was black, and the other -- Dylan and the other three men were white?

A.    It wasn't part of the equation at all.

Q.    And for you -- again, we have been over this, but you didn't ask Mr. Williams if he felt threatened or in fear?

A.    I don't believe I -- those specific words.

      He explained to me that when he pulled the knife, he did it out of fear, so I didn't need to ask him that question.  He had already stated that.

Q.    Let's just be clear about this.  When you say "Pull," Mr. Williams says that he pointed it down to the ground in a nonthreatening way.

A.    I don't know how there is a nonthreatening way to open up a knife on somebody.  I don't know how that is nonthreatening.

      There is no nonthreatening way to flick a tactical knife and put it in somebody's

view.  I can't see that happening.

Q.   If you do that, and you are also -- that's paired with calling 911, doesn't that show that you are trying to avoid conflict rather than create it?

MR. LOUISON:  Objection.

Q.   I am just -- but doing that, in conjunction with the 911 call, what is the message you take from that?

MR. LOUISON:  Objection.  If he took a message.

Q.   Did you take a message from the fact that Williams had also called 911?

Did that color how you saw the -- showing the knife.

A.   Obviously, it played part of the initial investigation, yes, but it still doesn't change the fact that he brandished a knife, no.

Q.   You just said there is no other way to interpret it if somebody pulls a knife, but if the paired action is someone calling 911, that would seem to color the interpretation.  Let me put it this way --

A.   Please.

Q.   -- the fact that Williams -- there's a dispute about whether he showed the knife, or brandished, as you are saying.  At the very least, he made it known that he had a knife, and he also called 911.

How did you interpret those two things happening, that Mr. Williams did?

A.   I guess I am still not completely understanding.

Q.   Did it help color or shape your sense of his intent with the knife?

MR. LOUISON:  Objection.  You can answer it if you can.

A.   I can't speak towards -- I mean, if you are brandishing a knife like that, I would surmise that you intend to use it, if you have to.

Q.   You said brandishing a knife like that.  Your account of the knife being brandished is based on what Dylan Leighton, who was intoxicated, told you?

A.   No, it is based on the other -- what Dylan Leighton told me, on top of the other two eye witnesses to it being brandished.

Q.   And so how do you square you finding their
     version quite credible, while finding
     Mr. Williams' version to be incredible?
          MR. LOUISON:  Objection.

A.   I don't, again, see --

Q.   How --

          MR. LOUISON:  You have to permit the
     witness to finish his answer, please.

          MR. BURLEY:  Okay.

A.   Two eye witnesses said that the knife came out
     of his pocket and was opened in the direction
     of Mr. Leighton.  Mr. Leighton said he heard
     it.  Mr. Williams stated to me that he pulled
     a knife and opened it in front of him, which
     is where Mr. Leighton was standing.  There is
     really not much difference there.

Q.   So in your judgment, you don't -- in your
     judgment, when people have been called 911 on,
     they can have a motivation to lie or
     embellish, correct?

A.   It happens.

Q.   Did that cross your mind in this certain
     circumstance, that they were embellishing or
     lying?

Brent Peterson - March 4, 2025                    83

A.    As an experienced police officer, I did not get that feeling one bit.

Q.    And that's even though Dylan Leighton was drunk and aggressive --

A.    As I mentioned earlier, if he was going to lie, he was going to lie all the way.  Yes, I saw it, yes, he pointed it at me, yes, he swung at me with it.  Not just tell me, oh, I only heard it.

So yeah, I found him credible at that point, regardless of his intoxication.

Q.    And in your view, there's no defensive way to make it known that you are possessing a knife?

A.    Sorry, I don't understand.

Q.    I guess, in your view, there is no defensive -- or way to make it known that you have a knife if you don't feel like it's possible for a person to do that, to signal that they have a knife in a nonthreatening way; you don't see that as being possible?

MR. LOUISON:  Objection to the form of the question.

A.    Not unless they -- I have got a knife in my pocket and say something like that, but again,

Brent Peterson - March 4, 2025                               84

once the knife comes out and is opened, that
is a threatening way.

Q. Based on your interaction with Dylan, you felt
like Mr. Williams had a lot of time to think
about what he was doing?

A. Probably -- I don't think he had a significant
amount of time probably.  I was there pretty
quickly, from the time that this all
initiated, so -- but I also know he probably
had enough time to get back in his car, or to
take a few steps back on the other side of the
car, or to go in the house, but he didn't; he
pulled a knife.

Q. As we talked about, you say you didn't notice
his wife, heavily pregnant, standing on the
porch, which might have been one reason why he
felt like he couldn't retreat?

        MR. LOUISON:  Objection to the
theoretical question.

A. As I said before, I don't know -- I didn't see
her on the porch, didn't know she was on the
porch.

Q. But based on your interaction with Dylan, you
could see -- would it seem reasonable to you

that Mr. Williams might have felt the need to protect himself from Mr. Leighton?

A.  To feel the need to protect himself, sure.  He may have felt the need to protect himself.  He certainly, I don't believe, had to use a knife to do so.

Q.  Okay.  So that is an answer, right?  And the -- so that is an answer, you felt like he didn't have to use a knife to do so.

    Again, you have stated, as part of your analysis, you are saying you are unaware that Valencia was part of the picture here?

A.  Correct.

Q.  That was not part of your analysis?

A.  Correct.

Q.  I think that is all I have for you.

    MR. LOUISON:  I have nothing for the defendant witness.  Actually, give me a moment.

    (Short break taken.)

    MR. LOUISON:  With that, we have nothing further for the record.

    (Deposition concluded at 11:36 a.m.)

C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS
COUNTY OF PLYMOUTH

I, Kristin M. Stedman, a Registered Professional Reporter and Notary Public duly commissioned in and for the Commonwealth of Massachusetts, do hereby certify that BRENT PETERSON remotely appeared and proved to me through satisfactory evidence to be the Witness whose testimony is hereinbefore set forth.  He was duly sworn by me; his testimony thereupon given under his oath and his examination reduced to typewriting under my direction; and that the deposition is a true record of the testimony given by the Witness, to the best of my knowledge, skill and ability.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 20th day of March, 2025.

*Kristin M. Stedman*

KRISTIN M. STEDMAN, NOTARY PUBLIC
MY COMMISSION EXPIRES
AUGUST 2, 2030

The foregoing certification of this transcript does not apply to any reproduction of the same in any respect unless under the direct control and/or direction of the certifying reporter.

ERRATA SHEET

        INSTRUCTIONS:  After reading the
transcript of your deposition, note any change
or correction to your testimony and the reason
therefor on this sheet.  DO NOT make any marks
or notations on the transcript volume itself.
Sign and date this errata sheet (before a
Notary Public, if required).


Page Line  Change        Reason



        I have read the foregoing transcript of
my deposition and except for any corrections or
changes noted above, I hereby subscribe to the
transcript as an accurate record of the
statements made by me.


_____
BRENT PETERSON                        Date


BEACON COURT REPORTING SERVICES
(774) 678-4255