# EXHIBIT 5

# In The Matter Of:

*Charles Williams, et als. v.*
*Town of Hanson, MA, et als.*

---

*Michael Miksch*
*March 4, 2025*

---

*Beacon Court Reporting Services*
*100 Independence Drive, Suite 7*
*Hyannis, Massachusetts 02601*
*(774) 678-4255*
*www.beaconcourtreporting.com*



Original File 2025-0304_Miksch.txt
**Min-U-Script®**

Michael Miksch - March 4, 2025

```
           IN THE UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS

                            Case No.  1:24-CV-11161-IT

     ****************************
     CHARLES WILLIAMS, VALENCIA    *
     WILLIAMS, and their MINOR     *
     CHILDREN,                     *
              Plaintiffs,          *
                                   *
     v.                            *
                                   *
                                   *
     TOWN OF HANSON, MA.;          *
     MICHAEL MIKSCH, in his        *
     official and supervisory      *
     capacities as the Chief of    *
     the Hanson Police             *
     Department; BRENT PETERSON,   *
     individually and in his       *
     official capacities as a      *
     police officer for the        *
     Hanson Police Department;     *
     and PAUL O'BRIEN,             *
     individually and in his       *
     official capacities as a      *
     police officer for the        *
     Hanson Police Department,     *
              Defendants.          *
     ****************************
```

          REMOTE DEPOSITION of MICHAEL MIKSCH, taken
     pursuant to the applicable provisions of the
     Rules of Civil Procedure, appearing via Zoom
     Conferencing from Rockland, Massachusetts,
     before Kristin M. Stedman, Registered
     Professional Reporter, Certified Shorthand
     Reporter No. 1412, and a Notary Public in and
     for the Commonwealth of Massachusetts,
     reporting from Plymouth County, Massachusetts,
     on Tuesday, March 4, 2025, at 1:50 p.m.

               BEACON COURT REPORTING SERVICES
               100 Independence Drive, Suite 7
                Hyannis, Massachusetts  02601
               www.beaconcourtreporting.com

```
REMOTE APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:

EDWARD S. BURLEY, ESQ.
  Emancipated Law, P.C.
1 Beacon Street, 15th Floor
  Boston, MA  02108
(617) 637-6615
  ed@emancipatedlaw.com

  ON BEHALF OF THE DEFENDANTS:

  DOUGLAS I. LOUISON, ESQ.
MANUEL D. SOZA, ESQ.
  Louison, Costello, Condon & Pfaff, LLP
10 Post Office Square, Suite 1330
  Boston, MA  02109
(617) 439-0305
  dlouison@lccplaw.com
msoza@lccplaw.com

ALSO PRESENT:

Allyson Christian
```

I N D E X

EXAMINATION BY MR. BURLEY...................Page 4

E X H I B I T S

No.                                        Page No.

None marked.

P R O C E E D I N G S

- - - - -

MICHAEL MIKSCH,

having first been satisfactorily identified and

duly sworn by the Notary Public,

was examined and testified as follows:

- - - - -

MR. LOUISON:  Before we begin, just a continuation of the same stipulations as to objections and motions to strike, and the witness will read and sign under the pains and penalties.

MR. BURLEY:  Okay.

EXAMINATION BY MR. BURLEY:

Q.  Hi, Chief Miksch.

A.  Hi.

Q.  How long have you been the chief of the Hanson Police Department?

A.  Since July, I think, 20th of 2013, so about twelve years.

Q.  Okay.

A.  A little over twelve years.

Q.  And what is the size of the department; how many officers do you have?

A.   Currently, there is twenty-five sworn.

Q.   And around how many arrests have you made in the last couple of years?

A.   Probably down to around a hundred or so a year.

Q.   What is the population of Hanson?

A.   Just under eleven thousand, I believe, was the last census.

Q.   When arrests do happen, are you in the practice of reviewing them when the police incident report comes in?

A.   At times.  I don't review all of them.

Q.   Do you remember reviewing the arrest of Charles Williams on January 20, 2022?

A.   Yes.

Q.   And did you have any concerns about what you saw in terms of the reasons for the arrest or the facts?

A.   No.

Q.   Can you explain to me why you felt you didn't have any concerns about it?

         MR. LOUISON:  Objection.

Q.   Why didn't it raise any red flags for you?

A.   It didn't seem that out of the ordinary.

Q.   It didn't concern you that Mr. Williams had called 911 for help, and then -- did that raise a flag for you at all?

A.   No.

Q.   So one of the things that the Williamses have mentioned is they feel like -- well, since the incident, they feel like they have been singled out in terms of -- let me rephrase the question.

Since after the incident on January 20, 2022, has there been -- had there been -- has the Hanson Police Department done extra drive-bys of the Williams house?

A.   Extra drive-bys?

Q.   Or increased?

A.   Not to my knowledge.

Q.   And Mr. Williams had mentioned an incident where a car was vandalized on the street, and they felt like the only house that police questioned was the Williams' house; are you familiar with that?

A.   Can you give me a time frame?

Q.   Last -- I think it was about four months ago, and Valencia felt that --

A.   Is this where a sergeant went to their door?

Q.   Right.

A.   My understanding is he went to the houses where people were home looking for Ring camera.  Not accusing anybody, but looking for -- and this would be a normal thing for any vandalism, theft, or anything in a neighborhood, we go -- and a lot of people have Ring cameras now.  We go and see if they have any footage, and if they do, would they share it with us.

Q.   Does Hanson Police Department have a policy around dealing with knives, when a knife is displayed, that interaction, how to treat those?

A.   A policy, no.

Q.   So do you rely more on the -- the probable cause, is it more of the totality of the circumstances test, and the officers weigh those factors?

        MR. LOUISON:  Objection to the form of the question.  You may answer it if you understand it.

        THE WITNESS:  I think I can answer it.

A.   The officers -- there's no policy on --
there's very few policies on specific types of
calls, I think is probably the easiest way to
say it.

As far as a call with a dangerous
weapon, they're going to decide how they're
acting based on their training, and based on
statutory law.

Q.   Based on your understanding of it, how did
that analysis apply to Williams' arrest?

MR. LOUISON:  Objection to the form.

Q.   How do your officers do the self-defense
analysis; how are they trained in that?

A.   Through the MPTC standards of self-defense.

Q.   And part of that is the --

MR. LOUISON:  May I just clarify, are
you talking about officer self-defense, or a
criminal defense in a case?  Do you understand
--

A.   I thought -- I was understanding that you were
asking how the officers respond for their own
defense.

Q.   No.  Sorry.  Let me be more precise.

In our case, Mr. Williams, part of his

defense is that he was acting in self-defense.

A.  Uh-huh.

Q.  Let me try to understand why that claim is not seen as credible by the officers who arrested him?

        MR. LOUISON:  Objection to the form of the question.

Q.  So let's see -- based on your understanding, anytime that -- anytime in a situation where one party is the first to show a knife, are they automatically arrested?

        MR. LOUISON:  Objection to the form of the question.

Q.  Is there a hard-and-fast rule around introducing a dangerous weapon to an altercation, in the Hanson Police Department?

A.  No.

Q.  So instead, are officers encouraged to use their discretion?

A.  At times.  The only time that we really -- that the officers are trained -- this isn't a Hanson Police; this is how they're trained in Massachusetts.  The only time we ever look at what we would call a primary aggressor is in a

domestic.  Massachusetts doesn't have any type of stand your ground law.

Actually, basically, in Massachusetts, if you are not in your own dwelling, you are supposed to retreat.

I mean, does it come up sometimes, like, mutual combatants -- I can tell you basically how a simple assault and battery goes.  If two people get in a fight, and neither of them wants to go to court, and the police didn't witness it, we have no statutory right to arrest.  We would summons them, or not.  If they're mutual combatants, and neither one of them might show up, we wouldn't.

Q.   Okay.

A.   But this is dangerous.  This is different in it's a dangerous weapon; it's a felony.

Q.   And Mr. Williams claimed that he was fearing for his life, and showing it in self-defense; does that overcome that?

A.   That is a defense in court.

Q.   Okay.  When did you first come to know Mr. Williams?

A.    My best recollection is sometime within a week or so of this incident, I can't remember whether he called on the phone or came to the station, and said that he moved to town, and he was interested in being a police officer. Other than that, I didn't have any interactions with him.

Q.    Now, after he was arrested, when did you become aware of his arrest?

A.    The next morning, when I came in.

Q.    And did you read that particular police report?

A.    Yes.

Q.    And you didn't have any questions based on what you read in the report?

A.    No.

Q.    Did you have any -- the next -- that day, did you have any conversations with Officer Peterson?

A.    Not that I recall.

Q.    You didn't have any conversations with O'Brien?

A.    I don't recall.  I don't remember who told me. I guess Mr. Williams was trying to call -- get

Michael Miksch - March 4, 2025                    12

them to call me in the middle of the night, which they're not going to do.

Other than that, I don't remember.  I pulled the report.  It was already down in court.  That is basically all I recall.

Q.   Now, you didn't find it suspicious that Mr. Williams was alone when this happened, and there were -- there was Dylan and three other people?

MR. LOUISON:  Objection.

Q.   Okay.  And the racial dynamics of Mr. Williams being black and the other men being white, that didn't raise a red flag for you?

MR. LOUISON:  Objection to the form of the question.  You can try to answer that.

A.   Look, I don't really take race into consideration.  It's not -- there was no hate crime involved with it, so no, I wouldn't take race into consideration.

Q.   So in your view, there is nothing you saw in the police report that made you feel this case warranted extra scrutiny?

A.   No.  There was probable cause.  He was arrested.  It went to court, and the DA

disposed of it as the DA felt was appropriate.

Q.   So what are we to make of that Mr. Williams'
version of events contradicts the officers'
version of events?

          MR. LOUISON:  Objection to the form of
the question.  If you understand what we're to
make of that.

A.   Can you try and rephrase that?  I am not sure
where you are going.

Q.   Like a lot of cases, there is different
versions of what happened.  And what do you
say to the Williams' contention that they're
not credited as being trustworthy with their
-- what they said, by the detectives, that
they're not -- that they're -- how do I say
it.

          Back to the incident and whether it
warranted more scrutiny.  It wasn't concerning
to you that a number of the men were drunk?

          MR. LOUISON:  Objection to the form of
the question.  You can try to answer that.

          THE WITNESS:  Can I try to --

          MR. LOUISON:  Just if you can answer
that question.  If not, just wait until the

next question.

A. Yeah, when -- if -- I think a big problem, if I can theorize as opposed to state facts --

MR. LOUISON: Just stick to the question.

A. As far as them being drunk, yes, that becomes something that we look at, but I think people do not understand how being drunk outside in the middle of the night is no longer the crime it used to be, so taking somebody into protective custody is not what it used to be.

Q. So what I meant was more to trustworthiness and credibility?

A. I don't think anybody didn't think Mr. Williams or Mrs. Williams was credible.

They took the totality of the circumstances, what was said by both parties, and they made a decision, and there was probable cause for that decision.

Q. There was probable cause for the decision, and the probable cause was that?

A. The arrest that was made, for assault with a dangerous weapon.

Q. And the probable cause, in that situation, was

that Mr. Williams showed a weapon?

A.   Yes.

Q.   Now, it seemed like there is also -- can you tell me why there wasn't probable cause for assault by Dylan Leighton against Mr. Williams?

         MR. LOUISON:  Objection.  If you have an understanding of it.  Theoretical.

A.   I wasn't there to make that decision.

Q.   Is there a protocol in the Hanson Police Department about responding to 911 calls?

A.   The only protocol we have is to respond to all 911 calls.

Q.   Is there a protocol that you make an effort to interview the person who may have placed the call first?

A.   No.  The officers get there, and they deal with what is presented in front of them.

Q.   Right.  Now, in the case of Mr. Williams, you didn't think the better policing would have been to speak to Mr. Williams and Mrs. Williams first?

         MR. LOUISON:  Objection.  Can you answer that?

Q.   Since he had placed the call?

A.   I can't answer that.  I don't know if they even knew who made the call.  A lot of times, we don't know who made the call.

Q.   If a police officer is aware of who made the 911 call, should they make an effort to talk to that person first?

A.   They should make an effort to talk to every witness they can.

Q.   But does it raise flags if officers spend a disproportionate amount of time interviewing one set of witnesses, and much less time interviewing another set of witnesses?

          MR. LOUISON:  Objection to the form.

A.   I mean, they were dealing with one person versus four people.  They are going to spend more time with four people than they are with one.

Q.   As the chief -- I know the goal here is to do justice and to find out the truth.

          In your experience, do you worry that -- in your experience, can officers be influenced by the first version of a story that they hear on the scene?

When they first show up and they talk to suspect A, can that shape their --

A.   They're trained to take in all the facts they can, and then make a decision.

Q.   Okay.

A.   Does anybody hold more weight than the others, that is a certain -- that is an incident-by-incident basis.  It really is.

Q.   Now, would you agree that to do the totality of the circumstances test properly, do you have to make an effort to talk to the relevant witnesses, the eye witnesses, right?

A.   Right.

Q.   Are you aware that that night, Valencia Williams was not interviewed or questioned about what had happened?

A.   I don't know.

Q.   Okay.

A.   They spoke to her at some point.

Q.   But she was -- had seen most or all of the events, and she wasn't questioned.

Should officers who are trying to understand what has happened make an effort to talk to the available witnesses?

MR. LOUISON:  Objection to the form of the question.  You can try to answer that.

A.  They're trained to speak to as many witnesses as they can.

Q.  Given what you know of the case, is it concerning to you that Valencia Williams wasn't questioned about what she saw that night?

A.  I don't know whether they spoke to her or not.  I already answered that.  I know they spoke to her at some point.  I don't know whether they spoke to her what she saw, what she didn't see.  I don't know what she offered.  I do not know; I was not there.

Q.  I know there is some discretion with this, but how does a Hanson police officer decide who to include in a police report?

What I mean by that is I am sure there are people who you do interview, and then there are people who are -- who do they determine --

A.  There will be times when there will be people interviewed, but their testimony doesn't -- their statements don't necessarily add to the

case.

Q.    Yeah.

A.    I mean, you are giving me a hypothetical here.
You only -- whoever they talk to that helps
them establish probable cause is who goes in a
report.

Q.    And would you say as a rule, you want the
officers to talk to the eye witnesses when
they investigate an incident?

A.    If they know there is an eye witness, yes.

Q.    That would be the best practice, right?

A.    It's best practice, yes.

Q.    And it might be hard to get the full story if
you don't talk to an eye witness who has
information?

        MR. LOUISON:  Objection to the form of
the question.  If that is something you can
answer.

A.    You are theorizing again for me.

Q.    Yeah.  We mentioned there is about a hundred
arrests a year.

A.    Yeah, I --

Q.    Give or take.  I am just trying to get a
range.

A.    Years ago there was more.  There aren't as many.

Q.    I want to sort of get a sense of -- is your practice as the chief, do you read every report, do you read some?

A.    I read some.  I don't read every --

Q.    When you read them, what are you looking for?

A.    It depends upon the case.  Usually, I am looking at the ones that are, like, a high liability, or ones that might be some type of -- the public has an interest in, or things like that.  Most of the arrests in the Town of Hanson are OUIs and domestics.

Q.    And if you do see something that warrants a little more scrutiny, what do you do in those cases; what is your process?

      I am trying to understand the management style.

A.    It depends.  Usually, if I see a report that needs some work or something, usually coach the officers saying, hey, next time you need to do this a little better or -- usually, most of their issues are bad report writing, which is just common amongst cops, but I don't

review every one.

The process is the officers file it, there's either a sergeant, or if there's no sergeant on duty, there's an OIC, they review it, it then goes to the court prosecutor, who reviews every case before it is sent to Plymouth District Court.  The deputy chief reviews them as well.

Usually it's when they bring something to me, like, hey, you might want to read this one.  I don't get into the day-to-day operations like that.

Q.  If a civilian in Hanson -- if I am mugged or attacked, what is a lawful way for me to defend myself?  Do you have any advice?  What would you --

MR. LOUISON:  Objection to the form of the question.  If you can answer that.

Q.  Maybe I can ask it more cleanly.

According to your understanding, is there a lawful way for a person who is assaulted to defend themselves?

A.  Of course there is, but that is a case-by-case basis.

Q.   And it's totality of the circumstances, right?

A.   Yes.

Q.   And in Mr. Williams' case, where we know some
     of the facts, you feel that he acted
     unlawfully in trying to defend himself?

          MR. LOUISON:  Objection to the form of
     the question.  You can answer it if you
     understand it.

Q.   The night in question, did you -- do you -- is
     it your view that Mr. Williams acted
     unlawfully in trying to defend himself?

A.   Yes, I believe there was probable cause for an
     assault with a dangerous weapon.

Q.   And so his attempt to use self-defense ended
     up being unlawful, correct, in your view?

          MR. LOUISON:  Objection.

A.   Cops on the street deal with probable cause.
     He met the elements of assault with a
     dangerous weapon.  I --

Q.   What I am trying to get at is intent -- would
     you agree that intent is part of the totality
     of the circumstances analysis?

A.   I --

Q.   And also, if somebody is afraid, those are

elements that are part of the analysis?

A.  It would be important to the analysis, but statutorily, what did they do.

Q.  Part of that is dependent on the effect it creates?

Like, to be assault, one of the elements of assault is to be fearful, right; to be put into a state of bodily fear, right?

And so that is an important step.  And so do you believe the officers in Mr. Williams' case asked that question, whether Mr. Williams felt like he was in bodily fear?

A.  I don't think I have ever asked anybody if you are in fear, other than in a domestic because it was part of what we need for an abuse -- for 209A.

They would usually pick up on that based on interviewing the people or seeing what happened.

Q.  Your officers have testified that Dylan Leighton expressed fear, and that was important to their determination, right?

A.  Okay.

Q.  Mr. Williams also expressed fear, and why is it that his expression of fear seems to be excluded from the analysis piece?

A.  You are theorizing again.  I don't think I can answer that.  I don't -- if --

THE WITNESS:  Can I theorize back?

MR. LOUISON:  No.  It's fine.

Q.  We know that assault can be fact intensive, right?  Someone being guilty of assault, it's fact intensive.

Is there any effort, in the Hanson Police Department, to be sure -- to be as thorough when asking questions about a white victim or a black victim, when they're in the same -- when they're -- they have all been -- assault situation?  Is there any training to --

A.  We don't handle people different based on race or gender or anything else.

Q.  Right.  What we're concerned about, an instance of concern is that -- based on the testimony I have heard, there seems to be a tendency to ask more questions about the state of mind of the white participants in the

incident, as opposed to Mr. Williams, who is black.

      MR. LOUISON:  Objection.

Q.  What I asked, though, within the Hanson Police Department, is there training to make sure that the police officers treat the black residents and the white residents the same when they're questioning them, with the same level of thoroughness, to want to make sure that there is not --

A.  Look, my standard is everybody is treated the same.  Have they been through bias training, yes, through the MPTC, they have.

Q.  The reason why I am saying this is when officers ask a more thorough set of questions of one party than they do the other, it can steer the investigation certain ways, and so I just want to know that your officers -- have your officers been put through training to ensure that they are as thorough when they're with residents of both races, when they're questioning?

      Do you feel like they have been put through training to ensure that?

MR. LOUISON:  Objection to the form of the question.

Q.  What policies does the Hanson Police Department have to ensure that the officers treat black and white residents equally?

A.  We don't break anything down by black, white, gender, anything.

People are supposed to be treated with respect and fairness.  They're supposed to go find the facts, and make a decision.

Q.  And so, again, we come back to the Williams case.  When you look at that, you don't see any red flags that Mr. Williams might have been treated unequally?

A.  I do not.

Q.  And you don't see it as a red flag that the intoxicated party, the party who was put in cuffs, was not arrested; you don't see that as a red flag?

A.  No.

Q.  You don't see it as a red flag that the intoxicated party, that he was credited as trustworthy, his answers to the officers' questions?

          MR. LOUISON:  Objection to the form of
     the question.  If you can understand it.
A.   I think they took all four people's testimony
     into consideration on the other side.
Q.   So it's not -- it doesn't raise a red flag to
     you that the eye witness, that Valencia's eye
     witness was omitted from the police report?
A.   Again, I don't know what -- I know they spoke
     to her.  I don't know what they spoke to her
     about.
Q.   Okay.  So from a -- just from a management
     perspective, you felt like -- you didn't see
     anything in there that reflected other than
     good police work, and it seemed like there was
     nothing that jumped out at you that warranted
     extra scrutiny?
A.   No.
Q.   I think after he was arrested, at some point
     -- at some point subsequent to the incident,
     did you, shortly thereafter, have an
     interaction with Mr. Williams, a conversation?
A.   He called me.
Q.   And what did you talk about?
A.   I remember telling him, because it was after

court, that he is represented, I shouldn't be speaking to him, I can't give him legal advice.

He didn't seem to understand why he used self-defense, and he still got arrested. That was basically what I can remember from the conversation.

Q. Okay.

A. Which I told him is a defense in court. It's not one on the street, most of the time.

Q. Okay. Most of the time. Okay.

So you are the police chief in Hanson, and I am visiting Hanson, right, what is -- this is a question for Mr. Williams -- this is the question the case raises that we're trying to figure out, that we're trying to solve.

For someone in Mr. Williams' situation, how can he -- how can he respond to that situation in a lawful way, where he doesn't get arrested? Same facts.

MR. LOUISON: Objection. You haven't even laid out any facts.

This is a hypothetical question, and I don't know how this witness can answer this.

Q.    I think the reason why we're here is that we have never got a good question -- a good answer to that question, and so can you help us answer what someone -- the night of January -- the morning of January 20, 2022, someone in Mr. Williams' situation, coming home from work, confronted by four men, in addition to calling 911, what more can they do to stay within the law?

A.    Stay in --

MR. LOUISON:  I am just going to object.  This is a hypothetical question.

This individual defendant witness is not here as an expert witness to answer hypothetical questions.

Q.    So there's a thrust to all of our questions, and the question we want to know is why wasn't Dylan Leighton and the instigators of the confrontation, why were they not arrested; why were they not held culpable?

MR. LOUISON:  Objection to the form of the question.  If you can answer that.

A.    What did they do that was illegal?

THE WITNESS:  I am sorry.  I don't mean

to be difficult.  It's --

MR. LOUISON:  If you can't answer the question based on the fact -- if you can't respond to the question as posed to you, just simply say it like that.

A.    My understanding of why Leighton was not taken into custody was he was intoxicated.  That is a -- we used to -- we used to be able to take people into protective custody.

Case law doesn't allow us to do that the way we used to.  If you can turn them over -- bring them home and turn them over to a responsible party, which is what I believe happened to him that night, that is the best practice.  The next thing is ship them off to medical.  And he wasn't incapacitated to the extent that we could even really PC him.

Being drunk and stupid is not against the law.

Q.    Right.

A.    The others, apparently, were not drunk enough that my guys let them drive away, so I am sure that they were not -- at least one of them was sober, but as far as why did he not, I mean,

you should have asked Brent and OB that, but my guess is they can't PC him, and he didn't violate the law, in their eyes.

Q.  I don't want to -- try not to beat a dead horse here, but I just want to understand this point.

    You, as the manager of the police report, why didn't you see -- why did you come to the conclusion -- why didn't you see that Dylan Leighton had committed assault against Charles Williams, based on the facts?

A.  From what -- I haven't read the report in a while.  From what I can recall, they were arguing.  That is not an assault.

Q.  So you know about the case, that Charles Williams was coming home from work, as a commuter rail operator, at approximately 1 a.m., and he is trying to get into his driveway, and you know that Dylan Leighton was out with his friends, and at least Dylan was intoxicated at that point?

A.  (Nods head.)

Q.  And that Mr. Williams was impeded from getting in the driveway by this point, correct?

And we also know that Leighton shouted at Mr. Williams and came aggressively toward him --

A.   I don't recall, but okay.

Q.   And you are aware that Mr. Williams was alone, and there were four of them, correct?

A.   (Nods head.)

Q.   And you are aware that Mr. Williams called 911?

A.   I am aware.

Q.   And you are aware that Mr. Williams called 911 and flashed the knife in close proximity in time; bang, bang, right?

A.   Yes.

Q.   So we know that.  And --

A.   I don't know the proximity in time -- I don't know the timeline of the call, no.

Q.   You already said it, but it's your opinion that they scrutinized the case, and you never found anything that was done improperly in the incident?

A.   No.

Q.   And in terms of the -- you stated that, in your view, self-defense comes in at a later

point; it's more of a pleading analysis?

A.   Yes.  That's a defense for somebody in court.

Q.   So in your view, the self-defense question doesn't play any role in terms of what happens in the arrest, like, in terms of the officers evaluating self-defense?

A.   There was probable cause to make the arrest. That is confirmed by going to court and a judge moving the case forward.  Like I said, the DA takes those things into consideration.

As far as the case went after that -- I mean, the DA will ask opinions on things and whatnot.  We usually let the DA handle the case and dispose of it as they feel proper. They dispose of it as they feel proper.

It ended up being dismissed, right?

Q.   It did.

A.   So I don't know what anybody else could do, at this point.

Q.   I am sure as a police chief, you know the impact an arrest can have on someone's life, right?  I mean, it's life changing, correct?

A.   Yes.

Q.   And so with an arrest like assault with a

dangerous weapon, I think you try to be -- I imagine you want to be as sure as you can be, right?  You want to be as sure as you can be.  And one way to be as sure as you can be is to make sure you talk to all the relevant eye witnesses, right?  That is an important piece in trying to be sure, right?  That is an important piece if you want to be sure.  That's an important piece.

Okay.  The -- okay.  And then just to back up for a second.  How would you characterize the Hanson Police Department when you took charge of it?

Were you coming in as new leadership?  Had the department been doing fantastic before you got there?

A.   I was brought in as an outside police chief, yes.

Q.   Okay.

A.   The department had some issues with the former chief, so he retired after he was investigated.  I don't even know all the things they investigated him for.

Q.   I believe the former chief's name is Savage,

correct?

A.   Yes.

Q.   Was some of it falsifying arrests --

A.   He was falsifying --

          THE REPORTER:  Excuse me, Ed, I am

     having trouble hearing you.

          MR. BURLEY:  Okay.

Q.   Can you give a few examples of --

A.   The allegations of him falsifying -- he was

     falsifying numbers in an annual report that --

     and my belief, and I am not a hundred percent

     sure on this, was he was doing that to ensure

     funding for the department.  So he had

     inflated a number of custody, arrests, and

     other -- motor vehicle stops, things like

     that.

Q.   And I think also there was -- so there was

     inflating the numbers.  I think it was from a

     few hundred to a few thousand --

A.   I don't think it was that great but --

Q.   -- so it seemed like it was quite a large

     number.  Okay.

A.   I think -- when you say the large number like

     that was the number of incidents.  The

incidents, I believe, he inflated as well.

Q.   And I think it's public record.  There were articles in the local papers at the time.  You know, some problems with culture in the Hanson Police Department.

For example, maybe one of them, subordinate officers doing work for the police chief and things of that nature.  So a series of things, right?

So where we're going with this is did you feel like you inherited a culture that needed to be cleansed or fixed some?

A.   My opinion when I went there?

Q.   Yeah.

A.   Yeah, I thought I was going to need to fix some things.

Q.   Okay.

A.   When I got there --

Q.   Yeah.

A.   For example, the one that you are bringing up where the officer was doing work for the chief, all those people were cleared by an independent investigator.  There was no ethics violations.  They weren't getting any type of

kickbacks.  Some of it, I think, was overtime for doing work and things like that.

So yeah, as an outside person, not knowing the people, yeah, I thought it was going to be a little difficult.

When I went in there, basically, I found that there was basically a chief who didn't come to work very often, and these guys were left to their own devices, and to be perfectly honest with you, I was pretty surprised that -- they were doing the right thing, for the most part.  They just needed a little guidance, and they needed some more training, and since I got there, training has been big.

So no, I didn't have -- there was nobody in there that I was afraid of them being a thief or a liar, and to be honest with you, we hardly have any issues.  We have had very, very few issues.

Q.   You already said that Hanson is a relatively small town.

Is the population about twelve thousand?

A.   Yeah, eleven, twelve thousand.  I don't know -- it's between ten and twelve.

Q.   Is one of the challenges for Hanson PD, or in a town that small, pleasing people you know?  That must be a little bit of a challenge -- can be a challenge.

Is that -- can that be a challenge in a town as small as Hanson, where you end up policing a lot of people that you know?

A.   No.

Q.   Not so much.  Okay.

So I am sure when you are helping people, it's less of an issue.  I imagine where it could be an issue is where you have to do -- you have to arrest someone who you know.  I imagine that is -- that is challenging.  I would think that -- can that be challenging as a --

A.   Yeah.

Q.   It can be challenging because of the emotions involved, the friendship, and I imagine the officers are aware of the impact that could have on the person's life who they know, right?

And so that -- can that be a challenging thing to untangle, to have that professionalism when you are arresting or policing somebody who you have a relationship with?

MR. LOUISON:  Objection to the form.

Q.  As the chief of a small town police department, I am sure -- I can imagine it's a problem you are aware of, try to stay on top of?

A.  It's not a problem.

Q.  Or it's a risk -- call it risk?

A.  Yeah.

Q.  It's a risk.

A.  It's uncomfortable.

Q.  It's uncomfortable.  And do you feel like to equip your officers to carry out their duties regardless of any personal relationship, do you feel like you have to do any extra training or any protocols to guard against that?

A.  No, it's -- no one is going to put their job on the line for a neighbor anymore.  It's not going to happen.  It's -- so no, they know

they're supposed to do the right thing.

Q. And you didn't have a concern -- in the Williams case, you didn't have a concern that you were dealing with a situation where it's long-time Hanson residents the officers were questioning versus new residents?

A. If you are referring that you think that the Leightons got any special treatment, no.  I am pretty sure OB arrested the old man at one point in his career, so no.

Q. He mentioned that.

A. No.  They're -- not at all.

Q. So you feel confident that the familiarity --

A. I don't think there is any love between the Leighton family and the Hanson Police.

Q. In small towns, there can be a little more suspicion of outsiders, of people who are new.

Is that something you have any training to help you out to be free of that?  Any sort of training --

MR. LOUISON:  Objection to the form of the question.  You can answer it if you can.

A. The rules and regs, everybody gets treated the same.  It doesn't matter.  That is the culture

we have tried to push at the department, and I believe it exists.

Q.   To get to -- that is the culture you want, obviously, but to get there, sometimes you need to do training and other things to get to that point, right?

We would all like to be there, but sometimes it doesn't happen automatically, unfortunately, so are there programs --

A.   Other than the bias training we have been through, I don't know of any training that I would get -- half the time they don't even know the residency of people when they -- like, about the only time you will ever see a resident get a break over a nonresident is in a car stop, and even then, I really don't see that very often.

Q.   I will just ask you straightforward.  Maybe it will be more efficient.  In your view, the Williamses were not disadvantaged because they just moved to Hanson?

A.   No.

Q.   In your view, the Williamses were not mistreated because of their race, because they

were black?

A.   I don't believe they were mistreated.

Q.   And in your view, Dylan Leighton was not
treated better because of his race, because he
was white?

A.   No.

Q.   And in your view, Officers Peterson and
O'Brien did their job unaffected by racial
considerations, right?

A.   I have no indication that they acted other
than the way they were supposed to.

Q.   Okay.  And subsequent to the incident, you are
not aware of officers doing any intimidating
drive-bys or things like that to intimidate
the Williams' house?

A.   No.

Q.   Okay.

A.   Are you saying that we were down there -- you
do realize that Mr. Williams -- one of the
first interactions I had with him, now that I
think about it, besides talking about a job
with him, was him sending me clips of vehicles
speeding on his road, which is a private way,
so we are very limited on what we can do.

As a matter of fact, I remember having the deputy chief call UPS to tell the UPS over in Brockton to tell the driver, which probably hurt that driver somewhat, have a phone call from us to slow down on the road.

So were officers going down there more often beforehand, quite possible because we tell them, hey, we have got complaints down here of cars -- of speeding.  It's no different if I get a complaint on any street in town.

Q.  So your feeling would be that it's normal policing in terms of trying to adequately police --

A.  And that road is used as -- I am sorry.

MR. LOUISON:  Just wait for the question.

A.  I am sorry.  Go ahead, sir.  Sorry.

Q.  You were saying something about the nature --

A.  Yeah, it's a dirt road.  It's only, like, a lane-and-a-half wide.  It's used as a cut-through sometimes into the Monponsett neighborhood.

Q.  So in your view, there was no pattern or

increased intentional surveillance of the property?

A.    No.

Q.    Okay.  That's fine.

In terms of the officers, you are the supervising officer for Officer Peterson?

A.    I mean --

Q.    You are the chief?

A.    I am the chief so everybody falls under me, but do I supervise him on a day-to-day basis, no.

Q.    And Detective O'Brien?

A.    Detective O'Brien initially reports to the deputy chief and then to me.

Q.    And do they have disciplinary records?

A.    Neither one of them.

Q.    Neither one of them.  So both clean.  No complaints?

A.    I have no complaints for either one of them.

Q.    They're up to date on their bias training and what have you?

A.    They are up to date on everything.  They are POST certified.

Q.    Within your department, arrest records and so

forth, are they digital format or paper format?

A.   Both.

Q.   Are things after a certain date moving in one system, and then there was the old system?

A.   Digitally, the records management system, we have records in there from 1994 on.  As far as paper, they started digitally sending the reports to court, but that system, the state is behind implementing, and it doesn't always work, so usually paper copies go down to the district attorney and clerk's office for the district court.

Q.   So you have things that are, like, searchable, or you sort of have to --

A.   The records management search is searchable to an extent, but the system is from -- it's, like, a DOS-based system.  It's not something easy to data mine with.

Q.   It's a work in progress.

     With Mr. Williams' arrest, you saw the incident report.  Was there also kind of demographic information that went out with it, so you can tell the ethnic or racial

background of the parties mentioned in the report?

A.   Yeah, usually on the header, there are data fields, and it would have drop down, you can pick race, gender.

Q.   Because I have got the report here.  This is the police report.  Is there another piece that --

A.   That is the narrative.

Q.   Is there another form part of it that would have some more information?

A.   Yeah, it would have the names, dates of birth, Social Security numbers, everything of the -- anybody that was involved with it.

Q.   So here, a little bit of a narrative, but there would be a separate form --

A.   Sometimes they put the date of birth or a social in the narrative, yes.

Q.   And that form would also list Mr. Williams' race?

A.   I would assume so, yeah.

Q.   So that the person -- in addition to the narrative, there would be another piece here that would let me know, okay, Williams is

black here, Dylan Leighton is white, and I can sort of just be aware of those characteristics that are involved in the incident?

A.   Yeah.

Q.   So there's another piece, you're saying, in addition to this, right?  This is the narrative.  There is more, and if we get more, it will still have that --

A.   Yeah, that is just the narrative.  I mean, there's an arrest report, too, which is a different part.

Q.   So you are collecting that info?

A.   (Nods head.)

Q.   That's good to know.

          MR. BURLEY:  Give me a break for a minute.

          (Short break taken.)

Q.   Are you familiar with Section 1983 and 1985, federal civil rights laws?

A.   No.

Q.   So the section for both of those laws, you know, recites a scenario where people are basically ambushed and -- basically, these laws are created for racial protection.

Michael Miksch - March 4, 2025                          48

There's a fact pattern that they both cite similar to the fact pattern in the incident with Williams.

And our question is, was there anything about the fact pattern of a black person coming home late at night, being ambushed by four white men, that caused you alarm?  It's that basic fact pattern.

MR. LOUISON:  Objection to the form and the question.

Q.  Did you find any -- we have established that the night of January 20, 2022, Mr. Williams was coming home from work, and he was encountered by four men who were white; would you agree that that --

A.  My understanding from the report is they were blocking his driveway.

Q.  But they got out.  They got out.

A.  Okay.

Q.  Okay.  So is that fact pattern of Mr. Williams, one black male, to four younger men, who happen to be white, is that a fact pattern that is concerning about it might have a racial character, that it's worth

investigating further?

MR. LOUISON:  If you --

A.  There's no hate crime involved.  I don't --

Q.  But -- talk about that.  You say there's no hate crime involved because --

A.  There's nothing statutory that leads that there was a hate crime.  There is nothing to say that -- their encounter, blocking somebody's driveway and then getting -- excuse my language, but being an asshole in the nighttime is not really a crime.  It's a distasteful neighbor.

Q.  There's no question it could be assault, right?

MR. LOUISON:  Objection.

Q.  It's possible for someone at night, acting crazy late at night to assault somebody; that is possible, right?

A.  Yelling and screaming or having an argument over blocking a driveway is not an assault.

Q.  But if you charge toward someone, and you are shouting threats to them, isn't that assault?  Potentially, at least?

MR. LOUISON:  Objection to the form of

the question.  Again, it's theoretical --

MR. BURLEY:  Sure, it is --

MR. LOUISON:  Let me put my objection on the record.  So it's a theoretical, hypothetical question you are putting to this witness about facts not in evidence.

If you can answer that with those conditions --

A.    I wasn't there.  Okay.  What I reviewed met probable cause for assault with a dangerous weapon.

Like I said, it went to court, it was disposed of, as the district attorney saw fit, and none of us ever objected to it.

Q.    Right.  I was responding to sort of what you said about it's not a crime --

A.    It's not a hate crime.  So a hate crime, you have to show that there's a racial basis to it.

Q.    There is testimony -- are you aware there's testimony in the record that Dylan Leighton said, I own this street, this is my street, and things to that effect, suggesting the Williamses didn't belong on the street?

A.    That's not -- that doesn't reach the level of a hate crime.

Q.    Are you aware of the comments that Dylan made that can be seen as reflecting racial animus towards the Williamses?

A.    Look, I have no idea what that kid's bias could be or not be.  The little bit I do know of that kid, if we're going to theorize, most likely, if your client was white, he would have been an asshole to them, too.

Q.    Okay.

A.    I don't know what else to tell you, sir.  I am sorry.

Q.    Again, I have to sort of ask these last few questions in this area just because I have to have an answer.

        You are aware that Dylan Leighton threatened Charles Williams, and said that he has got something for him, seemed to be indicating a weapon, and went to his house to go retrieve it; are you aware of that?

A.    No.

Q.    Are you aware that Dylan Leighton said to Charles Williams, I own this fucking street,

and started charging toward him that night?

A.    No.

Q.    Now, another question is, if I am a Hanson resident, why should I have confidence in calling 911; why should I be confident about police response?

          MR. LOUISON:  Objection.

          Could you rephrase that question?

Q.    Let's put it this way, let's talk about Mr. Williams.  We have a lot of facts about the incident.  We understand sort of what happened.

          Going forward, how could Mr. Williams be confident in calling 911 if he feels distrust?

          MR. LOUISON:  That is not still not an appropriate question for this deposition.

          With those strict parameters, that this is a theoretical question that has nothing do with the case, you can try and answer that, but I object to the form of the question.

Q.    Let me put it more narrowly.  You would encourage Hanson residents to call 911 if they needed help, correct?

A.   Yes.

Q.   And you encourage Hanson residents to do that for what reason, use the 911 -- avail themselves to 911?

A.   We're there for their service, to help them.

Q.   I imagine it's also to prevent parties from taking matters into their own hands?

A.   Yes.

Q.   So if someone calls 911, then they're hoping you can -- Hanson Police will be able to rescue them or deescalate the situation, right?

A.   That is the goal, yes.

Q.   And you want residents to feel like calling 911 will make things better?  Sort of a safe option --

A.   Yes.

Q.   -- the right thing to do, right?

     You wouldn't want someone to not call 911?  You wouldn't want someone to -- you wouldn't -- you wouldn't want -- it would never be the message of the Hanson Police Department, if you had trouble, don't call 911?

Michael Miksch - March 4, 2025                         54

You never have a message like that, right?

MR. LOUISON:  Objection to the form of the question.

A.  (Shakes head.)

Q.  Partly because 911 serves a vital function. We have 911 all across the United States, right?

It's sort of, like, a key lifeline, I imagine, right?

So -- and Hanson is set up so if a resident calls 911, I am sure that call goes -- 911, someone staffs the 911 line 24/7, and it's sort of -- what is the system so 911 calls can be answered?

A.  All of our 911 calls go to a dispatch in Duxbury.

Q.  So it's --

A.  Then it is given out over the radio.

Q.  So we not cannot overstate that 911 is a valuable tool in the fight against crime and keeping citizens safe, right?

A.  Yes.

Q.  It's an institution.  It's very important that

it functions the way it is intended, right?

Also, we know demographically, we know that Hanson is getting more diverse, right? It's getting more diverse gradually. I think the black population and other racial groups, percentage by percentage, it's getting a little higher, right? The higher prices in Boston are driving people out.

As the chief, do you feel like -- or do you take any precautions or do any trainings to prepare your officers to deal with policing a more diverse population in Hanson?

A. I will go back to my earlier answers. Everybody is to be treated the same.

As far as any type of training for bias, like I said, we do the state mandate --

Q. Right, you have --

A. We do the state-mandated training on bias. Everybody is to be treated equally.

Q. As chief, as it becomes more diverse, are you on the lookout for the potential of more racial incidents as the population becomes more diverse? Are you concerned about that? Not so much?

A.    Not really.

Q.    Okay.

A.    I don't really have an issue.

Q.    I am not trying to create an issue.  I just have to ask my questions.

Also, is the Hanson Police Department itself very diverse?

MR. LOUISON:  Objection to the form of the question.  If you are asking him what the makeup is --

A.    I don't ask anybody what their -- I don't ask anybody their race.

Q.    I understand.  Are there any black Hanson police officers?

A.    I don't believe so.

Q.    That you know of?

A.    Currently?

Q.    Yes.  No.  Okay.

And what is the size of the department?

A.    There's twenty-five of us.

Q.    Also, did you -- Detective O'Brien mentioned that he was familiar with David Leighton from having policed him over the years?

A.    Yeah, David or the dad, I forget which.

Q.   And you had a similar sort of experience with him being on the police radar, David Leighton?

A.   No.  Not really, no.

Q.   Not so much?

A.   Since I have been there, not really.

Q.   Because David -- he has been -- Detective O'Brien goes back twenty years or longer.

A.   Yeah, I haven't -- I have only been there, like, thirteen, I think.

Q.   Internally, in terms of the department, is there sort of a demographics person, is there somebody who enters the data, keeps track of anything, or sends off -- complies with state mandates in terms of data collection?

A.   Yeah, each officer is responsible for their own reports.  So they'll fill out whatever data field is required for the type of incident or report.

     Then I do NIBRS every month, which goes to the state, and I do use of force once a month -- I think I am behind for the month of February -- to the FBI use of force database.

Q.   So you feel you are compliant --

A.   I am compliant with the requirements.

Q.   And were compliant with all the -- up to date
     with all the antibias training?

A.   Yes.

Q.   Okay.  Just to be sort of clear about this
     point with the whole self-defense issue, is
     there any special protocol around guns, in
     terms of people carrying -- when an assault
     with a dangerous weapon, when a firearm is
     involved?  Is there any protocol that differs
     in how knives are treated?

A.   A dangerous weapon is a dangerous weapon.

Q.   So if you flash a gun, you are getting
     arrested; same if you flash a knife?

          MR. LOUISON:  Objection to the form of
     the question.  You can try to answer that.

A.   Theoretically, yes.  A dangerous weapon is a
     dangerous weapon.

Q.   So your understanding of it is whoever reveals
     a dangerous weapon becomes liable for assault
     with a dangerous weapon?

A.   As I mentioned earlier, it's a case-by-case
     basis.

Q.   Okay.  So we agree that in the Williams case,
     it's a factor of analysis, right?  It's

Michael Miksch - March 4, 2025                          59

totality of the circumstances that create whether there is probable cause and whether -- around the use of the weapon.  It's an analysis.  There's no bright line rule.  I guess that is what I am trying to get at.  There's no bright line rule where you can just make the call, just determine in the abstract?

I have asked you a few questions around the weapon, and you say it's not that simple; there is no bright line -- it's dependent on the facts involved, right?

A.   Case by case.

Q.   Yeah, it's case by case.  So it sort of -- we have gone over all the different facts in the Williams case pretty thoroughly, to exhaustion, and even in that case, we can say there's no bright line rule, the arrest comes out of an analysis of all the factors, it's an analysis, right?  It's not the application of one bright line rule, that is just, like, that is it, right?  Would you say that is accurate?

MR. LOUISON:  Objection to the form of the question.

Q.   Is the dangerous weapon arrest a bright line

rule, or is it a more nuanced analysis?

MR. LOUISON:  I object to the --

Q.  Is there a bright line rule around when use of a weapon is dangerous?

MR. LOUISON:  Do you understand what the term "bright line" is in this context?

A.  I believe it means, like, you have to or you don't have to.  Am I misunderstanding?

Q.  Yes, that is --

A.  The only law in Massachusetts I am aware of that I have to arrest for is a violation of a restraining order.  There's no other bright line rules that I am familiar with.

Q.  So just to wrap this up, the night of the Williams incident, his arrest, your officers both used their discretion, as well as their analysis to arrive at the probable cause determination?

A.  Yes.

Q.  And that is really the -- that analysis is the -- is the proper and required way to make the probable cause determination.  It's just the way it is.  Okay.

MR. BURLEY:  Yeah, I think I can end

there.

MR. LOUISON:  Okay.

(Deposition concluded at 3:13 p.m.)

C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS
COUNTY OF PLYMOUTH

I, Kristin M. Stedman, a Registered Professional Reporter and Notary Public duly commissioned in and for the Commonwealth of Massachusetts, do hereby certify that MICHAEL MIKSCH remotely appeared and proved to me through satisfactory evidence to be the Witness whose testimony is hereinbefore set forth.  He was duly sworn by me; his testimony thereupon given under his oath and his examination reduced to typewriting under my direction; and that the deposition is a true record of the testimony given by the Witness, to the best of my knowledge, skill and ability.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 20th day of March, 2025.

_Kristin M. Stedman_

KRISTIN M. STEDMAN, NOTARY PUBLIC
MY COMMISSION EXPIRES
AUGUST 2, 2030

The foregoing certification of this transcript does not apply to any reproduction of the same in any respect unless under the direct control and/or direction of the certifying reporter.

ERRATA SHEET

INSTRUCTIONS:  After reading the transcript of your deposition, note any change or correction to your testimony and the reason therefor on this sheet.  DO NOT make any marks or notations on the transcript volume itself.  Sign and date this errata sheet (before a Notary Public, if required).



Page Line  Change        Reason

I have read the foregoing transcript of my deposition and except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

_____

MICHAEL MIKSCH                      Date