# EXHIBIT 6

# In The Matter Of:

*Charles Williams, et als. v.*
*Town of Hanson, MA, et als.*

*Paul O'Brien*
*March 4, 2025*

*Beacon Court Reporting Services*
*100 Independence Drive, Suite 7*
*Hyannis, Massachusetts 02601*
*(774) 678-4255*
*www.beaconcourtreporting.com*



Original File 2025-0304_O'Brien.txt
**Min-U-Script®**

Paul O'Brien - March 4, 2025

```
            IN THE UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS

                              Case No.  1:24-CV-11161-IT

     ****************************
CHARLES WILLIAMS, VALENCIA    *
WILLIAMS, and their MINOR     *
CHILDREN,                     *
             Plaintiffs,      *
                              *
v.                            *
                              *
                              *
TOWN OF HANSON, MA.;          *
MICHAEL MIKSCH, in his        *
official and supervisory      *
capacities as the Chief of    *
the Hanson Police             *
Department; BRENT PETERSON,   *
individually and in his       *
official capacities as a      *
police officer for the        *
Hanson Police Department;     *
and PAUL O'BRIEN,             *
individually and in his       *
official capacities as a      *
police officer for the        *
Hanson Police Department,     *
             Defendants.      *
     ****************************
```

REMOTE DEPOSITION of PAUL O'BRIEN, taken pursuant to the applicable provisions of the Rules of Civil Procedure, appearing via Zoom Conferencing from Rockland, Massachusetts, before Kristin M. Stedman, Registered Professional Reporter, Certified Shorthand Reporter No. 1412, and a Notary Public in and for the Commonwealth of Massachusetts, reporting from Plymouth County, Massachusetts, on Tuesday, March 4, 2025, at 12:12 p.m.

BEACON COURT REPORTING SERVICES
100 Independence Drive, Suite 7
Hyannis, Massachusetts  02601
www.beaconcourtreporting.com

REMOTE APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:

EDWARD S. BURLEY, ESQ.
  Emancipated Law, P.C.
1 Beacon Street, 15th Floor
  Boston, MA  02108
(617) 637-6615
  ed@emancipatedlaw.com

  ON BEHALF OF THE DEFENDANTS:

  DOUGLAS I. LOUISON, ESQ.
MANUEL D. SOZA, ESQ.
  Louison, Costello, Condon & Pfaff, LLP
10 Post Office Square, Suite 1330
  Boston, MA  02109
(617) 439-0305
  dlouison@lccplaw.com
msoza@lccplaw.com

ON BEHALF OF BRENT PETERSON AND PAUL O'BRIEN:

LAUREN KOPEC, ESQ.
  Sandulli Grace, P.C.
44 School Street, Suite 1100
  Boston, MA  02108
(617) 523-2500
  lkopec@sandulligrace.com

  ALSO PRESENT:

  Allyson Christian

I N D E X

EXAMINATION BY MR. BURLEY...................Page 4

E X H I B I T S

No.                                           Page No.

None marked.

P R O C E E D I N G S

- - - - -

PAUL O'BRIEN,

having first been satisfactorily identified and

duly sworn by the Notary Public,

was examined and testified as follows:

- - - - -

MR. LOUISON:  Same stipulations as to
the inquiry and the reading and signing?

MR. BURLEY:  Yes, same rules.

EXAMINATION BY MR. BURLEY:

Q.  Nice to meet you.

A.  Nice to meet you, sir.

Q.  Can you state your date of birth?

A.  Yes.  6/2/69.  June 2, 1969.

Q.  So you are how old?

A.  Fifty-five; I will be fifty-six in June.

Q.  How long have you been a Hanson police
officer?

A.  Full-time, twenty-eight years.  All together,
I was part-time for maybe two years, but
full-time twenty-eight.

Q.  So that's a long time.

A.  Yes.

Q.   And you also live in Hanson?

A.   No, I live in Kingston, Mass., but I grew up
     in Hanson.

Q.   Do you know David Leighton at all?

A.   Yes, I do.

Q.   How do you know him?

A.   Had several interactions, encounters with him,
     calls for service, and he was a target of one
     of my drug cases I -- on a search warrant.

Q.   So have you been to Leon Court?

A.   Yes.

Q.   In conjunction with Dave Leighton?

A.   Yes.

Q.   And you know Dylan Leighton, his son?

A.   Yes.  I believe he was there the time that I
     did the search warrant.

Q.   And do you know him also to have had
     interactions with the police department in
     Hanson?

A.   Not that I recall.  I mean, with -- like,
     pertaining to, like, drug stuff, no.  The
     target was the father, but when we did do the
     search warrant, he was, you know, home.

Q.   Okay.  How was it that you came to Leon Court

the morning of January 20, 2022?

A.   I was dispatched there.  I was working a shift, and I was actually in the north sector at the time of the call when it came in.

Q.   And what did you know about the situation?

A.   From the dispatch call, it was some type of disturbance.

Q.   And what did you see when you arrived at Leon Court?

A.   When I pulled into Leon Court, I observed Officer Peterson and the male subject, like, near the -- in between the two houses.

Q.   Do you know now who the subject was?

A.   Yes.

Q.   Can you name him?

A.   Yes.  Dylan Leighton.

Q.   Can you describe Dylan Leighton physically; is he a small guy, a big guy?

A.   I would say medium build, to the best of my memory.  It was dark out at the time, too.

Q.   And so you saw that, and then what happened next?

A.   I got out of the car.  I approached Officer Peterson.  He gave me a brief -- information,

he was conducting a field investigation, and he explained to me why Leighton was in handcuffs at the time, for his safety.

Q. For Officer Peterson's safety?

A. Yes.

Q. And was it readily noticeable to you that Leighton was intoxicated?

A. Yes.

Q. Was he still, for lack of a better word, mouthing off --

A. No, he -- I should say more like excited, didn't understand why he was handcuffed, and where I had dealt with him before, or at the house, he was very polite to me, again, when we did the search warrant. I calmed him down, and then that was basically my interaction with Leighton.

Q. And from there, what did you do; what did you do next?

A. Halifax arrived on scene. That is when I took the handcuffs off him. He was calmed down. He wasn't excited anymore. He obviously could stand on his own two feet; he wasn't going to fall down. There was other people in the

area, and then officer Peterson approached me, probably in the area between the two houses.

Q.  And did you notice Charles Williams at that point?

A.  No, I didn't.

Q.  You didn't see him?

A.  No, I didn't.

Q.  Had you known Charles Williams before the call?

A.  No.

Q.  Not really?

A.  No, I don't -- I -- no.

Q.  What about Valencia Williams, the wife?

A.  No.

Q.  Did you know Valencia Williams?

A.  No.

Q.  It was the first time?

A.  Yes.

Q.  Did you know that the Williams lived at 115 Leon Court before that?

A.  No, I didn't have previous knowledge.

Q.  So what happened next?

A.  Officer Peterson conducted his interviews.

Q.  Yeah.

A.    Approached me --

Q.    Which interview -- can you be more specific; interview with whom?

A.    I believe it was Williams.  He walked away from me towards the house, and then when he came back, we met, like, halfway, and he told me -- gave me the quick information regarding the field investigation and what transpired.

Q.    And from that point, did you and Officer Peterson go closer to David and Dylan Leighton's house and talk more with Dylan and the three others and his father; is that what happened next?

A.    I don't know the exact timeline.  I actually talked to the father, I think near the end of the field investigation, just to let him know what happened, and that his son was intoxicated, he might want to keep an eye on him, and that was my interaction, and that was outside the door of Leighton's house.

Q.    Did David Leighton ask if you were planning on arresting his son?

A.    No.

Q.    He didn't ask you that?

A.    Not that I recall.

Q.    Do you remember, did David Leighton have anything to say about Charles or Valencia Williams, the neighbors?

A.    He might have made a comment that there was some ongoing issues, but he didn't get into it, and he kept a very -- he was just -- I just wanted to make sure, take care of his son.

Q.    He wanted to make sure that you take care of his son?

A.    No, I --

Q.    You wanted to?

A.    Yes.  I was letting him know that his son was intoxicated so he could take care of him.  Put him in the house.

Q.    Oh, that he should --

A.    Yes.

Q.    I see.  But Leighton didn't -- Dave Leighton didn't ask if you were planning on arresting him?

A.    I don't recall that, no.

Q.    Did he bargain for you not to arrest him?

A.    No.

Q.    And then at a certain point, did you learn anything from Dylan that made you move back towards the Williams' house?

At what point did you -- so there's that interaction, and then how long did you and Officer Peterson talk to Dylan Leighton and his three friends?

A.    I didn't conduct any of those interviews.

Q.    Were you present?

A.    Yes.

Q.    You were present?

A.    I think some of them were already conducted before I got there.

Q.    And what did you pick up from what you overheard?

A.    Basically, that they were coming home, and there was some type of confrontation, verbally, which led to the cars stopping, and an altercation occurred.

Q.    And in this situation -- you are a detective?

A.    Yes.

Q.    So you have a higher rank than Officer Peterson?

A.    Um, in our department, no, but I am a

specialized position.

Q.  What specialty?

A.  Detective unit.  Yeah, I still have the same -- I am badge 2, so we're considered, I should say equal, but I am assigned to the detective unit, and I have got a gold badge, so I guess it is -- if that is what you are getting at.

Q.  Very special.  What I really wanted to know --

        MR. LOUISON:  At least in his mind.

Q.  -- is how did you work together on the field investigation; how were you and Officer Peterson working in tandem?

A.  I controlled the person that he had in handcuffs.  I took care of that situation.  He proceeded to do another interview, or interviews, and then when Halifax got there, Officer Peterson was coming back, and that is when he gave me, you know, the facts of what transpired, what he obtained, and that is when we proceeded back towards the house, so we were pretty much, I would say, to the best of my memory, in the middle of both houses on the dirt road.  It's real tight down there.

Q.  Yeah.  I was there Friday.

A.    So it's really tight.

Q.    It really is.

A.    So it's hard when you say exact where I was, I was -- I can say I was -- I don't know what house I was closer to, but we were in between there.

Q.    Were you able to overhear what was being said in the Peterson interviews -- interviews Peterson was conducting?

A.    No.

Q.    So you could visually see, but you couldn't hear?

A.    Actually, to be honest with you, I didn't see him talking to Williams.

Q.    You were focused on Dylan?

A.    Yes.  And it was -- at that time, too, to the best of my memory, it was dark out.

Q.    It was also cold that night, wasn't it?

A.    Yes.

Q.    A cold winter night.  So was the next thing that happened that Peterson finished his interview and then approached you?

A.    Yes.

Q.    And what happened next?

A.    He informed me what he had obtained from the witnesses.  He had a knife that he obtained during his investigation, and then at that time, he told me he was going to place Williams under arrest.

Q.    So you --

A.    Excuse me, can I go back, sir?

Q.    Yes, sir.

A.    I was the officer in charge that night, so to answer your question prior, before, a couple of minutes ago, I was the officer in charge, and there was only three of us, and one was on the desk.

Q.    Okay.

A.    So I thought you meant as a detective and an officer, if I had more rank than him, but that night, I was the officer in charge, just to be clear.

Q.    Okay.  I just want to make sure we have the events in the right order.

A.    Okay.

Q.    Peterson said that you -- did you go with Peterson to the Williams' house to ask if Williams had a knife?

A.    No, not that I remember.

Q.    Do you -- and you -- Peterson summarized for you what he had learned about the incident?

A.    Yes, sir.

Q.    And one element, that there was an altercation --

A.    Yes.

Q.    -- between the parties?

      And Dylan and friends were saying there was a knife that was shown by Williams?

A.    Yes.

Q.    And then with that information, you did what? Where did you and Peterson go next?

A.    We walked to the Williams' residence.

Q.    And was Charles Williams outside?

A.    I believe he was inside at that time and --

Q.    Okay.

A.    -- officer Peterson approached the entrance door.

Q.    What happened then?

A.    He had a conversation with them.  Told them that he was being placed under arrest.

Q.    Who is them?

A.    Mrs. Williams and Mr. Williams.

Q.   Okay.

A.   And I believe I was positioned, I was at the
     bottom of the stairs.  You could see, too,
     there's not a big area, so there was some
     distance between us.

Q.   So you weren't both conducting the interview
     -- you weren't both asking questions?

A.   When we went back to the house?

Q.   Yeah.

A.   No.

Q.   So it was Peterson was the questioner, and you
     were support at that point?

A.   Yes.

Q.   And how long did he question the Williamses
     for?

A.   I don't think he questioned them long.  He
     told them he was placing him under arrest.

Q.   It was quick?

A.   Yes.

Q.   And before that moment, had he talked with you
     about whether it was appropriate to arrest
     Williams?

A.   Well, he told me what he had --

Q.   Yeah.

A.   Yes.  Well, he told me what he had.  He had PC
to arrest for the assault with a dangerous
weapon.

Q.   And PC was primarily obtained from questioning
--

THE REPORTER:  I am sorry, I can't
hear.  I didn't hear that.

Q.   I said this is PC derived from the questioning
of Leighton and the three friends?

A.   And I believe -- and Williams.

Q.   The idea was that --

A.   When we -- yes -- I don't know -- no, I think
he might have went back and spoke --

MR. LOUISON:  I don't want to
interrupt, but the court reporter is having
trouble.  You have to -- it's not your fault.
You have to just wait --

THE WITNESS:  Okay.  No problem.

MR. LOUISON:  And that goes for you,
too, respectfully.

THE REPORTER:  Thank you.

MR. BURLEY:  Are you ready to go?

THE REPORTER:  Yes, please.

Q.   So based on -- you had a sense that he had

talked to Williams before you arrived?

A.   No, he might have talked to him while I was there.  I did not see it or hear it.

Q.   Okay.

A.   But when we spoke, his field investigation was completed --

Q.   Okay.

A.   -- with the information that he gave me.

Q.   And the gist of that field investigation was what?

        MR. LOUISON:  Objection to the --

Q.   Sort of the conclusion of the field investigation?

        MR. LOUISON:  I am going to object to the form of the question, but you can answer it if you understand what he means.

A.   Repeat that, sir.

Q.   What in the field investigation led you and Officer Peterson to decide to arrest Williams for assault with a dangerous weapon?

A.   The way he told me was there was witnesses, a knife was shown, it was also heard, so that was, obviously, enough that filled the elements for the arrest.

Q.   Are you aware that -- were you aware that
     Williams had placed the 911 call?

A.   Yes.  I don't know when, though.  I don't know
     when I was aware of that, to be honest.  I
     don't remember.

Q.   You are not sure if -- to the best of your
     recollection, you may or may not have been
     aware of that during your investigation?

A.   Yes.  I did obtain that -- I don't know how or
     from who, I did obtain that, sometime in the
     timeline.

Q.   Would it be fair to say that you participated
     in the arrest of Williams without knowing that
     he had placed the 911 call?

A.   I can't answer that.  I don't -- again --

Q.   Yeah.

A.   I am being honest with you --

Q.   No, no --

A.   I don't remember when I obtained that
     information, but I did, yes.

          MR. LOUISON:  Just -- you are talking
     over each other, just so he finishes his
     answer.  Did you finish your answer?

          THE WITNESS:  Okay.

A.    Yeah, I don't remember when I obtained that he
was the caller.

      I just remember that I did -- at some
point, I had that information; I just don't
remember when I obtained it.

Q.    Do you feel that knowing that Williams had
placed the 911 call would influence the
analysis?

A.    No, I think the facts of their field
investigation were the main points.

Q.    So because Williams had placed -- or if you
knew Williams had placed the 911 call, would
you have felt the duty to question him about
what happened and why?

A.    No.  I was good with the information that
Officer Peterson provided me with.

Q.    Okay.  Would you say that Officer Peterson was
the one driving the decisions that night?

A.    I would say he did police work; he did his
job.

Q.    What I am trying to understand is would you
characterize it as a joint decision to move
forward with arresting Williams, or would you
characterize it as a Peterson decision,

primarily?

A.  Well, I would say it was his decision, but it's my job to make sure that the arrest was good, that everything -- that all the elements were there.

Q.  Okay.  And can you --

A.  And I agreed with the decision, yes.

Q.  And can you repeat again the elements that you saw present that justified the arrest?

A.  Yes, there was a victim, there was witnesses, and there was physical evidence.

Q.  Did you have any questions about the veracity of the quote-unquote "victim," and his associates?

A.  What do you --

Q.  Credibility, their credibility?

A.  No.  Well, I knew they were intoxicated, but they could be -- well, Leighton was, but the other -- I had a brief interaction with the other ones, and they -- I didn't -- their speech was fine.

Q.  And you weren't troubled by the fact that there were four of them and one of Williams, Mr. Williams?

A.    No.

Q.    You weren't troubled by how aggressive
      Leighton --

A.    What do you mean was I -- I am really kind of
      -- what do you mean by if I was -- how I was
      troubled?

Q.    When you are making --

A.    When you say troubled, that is the word that I
      am kind of stuck on --

            MR. LOUISON:  You've got to --

            (Reporter asks for clarification.)

Q.    In conducting your -- or upholding the
      totality of the circumstances analysis, the
      factor of Leighton being drunk and
      belligerent, how did that influence your
      analysis?

A.    It didn't.  I mean, I was given, you know, the
      statements and the facts of what occurred.

Q.    So you felt like his intoxicatedness and his
      belligerence weren't --

A.    I didn't see the belligerence when I was
      there.  He was -- he had calmed down.  He
      wasn't excited when I got there, sir.

Q.    Okay.  But were you able to make the inference

that he was in cuffs for a reason?

A.    Yes.  And Officer Peterson explained why.

Q.    So he had been acting disorderly before your arrival, Leighton?

A.    Well, I think -- yes, and -- well, I shouldn't say disorderly, but Officer Peterson was controlling the scene.

Q.    Okay.  Okay.  So I want to just keep this chronological so we can try to be efficient.

So you say you're with Peterson at the Williams house, 115 Leon Court.  You are positioned more on the front porch and stairs?

A.    I was right below it, I believe.

Q.    Right.  And Peterson is couple of steps inside the door?

A.    Yes, sir.

Q.    Maybe, right?

A.    I don't know if he was in the door, but he was in that area, to the best of my memory, yes.

Q.    Can you tell us, to the best of your memory, exactly what happened there, while you were standing in that position; what did you see?

A.    He notified Williams -- Officer Peterson notified him that he was placing him under

arrest, and he explained why, and he effected the arrest at that time.

Q. And how did he effect the arrest; how did he do it?

A. He placed handcuffs on him.

Q. And then did Peterson or you bring him to the car?

A. Officer Peterson did.

Q. Do you remember if Williams had shoes on at this point or not?

A. I believe he did. I don't -- couldn't tell you what color they were or --

Q. What about pajamas or not pajamas?

A. He had some type of pants on. I couldn't tell you what exactly -- what it was.

Q. Do you remember, at this point, that as you -- so Peterson brought Williams to the car --

A. Yes.

Q. -- is that correct?

Were you driving that car or a different car?

A. No, I was driving a different one.

Q. Do you remember Valencia Williams coming out of the house at that point?

A.    Yes.

Q.    And what did you observe?

A.    I observed her to be pregnant, my first observations, and then I had a conversation with her, and I believe at that time, Officer Peterson walked back towards either my cruiser or towards Halifax police officers, away from the cruiser -- or the area where we were, and I had a brief conversation with her, and I told her I would -- she could call the front desk, and when I had information regarding bail or any other -- anything -- any information to help her out, and I offered, if she needed any help, because at some time during that encounter, I think I knew, or she mentioned that there was other children in the house.  So I even offered if she needed a ride or any type of assistance -- obviously, I saw -- you know, I wanted to try to help her out.

Q.    And how did the conversation end?

A.    It was cordial, and I let her speak to the defendant in the vehicle, her husband.

Q.    And did she bring him anything?

A.    I don't--

Q.    A pair of pants maybe?

A.    Maybe.  I don't recall that, but I opened the door and let her talk to him face to face.

Obviously, he was fine, but you could tell, obviously, he wasn't too happy being arrested, but she came over and got to speak with him one on one.

Q.    Were you aware that Mr. Williams was coming home from work when the incident happened?

A.    Yes.

Q.    And so you were aware of the fact -- and you are aware that Mr. Williams is black?

A.    Yes.

Q.    That is clear.  And Valencia Williams is black?

A.    Yes.

Q.    And Dylan Leighton is white?

A.    Yes, sir.

Q.    And I think the other three friends who were with him were also white?  I can go through the --

A.    I was just waiting for you to finish.  I was trying to follow the rules.  I don't want to get yelled at by Doug.

MR. LOUISON:  I wish more people said that in life, but that's fine.

A.  To answer your question, yes, they were white.

Q.  Our touchstone is totality of the circumstances, in terms of how we get to PC to make that determination --

MR. LOUISON:  I am going to object to the form of the question.  You can answer that --

MR. BURLEY:  Okay.

MR. LOUISON:  -- if you understand what totality --

Q.  What are the components when you do the probable cause analysis?

A.  I am the type of investigator, I like to get all the information, and then either help, or if I was the responding officer, make that, you know, clear decision, and as -- like, I have been a detective for over twelve years. I've been involved in some investigations, and I like to be thorough and try to get all the information before making a decision, whether it is -- I am making the decision or someone else is.

Q.   And what is your understanding of totality of the circumstances to test for finding probable cause?

A.   Based on the interviews, the statements, the victim, again, the evidence.  There was actually evidence at the scene that was confirmed, and I saw the evidence, so with all of those things, I would believe it was part of the circumstances and the facts of that investigation.

Q.   Was there one element that stood out to you that night, in terms of swinging the analysis to a finding of probable cause?

        Was there one factor out of all the factors you were --

        MR. LOUISON:  Objection to the form of the question, but you may answer it if you can.

        THE WITNESS:  Okay.

A.   Yeah, a knife was shown.

Q.   Right.  Did you give weight to the fact that Williams was one person and they were four; did that carry some weight?

A.   From what Officer Peterson told me, at that

time, no, it didn't really carry weight.  It seemed like he pulled it on them -- on Mr. Leighton.

Q.    That is from the quote-unquote "victim" version, according to their version?

A.    Yes, and the other witnesses.

Q.    Okay.  Did you give weight to the fact that Williams was black and the other gentlemen were all white?

Did that -- was that part of -- did that concern you at all?

A.    No.

Q.    You weren't worried about that.

What about the fact that some of the party of four seemed to be intoxicated; is that something you considered?

A.    I wasn't too -- like I said, I had brief interaction, but I wasn't concerned with that.  No one was, like, mumbling -- you know, falling down, or that I couldn't understand any of them, and then the other ones weren't acting out or causing any type of disturbance, at that time.

Q.    But even so, Leighton is sitting in handcuffs,

correct, because of --

A. When I first arrived, yes.

Q. But that is pretty significant, that someone has to be placed in handcuffs; isn't it?

A. Again, Officer Peterson told me when he got to the scene, he tried to speak with him.  He -- I believe, from the report, he turned around, kept on walking.  So again, at all types of scenes, control is very important for everybody's safety, and I think that is what Officer Peterson did.  So I wasn't too -- when I got there, I wasn't -- obviously, I had pulled up; I didn't know what transpired before I got there.

He explained to me that, at first, he was just trying to control the scene, and that is why he placed the handcuffs on Leighton.

Q. Okay.  And you said you were made aware of the fact that Williams had placed the 911 call, correct?

A. Yes.

Q. Okay.  So you were aware of that.

And that combination of the 911 call and knowing that Leighton had to be restrained

in handcuffs, is that part of your -- does that have any weight?

A.  No.

Q.  It didn't have any weight.  Can you explain why not?

MR. LOUISON:  Objection to the form. If you can answer it --

THE WITNESS:  Okay.

A.  I just -- I am an investigator that likes the facts.  I believe in the facts, and sometimes I just -- what Officer Peterson told me what transpired, those -- I didn't have concerns with those.

Q.  Okay.  And you weren't concerned that you -- you had had interactions with Dylan before, as a police officer, and that didn't raise questions about his trustworthiness?

A.  No, because, like I explained before, sir, he was just home.  He was no part of my -- he was not named in my affidavit or part of the investigation.  His father was the -- at that -- in the house, I believe -- I think there's another son or two.  He has -- Dave had a couple of sons, to the best of my memory, but

I believe there were some friends there when we did execute the search warrant.

So yes, he wasn't -- he complied to the officers when we entered the house.  We didn't have any issues with him on that night, and that had nothing to do with -- again, he wasn't the target of the investigation.  He ended up just being home hanging out with his buddies when we executed the court-authorized search warrant.

Q.   Okay.  And did you say that Dylan was a known town troublemaker that night?

MR. LOUISON:  Objection to the form of the question.  You may answer it if you can.

A.   Did I say that?

Q.   Yeah.

A.   I don't remember saying that.

Q.   Would you disagree with that statement?

A.   Um, we have had interactions.  I don't know if I would call him a troublemaker, but the agency has had past interactions with him, and I think some school issues, to the best of my memory.

Q.   Did you read the police report that was filed

in this case?

A.   Yes.

Q.   Did you help draft it?

A.   No.

Q.   And did it strike you as -- did anything stand out to you in the report?

A.   No, I thought he put down everything that -- he told me at the scene was consistent with what he put on -- in his report.

Q.   Did it surprise you at all there is no questioning or mention of Valencia Williams?

A.   I shouldn't -- when you say surprise, I don't know, I wasn't surprised.

Q.   I am asking because you emphasized how thorough you like to be?

A.   Yes, sir.

Q.   You like to get as much information as you can?

A.   Yes.

Q.   And if Valencia Williams was home that night, she had been talking with her husband as he pulled in, and it seems remarkable that she wasn't questioned or mentioned in the police report?

MR. LOUISON:  Objection.

Q.   So given your preference for being thorough, why wasn't Valencia questioned about what she saw?

A.   I would believe that Officer Peterson didn't have anything that she had any information. That is all I could -- I guess, can say.

Q.   As part of thoroughness, if a spouse is awake in that manner -- would you usually question a spouse, in this kind of situation, who is awake?

A.   It depends on the circumstances, and I didn't conduct the field -- I didn't conduct the interview, sir.

Q.   In reading -- and you read the police report made that night or the next day, the police report?

A.   I would say that night, but I think I worked until 8 in the morning, so sometime in that shift.

Q.   And it's clearly obvious that -- was it clear to you that Charles Williams did not think he should be arrested?

A.   Yeah, I mean, he was -- yeah, he wasn't -- he

was polite, calm at the booking, but obviously, a little -- you know, obviously aggravated, I should say, a little upset that he was placed under arrest, but there was no debate or interaction regarding that.

Q.   And as far as you know, why didn't he think he should be arrested?

A.   I didn't -- I don't -- I didn't -- I don't believe I asked that.

Q.   What I am trying to get at here is we have got a person called 911, right?

A.   Yes.

Q.   When someone calls 911, is there a presumption that that person is going to be spoken to first on the scene or during the investigation?

A.   Sometime during the investigation, whoever calls, yes.

Q.   There is some presumption, right?

A.   Yes.  And every circumstance is different, what order.

Q.   In this circumstance, how much weight did you feel like him having called 911 was worth?

A.   Again, based on the facts of the field

investigation, from the circumstances and the facts, I didn't think that had a lot to -- whether he called 911 or someone else, we still had the same information was gathered at the scene.

Q. And you were comfortable taking the word of Dylan and his friends over the word of Williams and his wife?

MR. LOUISON:  Objection.

Q. Or their version?

A. I guess why didn't you find Mr. Williams credible.

MR. LOUISON:  Objection.

Q. Did you find Mr. Williams credible that night, in terms of his -- you weren't doing the questioning, but what led you to believe the story coming from Dylan Leighton and the friends to be true?

A. Based on their accounts, and Mr. Williams' statement to Officer Peterson.

Q. Would it surprise you to hear that Williams disputes Officer Peterson's characterization of their conversation?

MR. LOUISON:  Objection.  You may

answer it if you can.

A.   I don't -- I would say, no, I am not -- kind of an odd question.

Q.   So you yourself did not ask Mr. Williams any questions?

A.   No, sir.  Maybe at the booking, to sign, like, the Miranda form, but during the active investigation, no.

Q.   And you didn't ask Valencia Williams any questions?

A.   No.

Q.   So you relied on Officer Peterson's information gathering?

A.   Yes.

Q.   And you felt comfortable with the scope of that as a basis for making the arrest?

A.   Yes.

Q.   And looking back the next day, you didn't have any second thoughts about whether questioning Valencia Williams would have made a more complete investigation?

A.   No.

Q.   You didn't really think about it?

A.   No, I didn't think about it.

Q.  Now, I am just curious, you emphasized the need for thoroughness in the investigations, correct?

A.  Yes.

Q.  Wouldn't --

A.  But I would get back on that.  When I conduct the investigation, I like to be thorough.  I mean, I was assisting officer here, so I know you keep on bringing that up now --

Q.  Yeah, I am just trying to --

A.  And if I was assigned to do a follow-up on it, I would have.  I wasn't.  It was -- you know.

Q.  Also, it's quite -- do you remember what Mr. Williams was charged with?

A.  Yes.

Q.  Can you state it, please?

A.  Yes.  Assault with a dangerous weapon.

Q.  And what are the punishments for that, consequences?

A.  Two and a half years house of correction, up to five, and it's a felony.  Five in state prison.

Q.  So potentially, severe consequences, correct?

A.  Yes.

Q.   So when you make assault with a dangerous
weapon arrests, do you do so according to a
specific formula?

Do you have your own personal method
for applying the test that you use?

MR. LOUISON:  Objection to the form of
the question.  You can try to answer that, if
you understand it.

A.   Yeah, like, I usually -- again, right, I get
all the facts, information, observations,
evidence, and make a decision.

Q.   And did it occur to you, in this case, that
Leighton and his friends could be lying?

A.   People lie to the police -- people could lie
to us on any occasion.  If you want to make
that statement.

Q.   Did it also occur to you that they could be
embellishing?

A.   You want to know did I think they may have
lied?

Q.   Yeah.

A.   No, I don't.

Q.   And that was just because you know them to be
trustworthy, or what is that based on?

A.   No, I believe just at the scene, what I observed, and what Officer Peterson told me from the interviews, I believe they were being honest and truthful.

Q.   And it seemed like Williams wasn't being truthful when he said he just signaled that he had a knife?

A.   Could you ask that question again?

No, I am -- I never said that he wasn't being truthful, Mr. Williams.  Is that what you are asking?

Q.   Yes.

A.   I didn't know that part, what you just asked.

Q.   As a police officer, you frequently have situations where you hear two versions of the same --

A.   Oh, absolutely.  Yes, sir.

Q.   And I imagine part of your job is to try to discern which to credit -- which version to credit, right?

A.   Yes.

Q.   And part of the way you can do that is through the physical evidence, I imagine?

A.   Yes.

Q.    And then part of it is -- the way you do it, I
      imagine, is by the statements people make when
      questioned?

A.    Yes.

Q.    And part of that is what they say, I imagine,
      and part of it is also whether you believe
      what they say?

A.    Yeah, at times, yes.

Q.    What I would like to know is how is it that
      the questions -- the answers you are getting
      from Dylan and friends seemed to be --
      crediting their answer as trustworthy; would
      that be accurate?

A.    Yes, I -- yes.  I can't decide whether someone
      is being a hundred percent truthful or not.  I
      mean, I have been doing this job a long time
      and I don't know if I can, you know, make a
      statement that I can say that they were
      totally -- no one here knows that, right?  I
      mean, I don't know how --

Q.    Again, the answers that Williams would give
      would not be credited as trustworthy?

            MR. LOUISON:  Objection.

Q.    Did you believe the answers that Williams gave

-- or that -- was there -- did you feel like Williams was credible?

A.  Yes.

Q.  He was credible?

A.  From what I was given, yes.

Q.  And so you felt that his assertion of self-defense, that seemed credible to you?

MR. LOUISON:  Objection to the form of the question, if he made that assumption.

A.  Yeah, I don't recall any -- or even if you want to look at the report, I don't recall what he was saying what his self-defense was.

Q.  Would you agree with the statement that if you don't -- that one way -- would you agree with the statement that questions you to ask, dictate what information you would uncover, in a field investigation?

MR. LOUISON:  Objection.

Q.  Would you agree that by not asking questions, an officer can intentionally limit the information gathered?

MR. LOUISON:  Objection to the form of the question.

You may answer it if you understand the

theoretical question.

A.   Can you repeat that again?

Q.   Did you -- that night, did you intentionally limit the questioning of Mr. Williams?

A.   No.

Q.   Did you intentionally limit the questioning of Valencia Williams?

A.   No.

Q.   And you knew -- you're comfortable with the extent of the questioning of Valencia and Charles Williams the night of the incident?

A.   The questioning of Mr. Williams.

Q.   Mr. Williams?

A.   Yes.

Q.   I am just -- can you tell us internally, in the Hanson Police Department, because you were the detective that night, do you have to sign off on anything; is there anything formal where you are approving the report or the arrest or anything like that?

A.   No, I just have to make sure that the report was completed.  I didn't have to sign off on anything.

Q.   Okay.  But by sort of -- by not raising any

questions, does that mean to ratify the work of Peterson?

MR. LOUISON:  Objection to the form of the question.

Q.   I am just trying to understand sort of how it works with the Hanson Police.

As the ranking officer that night, what are your responsibilities around -- regarding Peterson's work?

A.   Obviously, first and foremost is answering your calls, right?

Q.   Answering phone calls?

A.   Making sure the person under me, that officers are answering their calls.  Most important thing in the job description, as a supervisor, the calls have to be answered, done in a timely fashion, and reports completed.

Q.   Okay.

A.   Before -- usually before the end of shift.  We have had, obviously, incidents on shifts where just everything goes -- you know, we got numerous calls.  Again, there was two of us on the road, assigned on the road that night, but for the most part, the OIC or the shift

supervisor makes sure that the paperwork is completed by the end of the shift.  Unless, again -- you know, the old word, the shit hits the fan.  Sorry.

Q.  Do you remember talking with Chief Miksch about this particular arrest of Williams?

A.  Just --

MR. LOUISON:  To the extent your answer would involve conversations arising out of the litigation, this suit, don't get into that.

THE WITNESS:  Okay.

A.  Yeah, I don't recall any conversations with him directly after the arrest.

Q.  Or maybe I can say it a little more cleanly.

In the week after the incident, did you talk to Chief Miksch about the Williams arrest?

A.  I don't remember whether I did or I didn't a week after.

Q.  Were the elements of the arrest unique enough to be a reason for conversation at the police house?

A.  No.

Q.  And generally, did people talk about the

arrests made, the cases made, say here's what happened last night?

A.   Yes, that happens on occasion, yes.

Q.   And so when the subject turned to the Williams arrest, was there some uneasiness about what happened?

A.   Not that I know of.

Q.   And you personally said that you didn't have any uneasiness around the thoroughness of the investigation and the results?

A.   Yes.

Q.   When the charges were -- were you aware that the charges were eventually dismissed?

A.   Yes.

Q.   And do you have any reactions to the fact that they were dismissed?

A.   No.  Again, I have been on this job a long time, and some cases get disposed of, dismissed.

Q.   Right.

A.   I have always worked under the thing that I try to, you know what I mean, as a police officer, not worry about the court part of it, make sure that what I was taught, after the

police academy, even guys on the -- you know, more veteran guys, just make sure -- like, you can't worry about the court part of it.  Make sure that you're on firm ground on the street, and make good decisions.

Q.  And the night --

A.  So the dispositions don't really -- I wasn't -- either way, I didn't have any issues with it.

Q.  The night of the incident, was it your understanding that Williams was a family man, a Hanson homeowner?

A.  Yeah, I knew that during being booked, or from there, that they were newly to the neighborhood, and that he had a family, obviously, a baby -- very apparent, a baby on the way, and that he had a good -- a decent job with the T.  That is what I did know.

Q.  Given the consequences of being arrested for assault with a dangerous weapon, given the consequences of that, as you said, you would want to make sure you talk to everyone, you want to be sure, I imagine, right?

A.  Yes.

Q.    And so given the consequences, you didn't think it would be merited to ensure that Valencia was asked for information?

        MR. LOUISON:  Objection.

A.    No, I felt -- reading the report and what he told me, I felt comfortable with the investigation.

Q.    And the --

A.    Could I add something, sir?

Q.    Yeah.

A.    In working with Officer Peterson in the past, if she did make a statement or she did see something, I would think that he would -- he is the type of officer that would document it.

Q.    And the night of the incident, do you feel like your manner and affect in dealing with the Williamses was -- would you characterize it --

        THE REPORTER:  I am sorry, would you characterize it as how?

A.    I would say professional, and you know, I am a family man, I have twins, a wife.  Yes, I would say I was professional and polite.

Q.    And from what you observed, was Officer

Peterson likewise professional?

A.   Yes.

Q.   And you yourself felt like you were evenhanded in dealing with the Williamses as well as dealing with Leighton; you felt like you treated both parties --

A.   Yes, I made sure he was okay -- sorry.

Q.   Go ahead.

A.   I offered Mrs. Williams any assistance, and I made sure that Dylan got into his residence, and that his father knew that he had been drinking, and I wanted to make sure that he was safe, that nothing else could happen that night.  You know, walking out to the woods, whatever.  They live in a crazy little -- there's a lot of wetlands around there, so I did try to make sure that -- I made sure -- I kind of like -- I like to treat people the way I would want my family to be treated, so that is just something that I try to do.

Q.   And if the races of the parties were reversed, do you feel the outcome would have been the same?

A.   Yes.  It doesn't -- that doesn't -- I don't

think that matters in this case.  That had no
--

Q.   It had no -- you felt like it doesn't matter
because -- can you expand on that?

A.   If it was the other way around that, you know
-- no, I didn't think -- race wasn't a factor
in this.

Q.   So you don't feel like if a person in
Williams' position had been a white Hanson
homeowner, and the four men in Dylan and
friends' position had been black men, do you
feel like the analysis would have played out
the same in terms of the arrest?

A.   Yes, the white, male homeowner would have went
to jail.

Q.   And that is because once the weapon is
introduced, in your view, you are saying that
there's no discretion; you don't have
discretion?

         MR. LOUISON:  Objection.  That's not
what he is saying.

A.   I never said that.

         MR. LOUISON:  Objection to the form.
If you can answer it, you may.

A.    Again, sir, thank you for being polite to me, but again, it wasn't just on the evidence.  It was based on everything that Officer Peterson presented to me.  Witness, victim, the statements, and then the evidence, all of that together.  I just didn't base it on the evidence, if that was your question, sir.

Q.    The reason I am pressing you is because my clients have a very different recollection of the statements, so I am trying to nail down what you are telling me.

        MR. LOUISON:  Objection.  And for the record, you don't have to explain why you are asking the questions.  I am just objecting to the form of the question.

        MR. BURLEY:  I know, but I want to be clear I am not just -- sort of the motivation here.

        Let me take a break, and I will see if I come back with any more questions.

        MR. LOUISON:  Very good.

        (Short break taken.)

Q.    The night of the incident, did you and Officer Peterson arrest Mr. Williams knowing that he

was, in fact, innocent?

MR. LOUISON:  You can answer that.

A.   No, I am not going to --

Q.   So the night of the incident --

A.   Can you just be a -- explain that a little more?  I am a little confused.

MR. LOUISON:  You don't have to explain.  Did you arrest him knowing he was innocent; that's a yes or no answer.

A.   No, I didn't.

Q.   The night of the incident, did you and Officer Peterson decide to shield Dylan Leighton from any legal consequences?

A.   To shield, no.

Q.   Did you conspire with Dylan Leighton to incriminate Mr. Williams for the charges --

A.   No.

Q.   Did you, the night of the incident, purposely avoid questioning Valencia Williams?

A.   No.

Q.   The night of the incident, did you -- or after the incident, did you play a role in potentially omitting Valencia Williams from the police report, omitting her name from the

police report?

A.   No.

MR. BURLEY:  That's my questions.

MR. LOUISON:  Okay.  I have nothing for the defendant witness at this time.  Thank you.

Similarly, Madam Court Reporter, you will send me the transcript and the Min-U-Script, and I will have the witness read and sign it.

THE REPORTER:  Yes.  Thank you.

(Deposition concluded at 1:14 p.m.)

C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS
COUNTY OF PLYMOUTH

I, Kristin M. Stedman, a Registered Professional Reporter and Notary Public duly commissioned in and for the Commonwealth of Massachusetts, do hereby certify that PAUL O'BRIEN remotely appeared and proved to me through satisfactory evidence to be the Witness whose testimony is hereinbefore set forth.  He was duly sworn by me; his testimony thereupon given under his oath and his examination reduced to typewriting under my direction; and that the deposition is a true record of the testimony given by the Witness, to the best of my knowledge, skill and ability.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 20th day of March, 2025.

*Kristin M. Stedman*

KRISTIN M. STEDMAN, NOTARY PUBLIC
MY COMMISSION EXPIRES
AUGUST 2, 2030

The foregoing certification of this transcript does not apply to any reproduction of the same in any respect unless under the direct control and/or direction of the certifying reporter.

```
                    ERRATA SHEET

     INSTRUCTIONS:  After reading the
  transcript of your deposition, note any change
or correction to your testimony and the reason
  therefor on this sheet.  DO NOT make any marks
or notations on the transcript volume itself.
  Sign and date this errata sheet (before a
Notary Public, if required).


  Page Line  Change        Reason
```



```
     I have read the foregoing transcript of
  my deposition and except for any corrections or
changes noted above, I hereby subscribe to the
  transcript as an accurate record of the
statements made by me.


_____
  PAUL O'BRIEN                        Date
```

BEACON COURT REPORTING SERVICES
(774) 678-4255